**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No.: _____

GOVERNMENT EMPLOYEES INSURANCE
CO., GEICO INDEMNITY CO., GEICO
GENERAL INSURANCE COMPANY and
GEICO CASUALTY CO.,

      Plaintiffs,

vs.

LUIS LOPEZ MAS, M.D., BARACUSA
HEALTH CARE CORP, BELKYS
CORRALES, ANGELA G. FERRER
ROMERO, DAVILA MEDICAL CENTER,
INC., JOSE DAVILA, DAIMY N. DIAZ,
MARIA VITAL, AILEM PAJON, E-Z
MEDICAL CENTER INC., LEONEL DIAZ-
PAIROL a/k/a LEONEL DIAZ, RAFAEL
NORBERTO HERNANDEZ, MAYTE
FERNANDEZ, YANLICETH RODRIGUEZ,
WESTCHESTER MEDICAL CENTER CORP,
and YOANDRY ESPINOSA MORALES,

      Defendants.

_____/

**Jury Trial Demand**

## <u>COMPLAINT</u>

Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO

General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"),

sue Defendants and allege as follows:

1.     This action seeks to recover more than $1,275,000.00 that Defendants wrongfully

obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-

fault ("no-fault", "personal injury protection", or "PIP") insurance charges through Defendants

Baracusa Health Care Corp ("Baracusa Health"), Davila Medical Center, Inc. ("Davila

Medical"), E-Z Medical Center Inc. ("E-Z Medical"), and Westchester Medical Center Corp ("Westchester Medical"), relating to medically unnecessary, illusory, unlawful, and otherwise unreimbursable health care services, including putative initial examinations, follow up examinations, and physical therapy services (collectively the "Fraudulent Services"), that purportedly were provided to Florida automobile accident victims ("Insureds") who were eligible for coverage under GEICO no-fault insurance policies.

2.      In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of pending, fraudulent no-fault insurance claims that Defendants have submitted or caused to be submitted through Baracusa Health, Davila Medical, E-Z Medical and Westchester Medical, because:

(i)      at all relevant times, Baracusa Health, Davila Medical, E-Z Medical and Westchester Medical operated in violation of the licensing and operating requirements set forth in the Florida Health Care Clinic Act, Fla. Stat. § 400.990 et seq. (the "Clinic Act"), rendering them ineligible to collect no-fault insurance benefits in the first instance, and rendering their no-fault insurance charges noncompensable and unenforceable;

(ii)     the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)    in many cases, the Fraudulent Services were not reimbursable as a matter of Florida law, because they were performed – to the extent that they were performed at all – by unsupervised massage therapists, and Florida law prohibits no-fault insurance reimbursement for massage or for services provided by unsupervised massage therapists;

(iv)     in many cases, the Fraudulent Services were not reimbursable as a matter of Florida law, because they were performed – to the extent that they were performed at all – by individuals who lacked the requisite licenses necessary to perform the services without supervision;

(v)      in many cases, the Fraudulent Services never were provided in the first instance; and

2

(vi) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO.

3. Defendants fall into the following categories:

(i) Defendants Baracusa Health, Davila Medical, E-Z Medical, and Westchester Medical (collectively, the "Clinic Defendants"), through which the Fraudulent Services purportedly were provided and were billed to insurance companies, including GEICO, falsely purported to be properly-licensed health care clinics that operated in compliance with the licensing and operating requirements set forth in the Clinic Act.

(ii) Defendants Belkys Corrales ("Corrales"), Jose Davila ("Davila"), Leonel Diaz-Pairol a/k/a Leonel Diaz ("Diaz-Pairol"), and Yoandry Espinosa Morales ("Morales") purported to own and control, respectively, Baracusa Health, Davila Medical, E-Z Medical, and Westchester Medical. Morales also is licensed as a massage therapist in Florida, and purported to perform many of the Fraudulent Services on behalf of Westchester Medical.

(iii) Defendant Luis Lopez Mas, M.D. ("Mas") is a physician licensed to practice medicine in Florida, falsely purported to serve as the medical director of the Clinic Defendants, and purported to perform or directly supervise many of the Fraudulent Services on behalf of the Clinic Defendants.

(iv) Defendant Rafael Norberto Hernandez ("R. Hernandez") is licensed as a physician assistant in Florida, and purported to perform many of the Fraudulent Services on behalf of E-Z Medical.

(v) Defendant Mayte Fernandez ("Fernandez") is licensed as a physical therapist assistant in Florida, and purported to perform many of the Fraudulent Services on behalf of E-Z Medical.

(vi) Defendant Yanliceth Rodriguez ("Y. Rodriguez") is licensed as a physical therapist assistant in Florida, and purported to perform many of the Fraudulent Services on behalf of E-Z Medical.

(vii) Defendant Daimy N. Diaz ("D. Diaz") is licensed as a massage therapist in Florida, and purported to perform many of the Fraudulent Services on behalf of Davila Medical.

(viii) Defendant Maria C. Vital ("Vital") is licensed as a massage therapist in Florida, and purported to perform many of the Fraudulent Services on behalf of Davila Medical.

(ix)     Defendant Ailem Pajon ("Pajon") is licensed as a massage therapist in Florida, and purported to perform many of the Fraudulent Services on behalf of Davila Medical.

(x)      Defendant Angela G. Ferrer Romero ("Romero") is licensed as a massage therapist in Florida, and purported to perform many of the Fraudulent Services on behalf of Baracusa Health.

4.       As set forth below, Defendants at all relevant times have known that:

(i)      the Clinic Defendants operated in violation of the licensing and operating requirements set forth in the Florida Health Care Clinic Act, Fla. Stat. § 400.990 et seq. (the "Clinic Act"), rendering them ineligible to collect no-fault insurance benefits in the first instance, and rendering their no-fault insurance charges noncompensable and unenforceable;

(ii)     the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)    in many cases, the Fraudulent Services were not reimbursable as a matter of Florida law, because they were performed – to the extent that they were performed at all – by unsupervised massage therapists, and Florida law prohibits no-fault insurance reimbursement for massage or for services provided by unsupervised massage therapists;

(iv)     in many cases, the Fraudulent Services were not reimbursable as a matter of Florida law, because they were performed – to the extent that they were performed at all – by individuals who lacked the requisite licenses necessary to perform the services without supervision;

(v)      in many cases, the Fraudulent Services never were provided in the first instance; and

(vi)     the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO.

5.       As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed through the Clinic Defendants to GEICO.

6.     The charts annexed hereto as Exhibits "1" – "4" set forth large and representative samples of the fraudulent claims that have been identified to date that Defendants have submitted, or caused to be submitted, to GEICO.

7.     Defendants' interrelated fraudulent schemes began no later than 2014 and have continued uninterrupted since that time.  As a result of Defendants' fraudulent schemes, GEICO has incurred damages of more than $1,275,000.00.

8.     Defendants' interrelated fraudulent schemes are the latest in a long line of insurance fraud scams aimed at Florida consumers and insurers.  They are part of an insurance fraud epidemic that – in 2014-2015 alone – led to almost 1,200 convictions in Florida.  See Florida Department of Financial Services, Division of Insurance Fraud Annual Report for Fiscal Year 2014-2015.

## THE PARTIES

### I.     Plaintiffs

9.     Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively, "GEICO") are Maryland corporations with their principal places of business in Chevy Chase, Maryland.  GEICO is authorized to conduct business and to issue automobile insurance policies in Florida.

### II.     Defendants

10.     Defendant Baracusa Health is a Florida corporation with its principal place of business in Miami, Florida.  At all relevant times, Baracusa Health falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act.  Baracusa Health was incorporated in Florida on or about October 30, 2015, had Corrales as its purported president and owner, falsely purported to have Mas as its

medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

11.     Defendant Corrales resides in and is a citizen of Florida. Corrales purported to be the president and owner of Baracusa Health, and used Baracusa Health as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers. Corrales is not and never has been licensed as a physician.

12.     Defendant Romero resides in and is a citizen of Florida. Romero was licensed to practice massage therapy in Florida on October 18, 2005, and purported to perform many of the Fraudulent Services on behalf of Baracusa Health.

13.     Defendant Davila Medical is a Florida corporation with its principal place of business in Miami, Florida. At all relevant times, Davila Medical falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act. Davila Medical was incorporated in Florida on or about April 20, 2010, had Davila as its purported president and owner, falsely purported to have Mas as its medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

14.     Defendant Davila resides in and is a citizen of Florida.  Davila purported to be the president and owner of Davila Medical, and used Davila Medical as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.  Davila is not and never has been licensed as a physician.

15.     Defendant D. Diaz resides in and is a citizen of Florida. D. Diaz was licensed to practice massage therapy in Florida on November 1, 2011, and purported to perform many of the Fraudulent Services on behalf of Davila Medical.

6

16.     Defendant Vital resides in and is a citizen of Florida. Vital was licensed to practice massage therapy in Florida on May 15, 2006, and purported to perform many of the Fraudulent Services on behalf of Davila Medical.

17.     Defendant Pajon resides in and is a citizen of Florida. Pajon was licensed to practice massage therapy in Florida on July 28, 2014, and purported to perform many of the Fraudulent Services on behalf of Davila Medical.

18.     Defendant E-Z Medical is a Florida corporation with its principal place of business in Miami, Florida.  At all relevant times, E-Z Medical falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing and operating requirements set forth in the Clinic Act.  E-Z Medical was incorporated in Florida on or about July 29, 2003, had Diaz-Pairol as its purported president and owner, falsely purported to have Mas as its medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

19.     Defendant Diaz-Pairol resides in and is a citizen of Florida. Diaz-Pairol purported to be the president and owner of E-Z Medical, and used E-Z Medical as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.  Diaz-Pairol is not and never has been licensed as a physician.

20.     Defendant R. Hernandez resides in and is a citizen of Florida. R. Hernandez was licensed as a physician assistant in Florida on January 31, 2001, and purported to perform many of the Fraudulent Services on behalf of E-Z Medical.

21.     Defendant Y. Rodriguez resides in and is a citizen of Florida. Y. Rodriguez was licensed as a physical therapist assistant in Florida on July 15, 2014, and purported to perform many of the Fraudulent Services on behalf of E-Z Medical.

22.     Defendant Fernandez resides in and is a citizen of Florida. Fernandez was licensed as a physical therapist assistant in Florida on August 14, 2013, and purported to perform many of the Fraudulent Services on behalf of E-Z Medical.

23.     On or about February 27, 2018, Fernandez and Diaz-Pairol's son, who purportedly served as E-Z Medical's billing manager, were arrested together with others at E-Z Medical on charges that they made false insurance claims and engaged in an organized scheme to defraud insurers at E-Z Medical.

24.     Defendant Westchester Medical is a Florida corporation with its principal place of business in Miami, Florida.  At all relevant times, Westchester Medical falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing and operating requirements set forth in the Clinic Act.  Westchester Medical was incorporated in Florida on or about November 29, 2016, had Morales as its purported president and owner, falsely purported to have Mas as its medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

25.     Defendant Morales resides in and is a citizen of Florida. Morales purported to be the president and owner of Westchester Medical, and used Westchester Medical as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.  Morales is not and never has been licensed as a physician.

26.     Morales was licensed to practice massage therapy in Florida on November 4, 2011, and purported to perform many of the Fraudulent Services on behalf of Westchester Medical.

27.     Defendant Mas resides in and is a citizen of Florida. Mas was licensed to practice medicine in Florida on August 30, 2004, falsely purported to serve as medical director at

Baracusa Health, Davila Medical, E-Z Medical and Westchester Medical, and purported to perform many of the Fraudulent Services on behalf of Baracusa Health, Davila Medical, E-Z Medical, and Westchester Medical.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

29.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") ACT).

30.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

31.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Southern District of Florida is the District where one or more of Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

### I.      An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement

### A.      The Florida No-Fault Law

32.     Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries.  The statutory system is embodied within the Florida Motor Vehicle No-Fault Law (the "No-Fault Law", Fla. Stat. §§ 627.730-627.7405), which requires automobile insurers to provide Personal Injury Protection benefits ("PIP Benefits") to Insureds.

33.     Under the No Fault Law, an Insured can assign his or her right to PIP Benefits to health care services providers in exchange for those services. See Fla. Stat. § 627.736. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500 form"). See id.

**B.     No-Fault Reimbursement and Compliance with Florida Law Governing Healthcare Practice**

34.     In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

35.     Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

36.     Thus, health care services providers, including clinics licensed under the Clinic Act, may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment. See, e.g., State Farm Mut. Auto. Ins. Co. v. B&A Diagnostic, Inc., 145 F. Supp. 3d 1154, 1163 (S.D. Fla. 2015); State Farm Mut. Auto. Ins. Co. v. Med. Serv. Ctr. of Fla., 103 F. Supp. 3d 1343, 1355 (S.D. Fla. 2015).

37.     By extension, insurers such as GEICO are not required to make any payments of PIP Benefits for health care services that were not provided in substantial compliance with all

relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

**C.      No-Fault Reimbursement and the Clinic Act**

38.      Subject to certain limited exceptions that are not applicable in this case, the Clinic Act defines "clinic" to mean "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider." See Fla. Stat. § 400.9905.

39.      Pursuant to the Clinic Act, clinics operating in Florida must – among other things – "appoint a medical director or clinic director who shall agree in writing to accept legal responsibility for [certain enumerated] activities on behalf of the clinic." See Fla. Stat. § 400.9935(1).

40.      Among other things, a clinic medical director must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful. Upon discovery of an unlawful charge, the medical director or clinic director shall take immediate corrective action." See Fla. Stat. § 400.9935(1).

41.      In addition, a clinic medical director must "[e]nsure that all practitioners providing health care services or supplies to patients maintain a current active and unencumbered Florida license", and "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided." See Fla. Stat. § 400.9935(1).

42.      Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed, or that is otherwise operating in violation of this part, regardless of whether a service is rendered or

whether the charge or reimbursement claim is paid, is an unlawful charge and is noncompensable and unenforceable. A person who knowingly makes or causes to be made an unlawful charge commits theft within the meaning of, and punishable as provided in, [Fla. Stat. §] 812.014." See Fla. Stat. § 400.9935(3).

43.     Thus, pursuant to both the No-Fault Law and the Clinic Act, clinics that operate in violation of the Clinic Act's medical director or other operating requirements are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided. See, e.g., Allstate Ins. Co. v. Vizcay, 826 F.3d 1326, 1330-1331 (11th Cir. 2015); B&A Diagnostic, Inc., supra, 145 F. Supp. 3d at 1164-1165.

44.     By extension, insurers such as GEICO are not required to make any payments of PIP Benefits to clinics that operate in violation of the Clinic Act's medical director or other requirements, whether or not the underlying health care services were medically necessary or actually provided. See, e.g., Med. Serv. Ctr. of Fla., supra, 103 F. Supp. 3d at 1355 ("Florida law clearly states that [an insurer] can refuse payment for services unlawfully rendered. Fla. Stat. § 627.736(5)(b)(1)(b). As a result of Defendants' conduct, Plaintiffs paid claims which it was statutorily entitled to deny. Accordingly, it would be inequitable to allow Defendants to retain those benefits, regardless of whether those services were medically necessary."); State Farm Fire & Cas. Co. v. Silver Star Health & Rehab, Inc., 2011 U.S. Dist. LEXIS 145629 at * 16 - * 17 (M.D. Fla. Dec. 19, 2011)(same).

D.     **No-Fault Reimbursement and Medical Necessity**

45.     Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for medically necessary services. See Fla. Stat. § 627.736. Concomitantly, a health

care services provider, including a clinic organized under the Clinic Act, is only eligible to receive PIP Benefits for medically necessary services. Id.

46.     Pursuant to the No-Fault Law, "medically necessary" means:

a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

(a) In accordance with generally accepted standards of medical practice;

(b) Clinically appropriate in terms of type, frequency, extent, site, and duration; and

(c) Not primarily for the convenience of the patient, physician, or other health care provider.

See Fla. Stat. § 627.732.

**E.     No-Fault Reimbursement, Massage Therapy, and Massage Therapists**

47.     Prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics organized under the Clinic Act, to collect PIP Benefits for massage therapy, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed" by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting. See 2012 Fla. ALS 197.

48.     However, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for services provided by massage therapists. See 2012 Fla. ALS 197; see also Fla. Stat. § 627.736(1)(a)(5)("Medical benefits [that are reimbursable under the No-Fault Law] do not include massage …, regardless of the person, entity, or licensee providing massage …, and a licensed massage therapist … may not be reimbursed for medical benefits under this section.").

49.     The No-Fault Law was amended to prohibit PIP reimbursement for massage or for services provided by massage therapists in response to widespread PIP fraud involving massage services and massage therapists. <u>See</u>, <u>e.g.</u>, Florida House of Representatives Staff Analysis for House Bill 119 (amending the No-Fault Law), noting that "PIP fraud remains rampant", and citing dramatic increases in PIP claims for massage therapy as a significant part of the problem.

50.     Pursuant to Fla. Stat. § 486.028, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy.

**F.      No-Fault Billing and No-Fault Reimbursement**

51.     Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP Benefits:

(i)      For any service or treatment that was not lawful at the time rendered;

(ii)     For any service or treatment that is "upcoded", meaning that it is billed using a billing code that would result in payment greater in amount than would be paid using a billing code that accurately describes the services performed;

(iii)    To any person who knowingly submits a false or misleading statement relating to the claim or charges; or

(iv)     With respect to a bill or statement that does not substantially meet the billing requirements set forth in the No-Fault Law.

<u>See</u> Fla. Stat. § 627.736.

52.     The No-Fault Law's billing requirements provide – among other things – that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, as well as

the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes. <u>See</u> Fla. Stat. § 627.736.

## II.   <u>Defendants' Interrelated Fraudulent Schemes</u>

53.     Since at least 2013, and continuing through the present day, Defendants masterminded and implemented a series of interrelated fraudulent schemes in which they billed GEICO, or caused GEICO to be billed, more than $1,275,000.00 for medically unnecessary, illusory, and otherwise unreimbursable services.

## A.   **The Fraudulent Operation of the Clinic Defendants Without Legitimate Medical Directors**

## 1.   **The Fraudulent Operation of E-Z Medical Without a Legitimate Medical Director**

54.     In or about early 2014, Diaz-Pairol – who is not and never has been licensed as a physician – sought to use E-Z Medical as a vehicle to submit a large volume of fraudulent PIP billing to GEICO and other insurers.

55.     However, because E-Z Medical was subject to the Clinic Act, Diaz-Pairol could not lawfully operate E-Z Medical, or use E-Z Medical as a vehicle to submit PIP billing to GEICO and other insurers, unless Diaz-Pairol recruited and retained a licensed physician to serve as E-Z Medical's medical director. <u>See</u> Fla. Stat. §§ 400.9905, 440.9935.

56.     However, if Diaz-Pairol recruited and retained a legitimate physician to serve as a legitimate medical director at E-Z Medical, the physician actually would be obligated to fulfill the statutory requirements applicable to a clinic medical director. <u>See</u>, <u>e.g.</u>, Fla. Stat. § 400.9935(1). By extension, any such legitimate medical director would impede Diaz-Pairol's ability to use E-Z Medical as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other Florida automobile insurers.

57.     Accordingly, Diaz-Pairol required a pliable physician willing to falsely pose as the "medical director" at E-Z Medical, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director, and thereby would permit Diaz-Pairol to use E-Z Medical as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other insurers.

58.     Thereafter, in or about April 2014, Diaz-Pairol recruited and retained Mas, a licensed physician who was willing to falsely pose as the legitimate medical director of E-Z Medical.

59.     Upon information and belief, Mas was receptive to Diaz-Pairol's offer because his relatively advanced age, in addition to his lack of experience and credentials, made it difficult for him to obtain legitimate, sufficiently-remunerative employment as a physician.

60.     For instance, Mas was approximately 66 years old when he first began to falsely purport to serve as E-Z Medical's "medical director".

61.     Though Mas received his medical degree in Cuba in February 1973, Mas did not become licensed to practice unrestricted medicine in the United States until 2004, by which time he was already 56 years old.

62.     In addition, Mas never obtained any board certification in any medical specialty, which – together with his advanced age, delayed licensure, and lack of experience – limited his employment prospects as a legitimate physician.

63.     In order to circumvent Florida law and induce the Florida Agency for Health Care Administration to maintain E-Z Medical's licensure and to permit E-Z Medical to operate as a clinic, Diaz-Pairol and E-Z Medical entered into a secret scheme with Mas. In exchange for compensation from Diaz-Pairol and E-Z Medical, Mas agreed to falsely represent, to the Florida

Agency for Health Care Administration, to the Insureds who sought treatment at E-Z Medical, and to the insurers including GEICO that received PIP claims from E-Z Medical, that he was the true medical director at E-Z Medical, and that he truly fulfilled the statutory requirements applicable to clinic medical directors at E-Z Medical.

64.     However, Mas never genuinely served as medical director at E-Z Medical. Instead, from the beginning of his association with E-Z Medical as its phony "medical director", Mas ceded all day-to-day decision-making and oversight regarding health care services at E-Z Medical, and the resulting billing, to Diaz-Pairol.

65.     Mas never legitimately served as medical director at E-Z Medical, inasmuch as he never ensured that all health care practitioners at the clinic had active appropriate certification or licensure for the level of care being provided, never conducted systematic reviews of E-Z Medical's billings to ensure that the billings were not fraudulent or unlawful, and never even made any attempt to discover the unlawful charges submitted through E-Z Medical, much less take any immediate corrective action. See Fla. Stat. § 400.9935(1).

66.     Rather, true authority over the provision of health care services through E-Z Medical, and the resulting billing – including the authority that would, at a legitimate clinic, be vested in the medical director – was held at all times by Diaz-Pairol.

67.     In keeping with the fact that Mas never legitimately served as medical director at E-Z Medical, Mas simultaneously: (i) purported to serve as medical director at numerous other Florida clinics, including Baracusa Health, Davila Medical, Westchester Medical, and Golden Health Solutions Inc. ("Golden Health"); and (ii) purported to personally perform, or at least directly supervise, a massive number of individual health care services at numerous health care clinics and other medical practices throughout the Miami area.

68.     It is improbable – to the point of impossibility – that Mas could have simultaneously fulfilled these various roles while also fulfilling his medical director role at E-Z Medical.

69.     Diaz-Pairol used the façade of Mas's phony "appointment" as E-Z Medical's ersatz "medical director" to do indirectly what he was forbidden from doing directly – namely: (i) to operate a clinic without a legitimate medical director; (ii) to engage in unlicensed medical decision-making with respect to the Insureds who sought treatment at E-Z Medical; (iii) to permit health care services to be provided at E-Z Medical by individuals who lacked the proper licensure to perform the services; and (iv) to use E-Z Medical as a vehicle to submit a massive amount of fraudulent PIP billing to GEICO and other insurers.

70.     In fact, the only thing that Mas did during his phony tenure as E-Z Medical's fake "medical director" was to occasionally purport to perform the initial and follow-up examinations that were billed through E-Z Medical to GEICO and other insurers, and to sign bills and treatment reports prepared by other E-Z Medical personnel, including R. Hernandez, Fernandez, and Y. Rodriguez, at Diaz-Pairol's direction.

71.     Mas unlawfully permitted Diaz-Pairol to dictate every aspect of the manner in which Insureds would be treated at E-Z Medical, and to dictate every aspect of the manner in which health care services at E-Z Medical would be billed to GEICO and other insurers, because he sought to continue profiting from the fraudulent billing submitted through E-Z Medical.

72.     Indeed, as set forth above – and in keeping with the fact that E-Z Medical operated without a legitimate medical director – on or about February 27, 2018, Fernandez and Diaz-Pairol's son were arrested at E-Z Medical together with others on charges that they engaged in an organized insurance fraud scheme at E-Z Medical.

2.      **The Fraudulent Operation of Davila Medical Without a Legitimate Medical Director**

73.      Concomitantly, in or about early 2016, Davila – who is not and never has been licensed as a physician – sought to use Davila Medical as a vehicle to submit a large volume of fraudulent PIP billing to GEICO and other insurers.

74.      However, because Davila Medical was subject to the Clinic Act, Davila could not lawfully operate Davila Medical, or use Davila Medical as a vehicle to submit PIP billing to GEICO and other insurers, unless Davila recruited and retained a licensed physician to serve as Davila Medical's medical director. See Fla. Stat. §§ 400.9905, 440.9935.

75.      However, if Davila recruited and retained a legitimate physician to serve as a legitimate medical director at Davila Medical, the physician actually would be obligated to fulfill the statutory requirements applicable to a clinic medical director. See, e.g., Fla. Stat. § 400.9935(1).  By extension, any such legitimate medical director would impede Davila's ability to use Davila Medical as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other Florida automobile insurers.

76.      Accordingly, Davila required a pliable physician willing to falsely pose as the "medical director" at Davila Medical, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director, and thereby would permit Davila to use Davila Medical as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other insurers.

77.      Thereafter, in or about January 2016, Davila recruited and retained Mas, a licensed physician who was willing to falsely pose as the legitimate medical director of Davila Medical, just as he had done at E-Z Medical.

78.      Upon information and belief, Mas was receptive to Davila's offer – just as he was receptive to Diaz-Pairol's offer – because of his difficulty obtaining legitimate, sufficiently-remunerative employment as a physician.

79.      In order to circumvent Florida law and induce the Florida Agency for Health Care Administration to maintain Davila Medical's licensure and to permit Davila Medical to operate as a clinic, Davila and Davila Medical entered into a secret scheme with Mas.  In exchange for compensation from Davila and Davila Medical, Mas agreed to falsely represent, to the Florida Agency for Health Care Administration, to the Insureds who sought treatment at Davila Medical, and to the insurers including GEICO that received PIP claims from Davila Medical, that he was the true medical director at Davila Medical, and that he truly fulfilled the statutory requirements applicable to clinic medical directors at Davila Medical.

80.      However, Mas never genuinely served as medical director at Davila Medical. Instead, from the beginning of his association with Davila Medical as its phony "medical director", Mas ceded all day-to-day decision-making and oversight regarding health care services at Davila Medical, and the resulting billing, to Davila.

81.      Mas never legitimately served as medical director at Davila Medical, inasmuch as he never ensured that all health care practitioners at the clinic had active appropriate certification or licensure for the level of care being provided, never conducted systematic reviews of Davila Medical's billings to ensure that the billings were not fraudulent or unlawful, and never even made any attempt to discover the unlawful charges submitted through Davila Medical, much less take any immediate corrective action. See Fla. Stat. § 400.9935(1).

82.     Rather, true authority over the provision of health care services through Davila Medical, and the resulting billing – including the authority that would, at a legitimate clinic, be vested in the medical director – was held at all times by Davila.

83.     In keeping with the fact that Mas never legitimately served as medical director at Davila Medical, Mas simultaneously: (i) purported to serve as medical director at numerous other Florida clinics, including E-Z Medical, Baracusa Health, Westchester Medical, and Golden Health; and (ii) purported to personally perform, or at least directly supervise, a massive number of individual health care services at numerous health care clinics and other medical practices throughout the Miami area.

84.     It is improbable – to the point of impossibility – that Mas could have simultaneously fulfilled these various roles while also fulfilling his medical director role at Davila Medical.

85.     Davila used the façade of Mas's phony "appointment" as Davila Medical's ersatz "medical director" to do indirectly what he was forbidden from doing directly – namely: (i) to operate a clinic without a legitimate medical director; (ii) to engage in unlicensed medical decision-making with respect to the Insureds who sought treatment at Davila Medical; (iii) to permit health care services to be provided at Davila Medical by individuals who lacked the proper licensure to perform the services; and (iv) to use Davila Medical as a vehicle to submit a massive amount of fraudulent PIP billing to GEICO and other insurers.

86.     In fact, the only thing that Mas did during his phony tenure as Davila Medical's fake "medical director" was to occasionally purport to perform the initial and follow-up examinations that were billed through Davila Medical to GEICO and other insurers, and to sign

21

bills and treatment reports prepared by other Davila Medical personnel, including D. Diaz, Vital, and Pajon, at Davila's direction.

87.     Mas unlawfully permitted Davila to dictate every aspect of the manner in which Insureds would be treated at Davila Medical, and to dictate every aspect of the manner in which health care services at Davila Medical would be billed to GEICO and other insurers, because he sought to continue profiting from the fraudulent billing submitted through Davila Medical.

**3.     The Fraudulent Operation of Baracusa Health Without a Legitimate Medical Director**

88.     In or about late 2015, Corrales – who is not and never has been licensed as a physician – incorporated Baracusa Health.

89.     Thereafter, Corrales sought to use Baracusa Health as a vehicle to submit a large volume of fraudulent PIP billing to GEICO and other insurers.

90.     However, because Baracusa Health was subject to the Clinic Act, Corrales could not lawfully operate Baracusa Health, or use Baracusa Health as a vehicle to submit PIP billing to GEICO and other insurers, unless Corrales recruited and retained a licensed physician to serve as Baracusa Health's medical director. See Fla. Stat. §§ 400.9905, 440.9935.

91.     However, if Corrales recruited and retained a legitimate physician to serve as a legitimate medical director at Baracusa Health, the physician actually would be obligated to fulfill the statutory requirements applicable to a clinic medical director. See, e.g., Fla. Stat. § 400.9935(1). By extension, any such legitimate medical director would impede Corrales's ability to use Baracusa Health as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other Florida automobile insurers.

92.     Accordingly, Corrales required a pliable physician willing to falsely pose as the "medical director" at Baracusa Health, but who – in actuality – would not even attempt to fulfill

the statutory requirements applicable to a clinic medical director, and thereby would permit Corrales to use Baracusa Health as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other insurers.

93.     Thereafter, in or about 2016, Corrales recruited and retained Mas, a licensed physician who was willing to falsely pose as the legitimate medical director of Baracusa Health.

94.     Upon information and belief, Mas was receptive to Corrales's offer because his relatively advanced age, in addition to his lack of experience and credentials, made it difficult for him to obtain legitimate, sufficiently-remunerative employment as a physician.

95.     In order to circumvent Florida law and induce the Florida Agency for Health Care Administration to maintain Baracusa Health's licensure and to permit Baracusa Health to operate as a clinic, Corrales and Baracusa Health entered into a secret scheme with Mas.  In exchange for compensation from Corrales and Baracusa Health, Mas agreed to falsely represent, to the Florida Agency for Health Care Administration, to the Insureds who sought treatment at Baracusa Health, and to the insurers including GEICO that received PIP claims from Baracusa Health, that he was the true medical director at Baracusa Health, and that he truly fulfilled the statutory requirements applicable to clinic medical directors at Baracusa Health.

96.     However, Mas never genuinely served as medical director at Baracusa Health. Instead, from the beginning of his association with Baracusa Health as its phony "medical director", Mas ceded all day-to-day decision-making and oversight regarding health care services at Baracusa Health, and the resulting billing, to Corrales.

97.     Mas never legitimately served as medical director at Baracusa Health, inasmuch as he never ensured that all health care practitioners at the clinic had active appropriate certification or licensure for the level of care being provided, never conducted systematic

reviews of Baracusa Health's billings to ensure that the billings were not fraudulent or unlawful, and never even made any attempt to discover the unlawful charges submitted through Baracusa Health, much less take any immediate corrective action. See Fla. Stat. § 400.9935(1).

98.     Rather, true authority over the provision of health care services through Baracusa Health, and the resulting billing – including the authority that would, at a legitimate clinic, be vested in the medical director – was held at all times by Corrales.

99.     In keeping with the fact that Mas never legitimately served as medical director at Baracusa Health, Mas simultaneously: (i) purported to serve as medical director at numerous other Florida clinics, including Davila Medical, E-Z Medical, Westchester Medical, and Golden Health; and (ii) purported to personally perform, or at least directly supervise, a massive number of individual health care services at numerous health care clinics and other medical practices throughout the Miami area.

100.     It is improbable – to the point of impossibility – that Mas could have simultaneously fulfilled these various roles while also fulfilling his medical director role at Baracusa Health.

101.     Corrales used the façade of Mas's phony "appointment" as Baracusa Health's ersatz "medical director" to do indirectly what she was forbidden from doing directly – namely: (i) to operate a clinic without a legitimate medical director; (ii) to engage in unlicensed medical decision-making with respect to the Insureds who sought treatment at Baracusa Health; (iii) to permit health care services to be provided at Baracusa Health by individuals who lacked the proper licensure to perform the services; and (iv) to use Baracusa Health as a vehicle to submit a massive amount of fraudulent PIP billing to GEICO and other insurers.

102.     In fact, the only thing that Mas did during his phony tenure as Baracusa Health's fake "medical director" was to occasionally purport to perform the initial and follow-up examinations that were billed through Baracusa Health to GEICO and other insurers, and to sign bills and treatment reports prepared by other Baracusa Health personnel, including Romero, at Corrales's direction.

103.     Mas unlawfully permitted Corrales to dictate every aspect of the manner in which Insureds would be treated at Baracusa Health, and to dictate every aspect of the manner in which health care services at Baracusa Health would be billed to GEICO and other insurers, because he sought to continue profiting from the fraudulent billing submitted through Baracusa Health.

**4.      The Fraudulent Operation of Westchester Medical Without a Legitimate Medical Director**

104.     In or about November 2016, Morales – who is not and never has been licensed as a physician – incorporated Westchester Medical.

105.     Thereafter, Morales sought to use Westchester Medical as a vehicle to submit a large volume of fraudulent PIP billing to GEICO and other insurers.

106.     However, because Westchester Medical was subject to the Clinic Act, Morales could not lawfully operate Westchester Medical, or use Westchester Medical as a vehicle to submit PIP billing to GEICO and other insurers, unless he recruited and retained a licensed physician to serve as Westchester Medical's medical director. See Fla. Stat. §§ 400.9905, 440.9935.

107.     However, if Morales recruited and retained a legitimate physician to serve as a legitimate medical director at Westchester Medical, the physician actually would be obligated to fulfill the statutory requirements applicable to a clinic medical director. See, e.g., Fla. Stat. § 400.9935(1).  By extension, any such legitimate medical director would impede Morales's ability

25

to use Westchester Medical as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other Florida automobile insurers.

108.     Accordingly, Morales required a pliable physician willing to falsely pose as the "medical director" at Westchester Medical, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director, and thereby would permit Morales to use Westchester Medical as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other insurers.

109.     Thereafter, in or about early 2017, Morales recruited and retained Mas, a licensed physician who was willing to falsely pose as the legitimate medical director of Westchester Medical.

110.     Upon information and belief, Mas was receptive to Morales's offer because his relatively advanced age, in addition to his lack of experience and credentials, made it difficult for him to obtain legitimate, sufficiently-remunerative employment as a physician.

111.     In order to circumvent Florida law and induce the Florida Agency for Health Care Administration to maintain Westchester Medical's licensure and to permit Westchester Medical to operate as a clinic, Morales and Westchester Medical entered into a secret scheme with Mas. In exchange for compensation from Morales and Westchester Medical, Mas agreed to falsely represent, to the Florida Agency for Health Care Administration, to the Insureds who sought treatment at Westchester Medical, and to the insurers including GEICO that received PIP claims from Westchester Medical, that he was the true medical director at Westchester Medical, and that he truly fulfilled the statutory requirements applicable to clinic medical directors at Westchester Medical.

112.    However, Mas never genuinely served as medical director at Westchester Medical.  Instead, from the beginning of his association with Westchester Medical as its phony "medical director", Mas ceded all day-to-day decision-making and oversight regarding health care services at Westchester Medical, and the resulting billing, to Morales.

113.    Mas never legitimately served as medical director at Westchester Medical, inasmuch as he never ensured that all health care practitioners at the clinic had active appropriate certification or licensure for the level of care being provided, never conducted systematic reviews of Westchester Medical's billings to ensure that the billings were not fraudulent or unlawful, and never even made any attempt to discover the unlawful charges submitted through Westchester Medical, much less take any immediate corrective action. See Fla. Stat. § 400.9935(1).

114.    Rather, true authority over the provision of health care services through Westchester Medical, and the resulting billing – including the authority that would, at a legitimate clinic, be vested in the medical director – was held at all times by Morales.

115.    In keeping with the fact that Mas never legitimately served as medical director at Westchester Medical, Mas simultaneously: (i) purported to serve as medical director at numerous other Florida clinics, including Davila Medical, E-Z Medical, Baracusa Health, and Golden Health; and (ii) purported to personally perform, or at least directly supervise, a massive number of individual health care services at numerous health care clinics and other medical practices throughout the Miami area. It is improbable – to the point of impossibility – that Mas could have simultaneously fulfilled these various roles while also fulfilling his medical director role at Westchester Medical.

116.    Morales used the façade of Mas's phony "appointment" as Westchester Medical's ersatz "medical director" to do indirectly what he was forbidden from doing directly – namely: (i) to operate a clinic without a legitimate medical director; (ii) to engage in unlicensed medical decision-making with respect to the Insureds who sought treatment at Westchester Medical; (iii) to permit health care services to be provided at Westchester Medical by individuals who lacked the proper licensure to perform the services; and (iv) to use Westchester Medical as a vehicle to submit a massive amount of fraudulent PIP billing to GEICO and other insurers.

117.    In fact, the only thing that Mas did during his phony tenure as Westchester Medical's fake "medical director" was to occasionally purport to perform the initial and follow-up examinations that were billed through Westchester Medical to GEICO and other insurers, and to sign bills and treatment reports prepared by other Westchester Medical personnel, including Morales and other massage therapists, at Morales's direction.

118.    Mas unlawfully permitted Morales to dictate every aspect of the manner in which Insureds would be treated at Westchester Medical, and to dictate every aspect of the manner in which health care services at Westchester Medical would be billed to GEICO and other insurers, because he sought to continue profiting from the fraudulent billing submitted through Westchester Medical.

**B.    The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at the Clinic Defendants**

119.    In keeping with the fact that Mas never truly served as medical director at E-Z Medical, Davila Medical, Baracusa Health, and Westchester Medical, and never fulfilled the statutory obligations of a clinic medical director at E-Z Medical, Davila Medical, Baracusa Health, and Westchester Medical, Mas permitted E-Z Medical, Davila Medical, Baracusa Health, Westchester Medical, and their associates to routinely falsely represent the identities of the

28

health care providers who rendered services at E-Z Medical, Davila Medical, Baracusa Health, and Westchester Medical, in order to obtain payment for the Fraudulent Services to which they otherwise would not be entitled.

**1.    The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at E-Z Medical**

120.    E-Z Medical, Diaz-Pairol, Mas, R. Hernandez, Fernandez, and Y. Rodriguez (collectively, the "E-Z Medical Defendants") billed for a limited range of health care services through E-Z Medical, specifically: (i) purported initial patient examinations; (ii) purported follow-up patient examinations; and (iii) purported physical therapy services, including hot/cold packs, mechanical traction, paraffin bath, infrared therapy, ultrasound therapy, neuromuscular reeducation, therapeutic exercises, manual therapy, and electrical stimulation.

121.    As set forth in Exhibit "1", the purported physical therapy services constituted the vast majority of the services that the E-Z Medical Defendants billed through E-Z Medical to GEICO.

122.    Mas was between approximately 66 and 70 years old during the period from 2014 to the present when he falsely purported to serve as "medical director" at E-Z Medical.

123.    Even so, during Mas's tenure as E-Z Medical's purported "medical director", Mas also purported to serve as the "medical director" for numerous other medical clinics, including Davila Medical, Baracusa Health, Westchester Medical, and Golden Health, and purported to personally perform or directly supervise a massive amount of medical services for those clinics and other health care providers.

124.    As a result, Mas was only occasionally physically present at E-Z Medical, and did not personally perform – or even directly supervise – the massive amount of physical therapy services that E-Z Medical purported to provide to GEICO Insureds.

125.     Indeed, during his tenure as E-Z Medical's purported "medical director", Mas only visited the clinic sporadically to purport to conduct initial and follow-up patient examinations – to the extent the examinations were performed at all – and to sign bills and treatment reports prepared by other E-Z Medical personnel, including R. Hernandez, Fernandez, and Y. Rodriguez, at Diaz-Pairol's direction.

126.     What is more, many of the initial examinations and follow-up patient examinations were never performed or even supervised by Mas.

127.     Indeed, many of the initial examinations and follow-up patient examinations were performed by unsupervised physician assistants.

128.     R. Hernandez was licensed as a physician assistant and was never licensed as a medical doctor.

129.     According to Florida law, "'[p]hysician assistant' means a person who is a graduate of an approved program or its equivalent or meets standards approved by the boards and is licensed to perform medical services delegated by the supervising physician." Fla. Stat. § 458.347(e).

130.     According to Florida Law, "'[s]upervision' means responsible supervision and control. Except in cases of emergency, supervision requires the easy availability or physical presence of the licensed physician for consultation and direction of the actions of the physician assistant. For the purposes of this definition, the term 'easy availability' includes the ability to communicate by way of telecommunication. The boards shall establish rules as to what constitutes responsible supervision of the physician assistant." Fla. Stat. § 458.347(f).

131.     As set forth by the Florida Administrative Code, "[t]he decision to permit the physician assistant to perform a task or procedure under direct or indirect supervision is made by

the supervising physician based on reasonable medical judgment regarding the probability of morbidity and mortality to the patient. Furthermore, the supervising physician must be certain that the physician assistant is knowledgeable and skilled in performing the tasks and procedures assigned." Fla. Adm. Code 64B8-30.012(2) (2010-2019).

132.    As stated in the Florida Administrative Code, [t]he term 'direct supervision' [] refers to the physical presence of the supervising physician on the premises so that the supervising physician is immediately available to the physician assistant when needed." Fla. Adm. Code 64B8-30.001(4). "Direct supervision" requires "the physical presence of the supervising licensee on the premises so that the supervising licensee is reasonably available as needed." Fla. Adm. Code 64B8-2.001(1)(a). "The term 'indirect supervision' [] refers to the easy availability of the supervising physician to the physician assistant, which includes the ability to communicate by telecommunications. The supervising physician must be within reasonable physical proximity." Fla. Adm. Code 64B8-30.001(5). "Indirect supervision" requires "that the supervising licensee practice at a location which is within close physical proximity of the practice location of the supervised licensee and that the supervising licensee must be readily available for consultation as needed. 'Close physical proximity' shall be within 20 miles or 30 minutes unless otherwise authorized by the Board." Fla. Adm. Code 64B8-2.001(1)(b).

133.    Because R. Hernandez was a physician assistant, Mas was required to provide either direct or indirect supervision of R. Hernandez.

134.    The E-Z Medical Defendants were well-aware of the fact that E-Z Medical could not legally recover PIP Benefits for services provided by unsupervised physician assistants such as R. Hernandez.

135.    In keeping with the fact that the E-Z Medical Defendants knew that they could not lawfully recover PIP Benefits for services provided by unsupervised physical therapist assistants or physician assistants, in 2014 the E-Z Medical Defendants began to list Mas as the treating provider on virtually every single bill submitted to GEICO for virtually every single service that the E-Z Medical Defendants purported to provide to GEICO Insureds, including virtually every initial examination and follow-up examination that was billed through E-Z Medical to GEICO.

136.    Considering his advanced age, and the fact that he simultaneously was purporting to serve as medical director at no fewer than five health care clinics and to perform or directly supervise a massive number of individual health care services at numerous health care practices throughout the Miami area, Mas could not legitimately have directly supervised, or even indirectly supervised, all of the initial examinations and follow-up examinations that were billed through E-Z Medical to GEICO between 2014 and the present.

137.    Even so, the E-Z Medical Defendants routinely falsely represented in the billing they submitted or caused to be submitted through E-Z Medical to GEICO for many of the initial examinations and follow-up examinations that Mas personally performed, or at least legitimately supervised, the examinations.

138.    For example:

(i)     On December 15, 2016, E-Z Medical, Diaz-Pairol, and Mas falsely represented that Mas legitimately supervised R. Hernandez in performing at least one patient examination at E-Z Medical, which then was billed to GEICO. In fact, Mas could not legitimately have supervised R. Hernandez considering that – on that same day – Mas purported to personally perform, or at least legitimately supervise, at least 68 one-on-one physical therapy services, which were provided to patients at five different locations, and all of which were billed to GEICO. In all, GEICO received billing for at least 14.5 hours of services that Mas purported to personally perform, or at least legitimately supervise, on December 15, 2016.

(ii)    On February 16, 2017, E-Z Medical, Diaz-Pairol, and Mas falsely represented that Mas legitimately supervised R. Hernandez in performing at least two patient

examinations at E-Z Medical, which then were billed to GEICO. In fact, Mas could not legitimately have supervised R. Hernandez considering that – on that same day – Mas purported to personally perform, or at least legitimately supervise: (a) two more patient examinations; and (b) at least 45 one-on-one physical therapy services, which were provided to patients at <u>seven</u> different locations, and all of which were billed to GEICO. In all, GEICO received billing for at least 19 hours of services that Mas purported to personally perform, or at least legitimately supervise, on February 16, 2017.

(iii)   On March 9, 2017, E-Z Medical, Diaz-Pairol, and Mas falsely represented that Mas legitimately supervised R. Hernandez in performing at least two examinations at E-Z Medical, which then were billed to GEICO. In fact, Mas could not legitimately have supervised R. Hernandez considering that – on that same day – Mas purported to personally perform, or at least legitimately supervise: (a) 8 patient examinations; and (b) at least 105 one-on-one physical therapy services, which were provided to patients at <u>eight</u> different locations, and all of which were billed to GEICO. In all, GEICO received billing for at least 29 hours of services that Mas purported to personally perform, or at least legitimately supervise, on March 9, 2017.

(iv)   On March 23, 2017, E-Z Medical, Diaz-Pairol, and Mas falsely represented that Mas legitimately supervised R. Hernandez in performing at least one examination at E-Z Medical, which then was billed to GEICO. In fact, Mas could not legitimately have supervised R. Hernandez considering that – on that same day – Mas purported to personally perform, or at least legitimately supervise: (a) six patient examinations; and (b) at least 72 additional physical therapy services, which were provided to patients at <u>five</u> different locations, and all of which were billed to GEICO. In all, GEICO received billing for at least 20 hours of services that Mas purported to personally perform, or at least legitimately supervise, on March 23, 2017.

(v)   On April 6, 2017, E-Z Medical, Diaz-Pairol, and Mas falsely represented that Mas legitimately supervised R. Hernandez in performing at least three examinations at E-Z Medical, which then were billed to GEICO. In fact, Mas could not legitimately have supervised R. Hernandez considering that – on that same day – Mas purported to personally perform, or at least legitimately supervise: (a) nine patient examinations; and (b) at least 105 one-on-one physical therapy services, which were provided to patients at <u>seven</u> different locations, and all of which were billed to GEICO. In all, GEICO received billing for at least 27 hours of services that Mas purported to personally perform, or at least legitimately supervise, on April 6, 2017.

(vi)   On April 13, 2017, E-Z Medical, Diaz-Pairol, and Mas falsely represented that Mas legitimately supervised R. Hernandez in performing at least one examination at E-Z Medical, which then was billed to GEICO. In fact, Mas could not legitimately have supervised R. Hernandez considering that – on that same day –

Mas purported to personally perform, or at least legitimately supervise: (a) 13 patient examinations; and (b) at least 105 one-on-one physical therapy services, which were provided to patients at <u>seven</u> different locations, and all of which were billed to GEICO. In all, GEICO received billing for at least 28 hours of services that Mas purported to personally perform, or at least legitimately supervise, on April 13, 2017.

(vii)   On April 27, 2017, E-Z Medical, Diaz-Pairol, and Mas falsely represented that Mas legitimately supervised R. Hernandez in performing at least one examination at E-Z Medical, which then was billed to GEICO. In fact, Mas could not legitimately have supervised R. Hernandez considering that – on that same day – Mas purported to personally perform, or at least legitimately supervise: (a) 10 patient examinations; and (b) at least 106 one-on-one physical therapy services, which were provided to patients located at <u>six</u> different locations, and all of which were billed to GEICO. In all, GEICO received billing for at least 29 hours of services that Mas purported to personally perform, or at least legitimately supervise, on April 27, 2017.

(viii)  On May 4, 2017, E-Z Medical, Diaz-Pairol, and Mas falsely represented that Mas legitimately supervised R. Hernandez in performing at least two examinations at E-Z Medical, which then were billed to GEICO. In fact, Mas could not legitimately have supervised R. Hernandez considering that – on that same day – Mas purported to personally perform, or at least legitimately supervise: (a) 10 patient examinations; and (b) at least 152 one-on-one physical therapy services, which were provided to patients at <u>seven</u> different locations, and all of which were billed to GEICO. In all, GEICO received billing for at least 39 hours of services that Mas purported to personally perform, or at least legitimately supervise, on May 4, 2017.

(ix)    On May 25, 2017, E-Z Medical, Diaz-Pairol, and Mas falsely represented that Mas legitimately supervised R. Hernandez in performing at least two examinations at E-Z Medical, which then were billed to GEICO. In fact, Mas could not legitimately have supervised R. Hernandez considering that – on that same day – Mas purported to personally perform, or at least legitimately supervise: (a) eight patient examinations; and (b) at least 105 one-on-one physical therapy services, which were provided to patients at <u>five</u> different locations, and all of which were billed to GEICO. In all, GEICO received billing for at least 27 hours of services that Mas purported to personally perform, or at least legitimately supervise, on May 25, 2017.

(x)     On June 1, 2017, E-Z Medical, Diaz-Pairol, and Mas falsely represented that Mas legitimately supervised R. Hernandez in performing at least one examination at E-Z Medical, which then was billed to GEICO. In fact, Mas could not legitimately have supervised R. Hernandez considering that – on that same day – Mas purported to personally perform, or at least legitimately supervise: (a) nine patient examinations; and (b) at least 104 one-on-one physical therapy services, which

were provided to patients located at six different locations, and all of which were billed to GEICO. In all, GEICO received billing for at least 28 hours of services that Mas purported to personally perform, or at least indirectly supervise, on June 1, 2017.

139. These are only representative examples. In the claims identified in Exhibit "1", the E-Z Medical Defendants routinely falsely represented that Mas had performed – or at least legitimately supervised – initial examinations and follow-up patient examinations while simultaneously performing – or at least directly supervising – an improbable, and often impossible, number of physical therapy services on individual dates.

140. It is improbable, to the point of impossibility, that Mas – who was advanced in age at the time, and simultaneously working or purporting to work at numerous other medical practices and clinics – routinely legitimately supervised the initial examinations and follow-up patient examinations performed by R. Hernandez and other physician assistants.

141. It is likewise improbable, to the point of impossibility, that Mas – who was advanced in age at the time, and simultaneously working or purporting to work at various other medical practices and clinics – routinely legitimately supervised initial examinations and follow-up patient examinations performed by R. Hernandez and other physician assistants while he supervised such a high volume of physical therapy services at multiple locations on individual dates.

142. Upon information and belief, the fraudulent billing for initial examinations and follow-up examinations that the E-Z Medical Defendants submitted or caused to be submitted through E-Z Medical to GEICO constituted only a fraction of the total fraudulent billing for initial examinations and follow-up patient examinations performed by R. Hernandez and other physician assistants that the E-Z Medical Defendants submitted through E-Z Medical to all of the automobile insurers in the Florida automobile insurance market.

35

143.   GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

144.   It is extremely improbable, to the point of impossibility, that the E-Z Medical Defendants only submitted fraudulent billing to GEICO, and that the E-Z Medical Defendants did not simultaneously bill other automobile insurers.

145.   Thus, upon information and belief, the number of initial examinations and follow-up patient examinations that Mas purported to legitimately supervise or provide to GEICO Insureds at E-Z Medical on individual dates of service, including the dates of service identified above, constituted only a fraction of the total number of services that Mas purported to legitimately supervise or provide at E-Z Medical, including to individuals insured by companies other than GEICO, on those same dates of service.

146.   In fact, Mas did not perform or legitimately supervise any of the initial examinations and follow-up patient examinations that were performed by R. Hernandez and billed through E-Z Medical to GEICO.

147.    Indeed, had Mas actually supervised R. Hernandez, a physician assistant, Mas would be listed as a supervising practitioner with respect to R. Hernandez on the Department of Health website.

148.   Furthermore, had Mas actually supervised R. Hernandez, a physician assistant, R. Hernandez would be listed as a subordinate practitioner with respect to Mas on the Department of Health website.

149.   However, Mas and R. Hernandez are not referenced under each other's licenses on the Florida Department of Health website because Mas never supervised R. Hernandez in the first instance.

36

150.     What is more, even when Mas was physically present at E-Z Medical, he never provided or supervised the physical therapy services purportedly provided at E-Z Medical.

151.     All of the physical therapy services that E-Z Medical purported to provide between 2014 and the present were performed by Fernandez, Y. Rodriguez, and other physical therapist assistants associated with E-Z Medical, who reported directly to Diaz-Pairol without any legitimate supervision or oversight by Mas or any other licensed physician or physical therapist.

152.     Fernandez and Y. Rodriguez were licensed as physical therapist assistants. Fernandez and Y. Rodriguez were never licensed as physical therapists.

153.     According to Florida law, a "'[p]hysical therapist assistant' means a person who is licensed in accordance with the provisions of this chapter to perform patient-related activities, including the use of physical agents, whose license is in good standing, and whose activities are performed under the direction of a physical therapist as set forth in rules adopted pursuant to this chapter. Patient-related activities performed by a physical therapist assistant for a board-certified orthopedic physician or physiatrist licensed pursuant to chapter 458 [Medical Practice] or chapter 459 [Osteopathic Medicine] or a practitioner licensed under chapter 460 [Chiropractic] shall be under the general supervision of a physical therapist, but shall not require onsite supervision by a physical therapist. Patient-related activities performed for all other health care practitioners licensed under chapter 458 [Medical Practice] or chapter 459 [Osteopathic Medicine] and those patient-related activities performed for practitioners licensed under chapter 461 [Podiatric Medicine] or chapter 466 [Dentistry] shall be performed under the onsite supervision of a physical therapist." Fla. Stat. Ann. § 486.021.

154.    Because Mas is a non-board certified medical doctor – and not a physical therapist – Mas was required to provide onsite supervision of Fernandez, Y. Rodriguez, and other physical therapist assistants that provided physical therapy services at E-Z Medical.

155.    The E-Z Medical Defendants were well-aware of the fact that E-Z Medical could not legally recover PIP Benefits for services provided by unsupervised physical therapist assistants such as Fernandez and Y. Rodriguez or unsupervised physician assistants such as R. Hernandez.

156.    In keeping with the fact that the E-Z Medical Defendants knew that they could not lawfully recover PIP Benefits for services provided by unsupervised physical therapist assistants or physician assistants, in 2014 the E-Z Medical Defendants began to list Mas as the treating provider on virtually every single bill submitted to GEICO for virtually every single service that the E-Z Medical Defendants purported to provide to GEICO Insureds, including almost every individual physical therapy service that was billed through E-Z Medical to GEICO.

157.    Considering his advanced age, and the fact that he simultaneously was purporting to serve as medical director at no fewer than five health care clinics and to perform or directly supervise a massive number of individual health care services at numerous health care practices throughout the Miami area, Mas could not physically have performed, directly supervised, or even indirectly supervised, the massive number of physical therapy services that were billed through E-Z Medical to GEICO between 2014 and the present.

158.    Even so, the E-Z Medical Defendants routinely falsely represented in the billing they submitted or caused to be submitted through E-Z Medical to GEICO for physical therapy services between 2014 and the present that Mas personally performed, or at least directly supervised, the underlying physical therapy services.

38

159.    For example:

(i)    On August 13, 2014, the E-Z Medical Defendants purported to provide at least 15 individual physical therapy services to at least two individual Insureds, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 2.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Mas also purported to personally perform, or at least directly supervise: (a) six 30-minute patient examinations at Golden Health; (b) at least five additional physical therapy services purportedly provided to at least one additional GEICO Insured at a healthcare practice called Family Practice Center, Corp ("Family Practice Center"), including at least 1.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (c) at least 10 additional physical therapy services purportedly provided to at least two additional GEICO Insureds at a Florida clinic called Hammocks Trauma Center Inc, including at least 2.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (d) at least six additional physical therapy services purportedly provided to at least one additional GEICO Insured at a Florida clinic called Therapeutic Rehab Center Inc ("Therapeutic Rehab"), including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services. In all, GEICO received billing for at least 10.75 hours of services that Mas purported to personally perform, or at least directly supervise, on August 13, 2014.

(ii)    On March 26, 2015, the E-Z Medical Defendants purported to provide at least 14 individual physical therapy services to at least two individual Insureds, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 1.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Mas also purported to personally perform, or at least directly supervise: (a) one 40-minute patient examination at Family Practice Center; (b) one 30-minute patient examination at E-Z Medical; (c) three 30-minute patient examinations at Golden Health; (d) one 15-minute patient examination at E-Z Medical; (e) one 15-minute patient examination at a Florida clinic called Atlantic Medical Specialty, Inc. ("Atlantic Medical"); (f) one 5-minute patient examination at Family Practice Center;  (g) at least six additional physical therapy services purportedly provided to at least one additional GEICO Insured at Atlantic Medical, including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; and (h) at least 24 additional physical therapy services purportedly provided to at least four additional GEICO Insureds at a healthcare practice called J.C. Medical Services Inc., including at

least 6.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 12.75 hours of services that Mas purported to personally perform, or at least directly supervise, on March 26, 2015.

(iii)     On January 27, 2016, the E-Z Medical Defendants purported to provide at least 16 individual physical therapy services to at least two individual Insureds, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 2.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Mas <u>also</u> purported to personally perform, or at least directly supervise: (a) one 25-minute patient examination at Therapeutic Rehab; (b) one 25-minute patient examination at Golden Health; (c) one 15-minute patient examination at Golden Health; (d) at least 30 <u>additional</u> physical therapy services purportedly provided to at least six <u>additional</u> GEICO Insureds at Atlantic Medical, including at least 7.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (e) at least five <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at a Florida clinic called Med-Advanced, Corp. ("Med-Advanced"), including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (f) at least 24 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at a Florida clinic called Premium Health Care Medical Center Inc, including at least 6.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (g) at least 12 <u>additional</u> physical therapy services purportedly provided to at least two <u>additional</u> GEICO Insureds at Therapeutic Rehab, including at least 3 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 22 hours of services that Mas purported to personally perform, or at least directly supervise, on January 27, 2016.

(iv)     On February 16, 2017, the E-Z Medical Defendants purported to provide at least 34 individual physical therapy services to at least five individual Insureds, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Mas <u>also</u> purported to personally perform, or at least directly supervise: (a) two 45-minute patient examinations at E-Z Medical; (b) two 15-minute patient examinations at E-Z Medical; (c) at least 10 <u>additional</u> physical therapy services purportedly provided to at least two

<u>additional</u> GEICO Insureds at Atlantic Medical, including at least 2.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (d) at least seven <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Baracusa Health, including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (e) at least six <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Davila Medical, including at least 2 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (f) at least 20 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at Golden Health, including at least 4.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (g) at least six <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Therapeutic Rehab, including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; and (h) at least 12 <u>additional</u> physical therapy services purportedly provided to at least two <u>additional</u> GEICO Insureds at a Florida clinic called We Care Medical Services, Inc ("We Care Medical"), including at least 3 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 21.75 hours of services that Mas purported to personally perform, or at least directly supervise, on February 16, 2017.

(v)   On April 24, 2017, the E-Z Medical Defendants purported to provide at least 43 individual physical therapy services to at least seven individual Insureds, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 7 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Mas <u>also</u> purported to personally perform, or at least directly supervise: (a) one 30-minute patient examination at Baracusa Health; (b) one 25-minute patient examination at Golden Health; (c) one 25-minute patient examination at Westchester Medical; (d) one 15-minute patient examination at Atlantic Medical; (e) five 5-minute patient examinations at Westchester Medical; (f) at least 39 <u>additional</u> physical therapy services purportedly provided to at least eight <u>additional</u> GEICO Insureds at Atlantic Medical, including at least 10 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (g) at least five <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Baracusa Health, including at least 1.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured

throughout the services; (h) at least six <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Davila Medical, including at least 2.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (i) at least 20 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at Golden Health, including at least 4.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (j) at least 20 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at a Florida clinic called Starlite Medical Center Inc ("Starlite Medical"), including at least 5.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (k) at least seven <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Therapeutic Rehab, including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; and (l) at least 30 <u>additional</u> physical therapy services purportedly provided to at least six <u>additional</u> GEICO Insureds at Westchester Medical, including at least 7.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 42 hours of services that Mas purported to personally perform, or at least directly supervise, on April 24, 2017.

(vi)     On May 3, 2017, the E-Z Medical Defendants purported to provide at least 62 individual physical therapy services to at least 10 individual Insureds, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 10 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Mas <u>also</u> purported to personally perform, or at least directly supervise: (a) three 30-minute patient examinations at Starlite Medical; (b) one 15-minute patient examination at Atlantic Medical; (c) three 5-minute patient examinations at Westchester Medical; (d) at least 28 <u>additional</u> physical therapy services purportedly provided to at least six <u>additional</u> GEICO Insureds at Atlantic Medical, including at least 7 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (e) at least six <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Baracusa Health, including at least 1.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (f) at least five <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Davila Medical, including at least 2 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (g) at least 10

<u>additional</u> physical therapy services purportedly provided to at least two <u>additional</u> GEICO Insureds at Golden Health, including at least 2 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (h) at least 59 <u>additional</u> physical therapy services purportedly provided to at least 12 <u>additional</u> GEICO Insureds at Starlite Medical, including at least 16.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (i) at least seven <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Therapeutic Rehab, including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; and (j) at least 13 <u>additional</u> physical therapy services purportedly provided to at least three <u>additional</u> GEICO Insureds at Westchester Medical, including at least 3.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 45.5 hours of services that Mas purported to personally perform, or at least directly supervise, on May 3, 2017.

(vii)  On May 17, 2017, the E-Z Medical Defendants purported to provide at least 47 individual physical therapy services to at least seven individual Insureds, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 7 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Mas <u>also</u> purported to personally perform, or at least directly supervise: (a) one 45-minute patient examination at Atlantic Medical; (b) one 25-minute patient examination at Westchester Medical; and (c) five 5-minute patient examinations at Westchester Medical; (d) at least 29 <u>additional</u> physical therapy services purportedly provided to at least six <u>additional</u> GEICO Insureds at Atlantic Medical, including at least 7.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (e) at least 12 <u>additional</u> physical therapy services purportedly provided to at least two <u>additional</u> GEICO Insureds at Davila Medical, including at least 4 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (f) at least 29 <u>additional</u> physical therapy services purportedly provided to at least six <u>additional</u> GEICO Insureds at Starlite Medical, including at least 8 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (g) at least 28 <u>additional</u> physical therapy services purportedly provided to at least six <u>additional</u> GEICO Insureds at Westchester Medical, including at least 6.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing

for at least 34.25 hours of services that Mas purported to personally perform, or at least directly supervise, on May 17, 2017.

(viii)   On June 13, 2017, the E-Z Medical Defendants purported to provide at least 62 individual physical therapy services to at least nine individual Insureds, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 9 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Mas also purported to personally perform, or at least directly supervise: (a) one 25-minute patient examination at Westchester Medical; (b) one 25-minute patient examination at Atlantic Medical; (c) six 5-minute patient examinations at Westchester Medical; (d) at least 10 additional physical therapy services purportedly provided to at least two additional GEICO Insureds at Atlantic Medical, including at least 2.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (e) at least 29 additional physical therapy services purportedly provided to at least five additional GEICO Insureds at Davila Medical, including at least 10 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (f) at least 45 additional physical therapy services purportedly provided to at least nine additional GEICO Insureds at Starlite Medical, including at least 12.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services;  and (g) at least 27 additional physical therapy services purportedly provided to at least seven additional GEICO Insureds at Westchester Medical, including at least 7.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 42.75 hours of services that Mas purported to personally perform, or at least directly supervise, on June 13, 2017.

(ix)   On December 6, 2017, the E-Z Medical Defendants purported to provide at least 27 individual physical therapy services to at least four individual Insureds, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 4.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Mas also purported to personally perform, or at least directly supervise: (a) one 45-minute patient examination at a Florida clinic called Angels Diagnostic Group, Inc ("Angels Diagnostic"); (b) two 15-minute patient examinations at Angels Diagnostic; (c) six 5-minute patient examinations at Westchester Medical; (d) at least 26 additional physical therapy services purportedly provided to at least five additional GEICO Insureds at Davila Medical, including at least 10.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds

44

throughout the services; (e) at least six <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at a Florida clinic called Health Solutions Therapy Services Inc ("Health Solutions"), including at least 1.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (f) at least 12 <u>additional</u> physical therapy services purportedly provided to at least two <u>additional</u> GEICO Insureds at a healthcare practice called Star Medical Center Inc ("Star Medical"), including at least 2.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (g) at least 55 <u>additional</u> physical therapy services purportedly provided to at least 11 <u>additional</u> GEICO Insureds at Starlite Medical, including at least 15.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (h) at least 18 <u>additional</u> physical therapy services purportedly provided to at least three <u>additional</u> GEICO Insureds at Therapeutic Rehab, including at least 4.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (i) at least 19 <u>additional</u> physical therapy services purportedly provided to at least six <u>additional</u> GEICO Insureds at Westchester Medical, including at least 7 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 48.25 hours of services that Mas purported to personally perform, or at least directly supervise, on December 6, 2017.

(x)     On December 12, 2017, the E-Z Medical Defendants purported to provide at least 33 individual physical therapy services to at least five individual Insureds, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 5.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Mas <u>also</u> purported to personally perform, or at least directly supervise: (a) one 45-minute patient examination at E-Z Medical; (b) two 45-minute patient examinations at Westchester Medical; (c) one 30-minute patient examination at E-Z Medical; (d) one 25-minute patient examination at Davila Medical; (e) one 25-minute patient examination at Starlite Medical; (f) six 5-minute patient examinations at Westchester Medical; (g) at least 37 <u>additional</u> physical therapy services purportedly provided to at least seven <u>additional</u> GEICO Insureds at Davila Medical, including at least 14.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (h) at least six <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Health Solutions, including at least 1.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (i) at least 24 <u>additional</u> physical therapy services purportedly provided to at least four

additional GEICO Insureds at Star Medical, including at least 5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (j) at least 45 additional physical therapy services purportedly provided to at least nine additional GEICO Insureds at Starlite Medical, including at least 11 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (k) at least 11 additional physical therapy services purportedly provided to at least two additional GEICO Insureds at Therapeutic Rehab, including at least 3 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (l) at least 24 additional physical therapy services purportedly provided to at least eight additional GEICO Insureds at Westchester Medical, including at least 7.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 51.75 hours of services that Mas purported to personally perform, or at least directly supervise, on December 12, 2017.

160.    These are only representative examples. In the claims for physical therapy services that are identified in Exhibit "1", the E-Z Medical Defendants routinely falsely represented that Mas had performed – or at least directly supervised – an improbable, and often impossible, number of physical therapy services on individual dates, considering the amounts of services he simultaneously was purporting to perform or directly supervise at the other Clinic Defendants and other health care clinics.

161.    It is improbable, to the point of impossibility, that Mas – who was advanced in age at the time, and simultaneously working or purporting to work at various other medical practices and clinics – routinely performed such a high volume of physical therapy services on individual dates.

162.    It is likewise improbable, to the point of impossibility, that Mas – who was advanced in age at the time, and simultaneously working or purporting to work at various other medical practices and clinics – routinely directly supervised such a high volume of physical therapy services on individual dates.

163.    Upon information and belief, the fraudulent billing for physical therapy services that the E-Z Medical Defendants submitted or caused to be submitted through E-Z Medical to GEICO constituted only a fraction of the <u>total</u> fraudulent billing for physical therapy services that the E-Z Medical Defendants submitted through E-Z Medical to <u>all</u> of the automobile insurers in the Florida automobile insurance market.

164.    GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

165.    It is extremely improbable, to the point of impossibility, that the E-Z Medical Defendants only submitted fraudulent billing to GEICO, and that the E-Z Medical Defendants did not simultaneously bill other automobile insurers.

166.    Thus, upon information and belief, the impossible number of physical therapy services that Mas purported to directly supervise or provide to GEICO Insureds at E-Z Medical on individual dates of service, including the dates of service identified above, constituted only a fraction of the <u>total</u> number of physical therapy services that Mas purported to directly supervise or provide at E-Z Medical, including to individuals insured by companies other than GEICO, on those same dates of service.

167.    In fact, Mas did not perform or directly supervise any of the physical therapy services that were billed through E-Z Medical to GEICO.

168.    What is more, E-Z Medical did not actually provide any legitimate physical therapy services to GEICO Insureds.

169.    Rather: (i) all of the putative "physical therapy" services that the E-Z Medical Defendants purported to provide through E-Z Medical to Insureds were performed, to the extent that they were performed at all, by Fernandez, Y. Rodriguez, and other physical therapist

assistants associated with E-Z Medical, rather than by Mas; (ii) Mas did not even legitimately supervise the putative "physical therapy" services that were billed through E-Z Medical to GEICO; and (iii) none of the putative "physical therapy" services that were billed through E-Z Medical to GEICO actually constituted physical therapy, because Fernandez, Y. Rodriguez, and the other physical therapist assistants associated with E-Z Medical are not and never have been licensed as physical therapists, and did not perform the pertinent services under the supervision of any licensed physical therapist, physician, or other healthcare provider.

170.    As set forth above, the No-Fault Law's billing requirements provide – among other things – that all PIP billing must comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms. See Fla. Stat. § 627.736.

171.    All of the billing that the E-Z Medical Defendants submitted through E-Z Medical to GEICO, including the billing for putative physical therapy services, was submitted on HCFA-1500 forms.

172.    Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, the name of the healthcare provider who actually performed or directly supervised the underlying physical therapy treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

173.    To "directly supervise" a physical therapy treatment, a physician "must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room

when the procedure is performed." <u>See</u>, <u>e.g.</u>, Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set, <u>citing</u> 42 C.F.R. 410.32.

174.    Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, to the extent that a physician is not actually "directly supervising" a physical therapy treatment, then the actual name of the person who is actually performing the physical therapy treatment must be listed on the HCFA-1500 form. <u>See</u>, <u>e.g.</u>, Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

175.    The E-Z Medical Defendants were well-aware of the fact that – because Fernandez, Y. Rodriguez and the other physical therapist assistants associated with E-Z Medical were unsupervised physical therapist assistants, rather than physical therapists – E-Z Medical could not recover PIP Benefits for any services that Fernandez, Y. Rodriguez, or the other physical therapist assistants associated with E-Z Medical purported to provide.

176.    As a result, and in order to conceal the fact that Fernandez, Y. Rodriguez, and the other physical therapist assistants associated with E-Z Medical unlawfully provided, without any legitimate supervision by Mas, all of the "physical therapy" services that were billed through E-Z Medical to GEICO, the E-Z Medical Defendants deliberately omitted any reference to Fernandez, Y. Rodriguez, and the other physical therapist assistants associated with E-Z Medical on many of the HCFA-1500 forms that they used to bill for the putative physical therapy services.

177.    Instead, in the claims for physical therapy services identified in Exhibit "1", the E-Z Medical Defendants routinely falsely listed Mas on the HCFA-1500 forms as the supposed provider or direct supervisor of the physical therapy services.

178.    For example:

(i)     On or about April 29, 2016, the E-Z Medical Defendants billed GEICO for physical therapy services that purportedly were provided through E-Z Medical to an Insured named LF on April 15, 2016. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the E-Z Medical Defendants deliberately omitted any reference to Y. Rodriguez from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Y. Rodriguez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Y. Rodriguez, without any legitimate supervision by Mas.

(ii)    On or about May 20, 2016, the E-Z Medical Defendants billed GEICO for physical therapy services that purportedly were provided through E-Z Medical to an Insured named CB on May 11, 2016. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the E-Z Medical Defendants deliberately omitted any reference to Y. Rodriguez from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Y. Rodriguez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Y. Rodriguez, without any legitimate supervision by Mas.

(iii)   On or about May 27, 2016, the E-Z Medical Defendants billed GEICO for physical therapy services that purportedly were provided through E-Z Medical to an Insured named LF on May 23, 2016. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the E-Z Medical Defendants deliberately omitted any reference to Y. Rodriguez from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Y. Rodriguez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Y. Rodriguez, without any legitimate supervision by Mas.

(iv)    On or about June 2, 2016, the E-Z Medical Defendants billed GEICO for physical therapy services that purportedly were provided through E-Z Medical to an Insured named RG on May 23, 2016. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the E-Z Medical Defendants deliberately omitted any reference to Y. Rodriguez from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Y. Rodriguez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Y. Rodriguez, without any legitimate supervision by Mas.

(v)     On or about September 27, 2016, the E-Z Medical Defendants billed GEICO for physical therapy services that purportedly were provided through E-Z Medical to

an Insured named GB on September 9, 2016. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the E-Z Medical Defendants deliberately omitted any reference to Fernandez from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Fernandez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Fernandez, without any legitimate supervision by Mas.

(vi)     On or about November 16, 2016, the E-Z Medical Defendants billed GEICO for physical therapy services that purportedly were provided through E-Z Medical to an Insured named GB on October 19, 2016. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the E-Z Medical Defendants deliberately omitted any reference to Fernandez from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Fernandez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Fernandez, without any legitimate supervision by Mas.

(vii)    On or about May 5, 2017, the E-Z Medical Defendants billed GEICO for physical therapy services that purportedly were provided through E-Z Medical to an Insured named HE on May 3, 2017. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the E-Z Medical Defendants deliberately omitted any reference to Fernandez from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Fernandez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Fernandez, without any legitimate supervision by Mas.

(viii)   On or about May 5, 2017, the E-Z Medical Defendants billed GEICO for physical therapy services that purportedly were provided through E-Z Medical to an Insured named RR on May 3, 2017. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the E-Z Medical Defendants deliberately omitted any reference to Fernandez from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Fernandez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Fernandez, without any legitimate supervision by Mas.

(ix)     On or about June 28, 2017, the E-Z Medical Defendants billed GEICO for physical therapy services that purportedly were provided through E-Z Medical to an Insured named PS on June 7, 2017. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the E-Z Medical Defendants deliberately omitted any reference to Fernandez from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Fernandez, in keeping with the fact that the

pertinent services were performed – to the extent that they were performed at all – by Fernandez, without any legitimate supervision by Mas.

(x)     On or about July 28, 2017, the E-Z Medical Defendants billed GEICO for physical therapy services that purportedly were provided through E-Z Medical to an Insured named PS on July 5, 2017. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the E-Z Medical Defendants deliberately omitted any reference to Fernandez from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Fernandez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Fernandez, without any legitimate supervision by Mas.

179.    These are only representative examples. In virtually all of the claims for physical therapy services that are identified in Exhibit "1", the E-Z Medical Defendants falsely represented in the HCFA-1500 forms they submitted to GEICO that Mas had performed or at least directly supervised the underlying physical therapy services, when in fact the services were performed by Fernandez, Y. Rodriguez, or other physical therapist assistants associated with E-Z Medical, to the extent that they were performed at all, without any supervision by Mas or anyone else.

180.    In the claims for initial examinations and follow-up examinations identified in Exhibit "1", the E-Z Medical Defendants routinely fraudulently misrepresented that the initial examinations and follow-up examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative initial examinations and follow-up examinations were illegally performed – to the extent they were performed at all – by physician assistants, without any supervision by anyone, in contravention of Florida law;

(ii)    E-Z Medical could not lawfully recover PIP Benefits for the putative initial examinations and follow-up examinations, because they were illegally performed by physician assistants, without any supervision by anyone, in contravention of Florida law; and

52

      (iii)     the E-Z Medical Defendants systematically fraudulently misrepresented that the initial examinations and follow-up examinations were legitimately supervised by Mas.

181.    In the claims for physical therapy services identified in Exhibit "1", the E-Z Medical Defendants routinely fraudulently misrepresented that the physical therapy services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

      (i)     the putative physical therapy services were illegally performed – to the extent they were performed at all – by physical therapist assistants, without any supervision by anyone, in contravention of Florida law;

      (ii)     E-Z Medical could not lawfully recover PIP Benefits for the putative physical therapy services, because they were illegally performed by physical therapist assistants, without any supervision by anyone, in contravention of Florida law; and

      (iii)     the E-Z Medical Defendants systematically fraudulently misrepresented and concealed the identities of the individuals who performed or directly supervised the putative physical therapy services in their billing for the putative "physical therapy" services.

182.    These fraudulent misrepresentations and acts of fraudulent concealment demonstrate that E-Z Medical was operated without a legitimate medical director.

183.    For instance, Mas – who purported to serve as the "medical director" at E-Z Medical beginning in December 2013 – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

184.    Nor, for that matter, did Mas "[e]nsure that all practitioners providing health care services or supplies to patients maintain[ed] a current active and unencumbered Florida license", or "[e]nsure that all health care practitioners at the clinic [had] active appropriate certification or licensure for the level of care being provided." See Fla. Stat. § 400.9935(1).

185. Had Mas actually fulfilled his statutory role as medical director at E-Z Medical, he would have – among other things – legitimately supervised Fernandez, Y. Rodriguez, or other physical therapist assistants associated with E-Z Medical when they performed physical therapy services under Mas's license number.

186. Had Mas actually fulfilled his statutory role as medical director at E-Z Medical, he would have noted – among other things – that the E-Z Medical Defendants routinely fraudulently represented in E-Z Medical's billing that the initial examinations and follow-up examinations were performed, or at least legitimately supervised, by Mas.

187. Had Mas actually fulfilled his statutory role as medical director at E-Z Medical, he would have noted – among other things – that the E-Z Medical Defendants routinely fraudulently represented in E-Z Medical's billing that the physical therapy services were performed, or at least directly supervised, by Mas.

188. Had Mas actually fulfilled his statutory role as medical director at E-Z Medical, he would have noted – among other things – that the E-Z Medical Defendants routinely fraudulently concealed the fact that the physical therapy services were provided – to the extent that they were provided at all – by Fernandez, Y. Rodriguez, and other physical therapist assistants associated with E-Z Medical, without any supervision by anyone, and therefore were unreimbursable under the No-Fault Law.

189. Had Mas actually fulfilled his statutory role as medical director at E-Z Medical, he would have ensured – among other things – that all of the individuals providing physical therapy services had active appropriate licensure to perform physical therapy services without supervision.

190.     Mas did none of these things, because he never actually served as a legitimate medical director at E-Z Medical in the first instance, rendering E-Z Medical ineligible to collect PIP Benefits in the first instance.

**2.     The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at Davila Medical**

191.     Davila Medical, Davila, Mas, D. Diaz, Vital, and Pajon (collectively, the "Davila Medical Defendants") billed for a limited range of health care services through Davila Medical, specifically: (i) purported initial patient examinations; (ii) purported follow-up patient examinations; and (iii) purported physical therapy services, including hot/cold packs, infrared therapy, ultrasound therapy, neuromuscular reeducation, therapeutic exercises, therapeutic activities, "self-care training", and electrical stimulation.

192.     As set forth in Exhibit "2", the purported physical therapy services constituted the vast majority of the services that the Davila Medical Defendants billed through Davila Medical to GEICO.

193.     Mas was between approximately 68 and 70 years old during the period from 2016 to the present when he falsely purported to serve as "medical director" at Davila Medical.

194.     Even so, during Mas's tenure as Davila Medical's purported "medical director", Mas also purported to serve as the "medical director" for numerous other medical clinics, including E-Z Medical, Baracusa Health, Westchester Medical, and Golden Health, and purported to personally perform or directly supervise a massive amount of medical services for those clinics and other health care providers.

195.     As a result, Mas was only occasionally physically present at Davila Medical, and did not personally perform – or even directly supervise – the massive amount of physical therapy services that Davila Medical purported to provide to GEICO Insureds. Indeed, during his tenure

as Davila Medical's purported "medical director", Mas only visited the clinic sporadically to purport to conduct or supervise initial and follow-up patient examinations – to the extent the examinations were performed at all – and to sign bills and treatment reports prepared by other Davila Medical personnel, including D. Diaz, Vital, and Pajon, at Davila's direction. Even when Mas was physically present at Davila Medical, he never provided, supervised, ordered, or prescribed the physical therapy services purportedly provided at Davila Medical.

196.    All of the physical therapy services that Davila Medical purported to provide between 2016 and the present were performed by D. Diaz, Vital, Pajon, and other massage therapists associated with Davila Medical, who reported directly to Davila without any legitimate supervision or oversight by Mas or any other licensed physician.

197.    As set forth above, prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics, to collect PIP Benefits for massage therapy, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed" by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting. See 2012 Fla. ALS 197.

198.    However – and again, as set forth above – in response to rampant PIP fraud involving massage therapists and massage, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for services provided by massage therapists. See 2012 Fla. ALS 197; see also Fla. Stat. § 627.736(1)(a)(5).

199.    What is more, and as set forth above, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy. See Fla. Stat. § 486.028.

200.     D. Diaz, Vital, and Pajon were licensed as massage therapists. They were never licensed as physical therapists.

201.     As a result, with respect to insurance policies issued after January 1, 2013, the No-Fault Law prohibited Davila Medical from recovering PIP Benefits for services – including but not limited to physical therapy services – provided by unsupervised massage therapists such as D. Diaz, Vital, and Pajon.

202.     The Davila Medical Defendants were well-aware of the fact that – with respect to insurance policies issued after January 1, 2013 – Davila Medical could not legally recover PIP Benefits for services provided by unsupervised massage therapists such as D. Diaz, Vital, and Pajon. For example, and as set forth above, the amendments to the No-Fault Law prohibiting PIP reimbursement for massage or for services provided by massage therapists were widely reported, as was the preceding legal struggle by various massage therapists and massage trade organizations to fight the amendments.

203.     In keeping with the fact that the Davila Medical Defendants knew that – with respect to insurance policies issued after January 1, 2013 – they could not lawfully recover PIP Benefits for services provided by unsupervised massage therapists, in 2016 the Davila Medical Defendants began to list Mas as the treating provider on the majority of the bills submitted to GEICO for the majority of services that the Davila Medical Defendants purported to provide to GEICO Insureds, including many of the individual physical therapy services that were billed through Davila Medical to GEICO.

204.     Considering his advanced age, and the fact that he simultaneously was purporting to serve as medical director at no fewer than five health care clinics and to perform a massive number of individual health care services at numerous health care practices throughout the

Miami area, Mas could not physically have performed, or even directly supervised, the physical

therapy services that were billed through Davila Medical to GEICO between 2016 and the

present.

205.    Even so, the Davila Medical Defendants routinely falsely represented in the

billing they submitted or caused to be submitted through Davila Medical to GEICO for physical

therapy services between 2016 and the present that Mas personally performed, or at least directly

supervised, the underlying physical therapy services.

206.    For example:

(i)    On March 14, 2017, the Davila Medical Defendants purported to provide at least
       five individual physical therapy services to at least one individual Insured, and
       falsely contended in the resulting bills to GEICO that Mas personally performed
       or at least directly supervised every one of those treatments. What is more, those
       putative treatments included at least 2 hours of physical therapy services that
       required direct, one-on-one patient contact between the treating provider and the
       Insured throughout the services. That same day, Mas <u>also</u> purported to personally
       perform, or at least directly supervise: (a) one 15-minute patient examination at
       Atlantic Medical; (b) two 5-minute patient examinations at Westchester Medical;
       (c) at least 10 <u>additional</u> physical therapy services purportedly provided to at least
       two <u>additional</u> GEICO Insureds at Atlantic Medical, including at least 2.5 hours
       of physical therapy services that required direct, one-on-one patient contact
       between the treating provider and the Insureds throughout the services; (d) at least
       12 <u>additional</u> physical therapy services purportedly provided to at least two
       <u>additional</u> GEICO Insureds at Baracusa Health, including at least 2.5 hours of
       physical therapy services that required direct, one-on-one patient contact between
       the treating provider and the Insureds throughout the services; (e) at least 37
       <u>additional</u> physical therapy services purportedly provided to at least five
       <u>additional</u> GEICO Insureds at E-Z Medical, including at least 5.25 hours of
       physical therapy services that required direct, one-on-one patient contact between
       the treating provider and the Insureds throughout the services; (f) at least nine
       <u>additional</u> physical therapy services purportedly provided to at least two
       <u>additional</u> GEICO Insureds at Golden Health, including at least 1.75 hours of
       physical therapy services that required direct, one-on-one patient contact between
       the treating provider and the Insureds throughout the services; (g) at least 13
       <u>additional</u> physical therapy services purportedly provided to at least two
       <u>additional</u> GEICO Insureds at Therapeutic Rehab, including at least 3 hours of
       physical therapy services that required direct, one-on-one patient contact between
       the treating provider and the Insureds throughout the services; (h) at least 12
       <u>additional</u> physical therapy services purportedly provided to at least two

<u>additional</u> GEICO Insureds at We Care Medical, including at least 3.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (i) at least 12 <u>additional</u> physical therapy services purportedly provided to at least two <u>additional</u> GEICO Insureds at Westchester Medical, including at least 3.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 24.5 hours of services that Mas purported to personally perform, or at least directly supervise, on March 14, 2017.

(ii)     On April 10, 2017, the Davila Medical Defendants purported to provide at least six individual physical therapy services to at least one individual Insured, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 2 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services. That same day, Mas <u>also</u> purported to personally perform, or at least directly supervise: (a) one 25-minute patient examination at Golden Health; (b) one 10-minute patient examination at Golden Health;  (c) four 5-minute patient examinations at Westchester Medical; (d) at least 19 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at Atlantic Medical, including at least 5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (e) at least six <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Baracusa Health, including at least 1.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (f) at least 34 <u>additional</u> physical therapy services purportedly provided to at least five <u>additional</u> GEICO Insureds at E-Z Medical, including at least 5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (g) at least 30 <u>additional</u> physical therapy services purportedly provided to at least six <u>additional</u> GEICO Insureds at Golden Health, including at least 6.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (h) at least seven <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Therapeutic Rehab, including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; and (i) at least 22 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at Westchester Medical, including at least 5.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 27.75 hours of services that Mas purported to personally perform, or at least directly supervise, on April 10, 2017.

(iii)    On April 24, 2017, the Davila Medical Defendants purported to provide at least six individual physical therapy services to at least one individual Insured, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 2.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services. That same day, Mas <u>also</u> purported to personally perform, or at least directly supervise: (a) one 30-minute patient examination at Baracusa Health; (b) one 25-minute patient examination at Golden Health; (c) one 25-minute patient examination at Westchester Medical; (d) one 15-minute patient examination at Atlantic Medical; (e) five 5-minute patient examinations at Westchester Medical; (f) at least 39 <u>additional</u> physical therapy services purportedly provided to at least eight <u>additional</u> GEICO Insureds at Atlantic Medical, including at least 10 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (g) at least five <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Baracusa Health, including at least 1.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (h) at least 43 <u>additional</u> physical therapy services purportedly provided to at least seven <u>additional</u> GEICO Insureds at E-Z Medical, including at least 7 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (i) at least 20 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at Golden Health, including at least 4.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (j) at least 20 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at Starlite Medical, including at least 5.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (k) at least seven <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Therapeutic Rehab, including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; and (l) at least 30 <u>additional</u> physical therapy services purportedly provided to at least six <u>additional</u> GEICO Insureds at Westchester Medical, including at least 7.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 42 hours of services that Mas purported to personally perform, or at least directly supervise, on April 24, 2017.

(iv)    On April 25, 2017, the Davila Medical Defendants purported to provide at least 5 individual physical therapy services to at least one individual Insured, and falsely contended in the resulting bills to GEICO that Mas personally performed or at

60

least directly supervised every one of those treatments. What is more, those putative treatments included at least 2 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services. That same day, Mas <u>also</u> purported to personally perform, or at least directly supervise: (a) two 25-minute patient examinations at Westchester Medical; (b) one 25-minute patient examination at Davila Medical; (c) one 15-minute patient examinations at Golden Health; (d) four 5-minute patient examinations at Westchester Medical; (e) at least 39 <u>additional</u> therapy services purportedly provided to at least eight <u>additional</u> GEICO Insureds at Atlantic Medical, including at least 9.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (f) at least five <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Baracusa Health, including at least 1.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (g) at least 43 <u>additional</u> physical therapy services purportedly provided to at least seven <u>additional</u> GEICO Insureds at E-Z Medical, including at least 7 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (h) at least 19 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at Golden Health, including at least 4.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (i) at least 20 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at Starlite Medical, including at least 4.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (j) at least seven <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Therapeutic Rehab, including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; and (k) at least 30 <u>additional</u> physical therapy services purportedly provided to at least six <u>additional</u> GEICO Insureds at Westchester Medical, including at least 7 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 39.25 hours of services that Mas purported to personally perform, or at least directly supervise, on April 25, 2017.

(v)     On May 3, 2017, the Davila Medical Defendants purported to provide at least five individual physical therapy services to at least one individual Insured, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 2 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services. That same day, Mas <u>also</u> purported to personally

61

perform, or at least directly supervise: (a) three 30-minute patient examinations at Starlite Medical; (b) one 15-minute patient examination at Atlantic Medical; (c) three 5-minute patient examinations at Westchester Medical; (d) at least 28 additional physical therapy services purportedly provided to at least six additional GEICO Insureds at Atlantic Medical, including at least 7 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (e) at least six additional physical therapy services purportedly provided to at least one additional GEICO Insured at Baracusa Health, including at least 1.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (f) at least 62 additional physical therapy services purportedly provided to at least 10 additional GEICO Insureds at E-Z Medical, including at least 10 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (g) at least 10 additional physical therapy services purportedly provided to at least two additional GEICO Insureds at Golden Health, including at least 2 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services additional services; (h) at least 59 additional physical therapy services purportedly provided to at least 12 additional GEICO Insureds at Starlite Medical, including at least 16.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (i) at least seven additional physical therapy services purportedly provided to at least one additional GEICO Insured at Therapeutic Rehab, including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; and (j) at least 13 additional physical therapy services purportedly provided to at least three additional GEICO Insureds at Westchester Medical, including at least 3.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 45.5 hours of services that Mas purported to personally perform, or at least directly supervise, on May 3, 2017.

(vi)     On May 17, 2017, the Davila Medical Defendants purported to provide at least 12 individual physical therapy services to at least two individual Insureds, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 4 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Mas also purported to personally perform, or at least directly supervise: (a) one 45-minute patient examination at Atlantic Medical; (b) one 25-minute patient examination at Westchester Medical; (c) five 5-minute patient examinations at Westchester Medical; (d) at least 29 additional physical therapy services purportedly provided to at least six additional GEICO Insureds at Atlantic Medical, including at least 7.25 hours of physical

therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (e) at least 47 <u>additional</u> physical therapy services purportedly provided to at least seven <u>additional</u> GEICO Insureds at E-Z Medical, including at least 7 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (f) at least 29 <u>additional</u> physical therapy services purportedly provided to at least six <u>additional</u> GEICO Insureds at Starlite Medical, including at least 8 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (g) at least 28 <u>additional</u> physical therapy services purportedly provided to at least six <u>additional</u> GEICO Insureds at Westchester Medical, including at least 6.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 34.25 hours of services that Mas purported to personally perform, or at least directly supervise, on May 17, 2017.

(vii)   On June 13, 2017, the Davila Medical Defendants purported to provide at least 29 individual physical therapy services to at least five individual Insureds, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 10 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Mas <u>also</u> purported to personally perform, or at least directly supervise: (a) one 25-minute patient examination at Westchester Medical; (b) one 25-minute patient examination at Atlantic Medical; (c) six 5-minute patient examinations at Westchester Medical; (d) at least 10 <u>additional</u> physical therapy services purportedly provided to at least two <u>additional</u> GEICO Insureds at Atlantic Medical, including at least 2.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (e) at least 62 <u>additional</u> physical therapy services purportedly provided to at least nine <u>additional</u> GEICO Insureds at E-Z Medical, including at least 9 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (f) at least 45 <u>additional</u> physical therapy services purportedly provided to at least nine <u>additional</u> GEICO Insureds at Starlite Medical, including at least 12.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (g) at least 27 <u>additional</u> physical therapy services purportedly provided to at least seven additional GEICO Insureds at Westchester Medical, including at least 7.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 42.75 hours of services that Mas purported to personally perform, or at least directly supervise, on June 13, 2017.

(viii)   On December 6, 2017, the Davila Medical Defendants purported to provide at least 26 individual physical therapy services to at least five individual Insureds, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 10.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Mas <u>also</u> purported to personally perform, or at least directly supervise: (a) one 45-minute patient examination at Angels Diagnostic; (b) two 15-minute patient examinations at Angels Diagnostic; (c) six 5-minute patient examinations at Westchester Medical; (d) at least 27 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at E-Z Medical, including at least 4.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (e) at least six <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Health Solutions, including at least 1.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (f) at least 12 <u>additional</u> physical therapy services purportedly provided to at least two <u>additional</u> GEICO Insureds at Star Medical, including at least 2.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (g) at least 55 <u>additional</u> physical therapy services purportedly provided to at least 11 <u>additional</u> GEICO Insureds at Starlite Medical, including at least 15.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (h) at least 18 <u>additional</u> physical therapy services purportedly provided to at least three <u>additional</u> GEICO Insureds at Therapeutic Rehab, including at least 4.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (i) at least 19 <u>additional</u> physical therapy services purportedly provided to at least six <u>additional</u> GEICO Insureds at Westchester Medical, including at least 7 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 48.25 hours of services that Mas purported to personally perform, or at least directly supervise, on December 6, 2017.

(ix)   On December 12, 2017, the Davila Medical Defendants purported to provide at least 37 individual physical therapy services to at least seven individual Insureds, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 14.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Mas <u>also</u> purported to personally perform, or at least directly supervise: (a) one 45-minute patient examination at E-Z Medical; (b) two 45-minute patient examinations at

Westchester Medical; (c) one 30-minute patient examination at E-Z Medical; (d) one 25-minute patient examination at Davila Medical; (e) one 25-minute patient examination at Starlite Medical; (f) six 5-minute patient examinations at Westchester Medical; (g) at least 33 additional physical therapy services purportedly provided to at least five additional GEICO Insureds at E-Z Medical, including at least 5.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (h) at least six additional physical therapy services purportedly provided to at least one additional GEICO Insured at Health Solutions, including at least 1.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (i) at least 24 additional physical therapy services purportedly provided to at least four additional GEICO Insureds at Star Medical, including at least 5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (j) at least 45 additional physical therapy services purportedly provided to at least nine additional GEICO Insureds at Starlite Medical, including at least 11 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (k) at least 11 additional physical therapy services purportedly provided to at least two additional GEICO Insureds at Therapeutic Rehab, including at least 3 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (l) at least 24 additional physical therapy services purportedly provided to at least eight additional GEICO Insureds at Westchester Medical, including at least 7.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 51.75 hours of services that Mas purported to personally perform, or at least directly supervise, on December 12, 2017.

(x)     On January 11, 2018, the Davila Medical Defendants purported to provide at least 32 individual physical therapy services to at least five individual Insureds, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 12.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Mas also purported to personally perform, or at least directly supervise: (a) one 15-minute patient examination at E-Z Medical; (b) three 5-minute patient examinations at Westchester Medical; (c) at least 22 additional physical therapy services purportedly provided to at least three additional GEICO Insureds at E-Z Medical, including at least 3.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (d) at least 24 additional physical therapy services purportedly provided to at least four additional GEICO Insureds at Star Medical, including at least 5.25 hours of physical therapy services that required direct, one-on-one patient contact between

65

the treating provider and the Insureds throughout the services; (e) at least 35 additional physical therapy services purportedly provided to at least seven additional GEICO Insureds at Starlite Medical, including at least 9 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (f) at least 21 additional physical therapy services purportedly provided to at least four additional GEICO Insureds at Therapeutic Rehab, including at least 6 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (g) at least 12 additional physical therapy services purportedly provided to at least three additional GEICO Insureds at Westchester Medical, including at least 3.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 40.75 hours of services that Mas purported to personally perform, or at least directly supervise, on January 11, 2018.

207.    These are only representative examples. In the claims for physical therapy services that are identified in Exhibit "2", the Davila Medical Defendants routinely falsely represented that Mas had performed – or at least directly supervised – an improbable, and often impossible number of physical therapy services on individual dates, considering the amounts of services he simultaneously was purporting to perform or directly supervise at the other Clinic Defendants and other health care clinics.

208.    It is improbable, to the point of impossibility, that Mas – who was advanced in age at the time, and simultaneously working or purporting to work at numerous other medical practices and clinics – routinely performed or directly supervised such a high volume of physical therapy services on individual dates.

209.    Upon information and belief, the fraudulent billing for physical therapy services that the Davila Medical Defendants submitted or caused to be submitted through Davila Medical to GEICO constituted only a fraction of the total fraudulent billing for physical therapy services that the Davila Medical Defendants submitted through Davila Medical to all of the automobile insurers in the Florida automobile insurance market.

210.    As set forth above, GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

211.    It is extremely improbable, to the point of impossibility, that the Davila Medical Defendants only submitted fraudulent billing to GEICO, and that the Davila Medical Defendants did not simultaneously bill other automobile insurers.

212.    Thus, upon information and belief, the impossible number of physical therapy services that Mas purported to directly supervise or provide to GEICO Insureds at Davila Medical on individual dates of service, including the dates of service identified above, constituted only a fraction of the total number of physical therapy services that Mas purported to directly supervise or provide at Davila Medical, including to individuals insured by companies other than GEICO, on those same dates of service.

213.    In fact, Mas did not perform or directly supervise any of the physical therapy services that were billed through Davila Medical to GEICO.

214.    What is more, since at least 2016 Davila Medical did not actually provide any legitimate physical therapy services to GEICO Insureds.

215.    Rather: (i) all of the putative "physical therapy" services that the Davila Medical Defendants purported to provide through Davila Medical to Insureds since at least 2016 were performed, to the extent that they were performed at all, by D. Diaz, Vital, Pajon, and other massage therapists associated with Davila Medical, rather than by Mas; (ii) Mas did not even legitimately supervise the putative "physical therapy" services that were billed through Davila Medical to GEICO; and (iii) none of the putative "physical therapy" services that were billed through Davila Medical to GEICO actually constituted physical therapy, because D. Diaz, Vital,

Pajon, and the other massage therapists associated with Davila Medical are not and never have been licensed as physical therapists.

216.    As set forth above, the No-Fault Law's billing requirements provide – among other things – that all PIP billing must comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms. See Fla. Stat. § 627.736.

217.    All of the billing that the Davila Medical Defendants submitted through Davila Medical to GEICO, including the billing for putative physical therapy services, was submitted on HCFA-1500 forms.

218.    As set forth above, pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, the name of the healthcare provider who actually performed or directly supervised the underlying physical therapy treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

219.    As set forth above, to "directly supervise" a physical therapy treatment, a physician "must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed." See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set, citing 42 C.F.R. 410.32.

220.    Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, to the extent that a physician is not actually "directly supervising" a physical therapy treatment, then the actual name of the person who is

actually performing the physical therapy treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

221.    The Davila Medical Defendants were well-aware of the fact that – because D. Diaz, Vital, Pajon, and the other massage therapists associated with Davila Medical were unsupervised massage therapists, rather than physical therapists – Davila Medical could not recover PIP Benefits for any services that D. Diaz, Vital, Pajon, or the other massage therapists associated with Davila Medical purported to provide with respect to insurance policies issued after January 1, 2013.

222.    As a result, and in order to conceal the fact that D. Diaz, Vital, Pajon, and the other massage therapists associated with Davila Medical unlawfully provided, without any legitimate supervision by Mas, all of the "physical therapy" services that were billed through Davila Medical to GEICO with respect to insurance policies issued after January 1, 2013, the Davila Medical Defendants deliberately omitted any reference to either D. Diaz, Vital, Pajon, and the other massage therapists associated with Davila Medical on the HCFA-1500 forms that they used to bill for the putative physical therapy services.

223.    Instead, in the claims for physical therapy services identified in Exhibit "2", the Davila Medical Defendants falsely listed Mas on the HCFA-1500 forms as the supposed provider or direct supervisor of the physical therapy services.

224.    For example:

(i)    On or about January 28, 2016, the Davila Medical Defendants billed GEICO for physical therapy services that purportedly were provided through Davila Medical to an Insured named LM on January 21, 2016. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Davila Medical Defendants deliberately omitted any reference to D. Diaz from the HCFA-1500 form. However, the underlying

physical therapy treatment notes were signed by D. Diaz, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by D. Diaz, without any legitimate supervision by Mas.

(ii)   On or about January 28, 2016, the Davila Medical Defendants billed GEICO for physical therapy services that purportedly were provided through Davila Medical to an Insured named EH on January 21, 2016. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Davila Medical Defendants deliberately omitted any reference to D. Diaz from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by D. Diaz, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by D. Diaz, without any legitimate supervision by Mas.

(iii)   On or about September 15, 2016, the Davila Medical Defendants billed GEICO for physical therapy services that purportedly were provided through Davila Medical to an Insured named JR on September 7, 2016. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Davila Medical Defendants deliberately omitted any reference to D. Diaz from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by D. Diaz, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by D. Diaz, without any legitimate supervision by Mas.

(iv)   On or about September 15, 2016, the Davila Medical Defendants billed GEICO for physical therapy services that purportedly were provided through Davila Medical to an Insured named BP on September 7, 2016. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Davila Medical Defendants deliberately omitted any reference to D. Diaz from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by D. Diaz, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by D. Diaz, without any legitimate supervision by Mas.

(v)   On or about January 18, 2017, the Davila Medical Defendants billed GEICO for physical therapy services that purportedly were provided through Davila Medical to an Insured named MM on January 3, 2017. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Davila Medical Defendants deliberately omitted any reference to D. Diaz from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by D. Diaz, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by D. Diaz, without any legitimate supervision by Mas.

(vi)     On or about February 13, 2017, the Davila Medical Defendants billed GEICO for physical therapy services that purportedly were provided through Davila Medical to an Insured named JQ on February 8, 2017. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Davila Medical Defendants deliberately omitted any reference to D. Diaz from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by D. Diaz, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by D. Diaz, without any legitimate supervision by Mas.

(vii)    On or about October 10, 2017, the Davila Medical Defendants billed GEICO for physical therapy services that purportedly were provided through Davila Medical to an Insured named YA on September 21, 2017. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Davila Medical Defendants deliberately omitted any reference to Vital from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Vital, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Vital, without any legitimate supervision by Mas.

(viii)   On or about October 11, 2017, the Davila Medical Defendants billed GEICO for physical therapy services that purportedly were provided through Davila Medical to an Insured named DM on September 21, 2017. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Davila Medical Defendants deliberately omitted any reference to Vital from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Vital, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Vital, without any legitimate supervision by Mas.

(ix)     On or about October 10, 2017, the Davila Medical Defendants billed GEICO for physical therapy services that purportedly were provided through Davila Medical to an Insured named RR on September 29, 2017. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Davila Medical Defendants deliberately omitted any reference to Vital from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Vital, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Vital, without any legitimate supervision by Mas.

(x)      On or about December 1, 2017, the Davila Medical Defendants billed GEICO for physical therapy services that purportedly were provided through Davila Medical to an Insured named AA on November 22, 2017. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Davila Medical Defendants deliberately omitted any reference to Vital from the HCFA-1500 form. However, the underlying

physical therapy treatment notes were signed by Vital, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Vital, without any legitimate supervision by Mas.

(xi)     On or about January 3, 2018, the Davila Medical Defendants billed GEICO for physical therapy services that purportedly were provided through Davila Medical to an Insured named GR on December 6, 2017. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Davila Medical Defendants deliberately omitted any reference to Vital from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Vital, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Vital, without any legitimate supervision by Mas.

(xii)    On or about December 27, 2017, the Davila Medical Defendants billed GEICO for physical therapy services that purportedly were provided through Davila Medical to an Insured named TO on December 7, 2017. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Davila Medical Defendants deliberately omitted any reference to Pajon from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Pajon, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Pajon, without any legitimate supervision by Mas.

(xiii)   On or about January 4, 2018, the Davila Medical Defendants billed GEICO for physical therapy services that purportedly were provided through Davila Medical to an Insured named RC on December 13, 2017. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Davila Medical Defendants deliberately omitted any reference to Pajon from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Pajon, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Pajon, without any legitimate supervision by Mas.

(xiv)    On or about January 5, 2018, the Davila Medical Defendants billed GEICO for physical therapy services that purportedly were provided through Davila Medical to an Insured named JZ on December 14, 2017. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Davila Medical Defendants deliberately omitted any reference to Vital from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Pajon, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Pajon, without any legitimate supervision by Mas.

(xv)     On or January 25, 2018, the Davila Medical Defendants billed GEICO for physical therapy services that purportedly were provided through Davila Medical

72

to an Insured named AC on January 18, 2018. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Davila Medical Defendants deliberately omitted any reference to Vital from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Vital, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Vital, without any legitimate supervision by Mas.

225.    These fraudulent misrepresentations and acts of fraudulent concealment demonstrate that Davila Medical was operated without a legitimate medical director.

226.    For instance, Mas – who purported to serve as the "medical director" at Davila Medical beginning in 2016 – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

227.    Nor, for that matter, did Mas "[e]nsure that all practitioners providing health care services or supplies to patients maintain[ed] a current active and unencumbered Florida license", or "[e]nsure that all health care practitioners at the clinic [had] active appropriate certification or licensure for the level of care being provided." See Fla. Stat. § 400.9935(1).

228.    Had Mas actually fulfilled his statutory role as medical director at Davila Medical, he would have noted – among other things – that the Davila Medical Defendants routinely fraudulently represented in Davila Medical's billing that the physical therapy services were performed, or at least directly supervised, by Mas.

229.    Had Mas actually fulfilled his statutory role as medical director at Davila Medical, he would have noted – among other things – that the Davila Medical Defendants routinely fraudulently concealed the fact that the physical therapy services were performed without supervision – to the extent that they were performed at all – by D. Diaz, Vital, Pajon, and

other massage therapists associated with Davila Medical, who were massage therapists and not physical therapists, and therefore were unreimbursable under the No-Fault Law.

230.   Had Mas actually fulfilled his statutory role as medical director at Davila Medical, he would have ensured – among other things – that all of the individuals providing physical therapy services had active appropriate licensure to perform physical therapy services. Mas also would have ensured that individuals providing physical therapy were being supervised by a licensed physician while the treatment was being rendered.

231.   Mas did none of these things, because he never actually served as a legitimate medical director at Davila Medical in the first instance, rendering Davila Medical ineligible to collect PIP Benefits in the first instance.

**3.     The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at Baracusa Health**

232.   Like the E-Z Medical Defendants and the Davila Medical Defendants, Baracusa Health, Corrales, Mas, and Romero (collectively, the "Baracusa Health Defendants") billed for a limited range of health care services through Baracusa Health, specifically: (i) purported initial patient examinations; (ii) purported follow-up patient examinations; and (iii) purported physical therapy services, including hot/cold packs, mechanical traction, infrared therapy, contrast baths, ultrasound therapy, neuromuscular reeducation, hydro-bed therapy, therapeutic exercises, paraffin bath, manual therapy, "self-care training", and electrical stimulation.

233.   As set forth in Exhibit "3", the purported physical therapy services constituted the vast majority of the services that the Baracusa Health Defendants billed through Baracusa Health to GEICO.

234.   Mas was between approximately 68 and 70 years old during the period from 2016 to the present when he falsely purported to serve as "medical director" at Baracusa Health.

235.     Even so, during Mas's tenure as Baracusa Health's purported "medical director", Mas also purported to serve as the "medical director" for numerous other medical clinics, including E-Z Medical, Davila Medical, Westchester Health, and Golden Health, and also purported to personally perform or directly supervise a massive amount of medical services for those clinics and other health care providers.

236.     As a result, Mas was only occasionally physically present at Baracusa Health, and did not personally perform – or even directly supervise – the massive amount of physical therapy services that Baracusa Health purported to provide to GEICO Insureds.

237.     Indeed, during his tenure as Baracusa Health's purported "medical director", Mas only visited the clinic sporadically to purport to conduct initial and follow-up patient examinations – to the extent the examinations were performed at all – and to sign bills and treatment reports prepared by other Baracusa Health personnel, including Romero, at Corrales's direction.

238.     Even when Mas was physically present at Baracusa Health, he never provided, supervised, ordered, or prescribed the physical therapy services purportedly provided at Baracusa Health.

239.     All of the physical therapy services that Baracusa Health purported to provide between 2016 and the present were performed by Romero or other unsupervised massage therapists at Baracusa Health who reported directly to Corrales without any legitimate supervision or oversight by Mas or any other licensed physician.

240.     As set forth above, prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics, to collect PIP Benefits for massage therapy, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed"

by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting. See 2012 Fla. ALS 197.

241.    However – and again, as set forth above – in response to rampant PIP fraud involving massage therapists and massage, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for services provided by massage therapists. See 2012 Fla. ALS 197; see also Fla. Stat. § 627.736(1)(a)(5).

242.    What is more, and as set forth above, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy. See Fla. Stat. § 486.028.

243.    Romero was licensed as a massage therapist. Romero was never licensed as a physical therapist.

244.    As a result, with respect to insurance policies issued after January 1, 2013, the No-Fault Law prohibited Baracusa Health from recovering PIP Benefits for services – including but not limited to physical therapy services – provided by unsupervised massage therapists such as Romero.

245.    The Baracusa Health Defendants were well-aware of the fact that – with respect to insurance policies issued after January 1, 2013 – Baracusa Health could not legally recover PIP Benefits for services provided by unsupervised massage therapists such as Romero. For example, and as set forth above, the amendments to the No-Fault Law prohibiting PIP reimbursement for massage or for services provided by massage therapists were widely reported, as was the preceding legal struggle by various massage therapists and massage trade organizations to fight the amendments.

246.     In keeping with the fact that the Baracusa Health Defendants knew that – with respect to insurance policies issued after January 1, 2013 – they could not lawfully recover PIP Benefits for services provided by unsupervised massage therapists, in 2016 the Baracusa Health Defendants began to list Mas as the treating provider on virtually every single bill submitted to GEICO for virtually every single service that the Baracusa Health Defendants purported to provide to GEICO Insureds, including almost every individual physical therapy service that was billed through Baracusa Health to GEICO.

247.     Considering his advanced age, and the fact that he simultaneously was purporting to serve as medical director at no fewer than five health care clinics and to perform a massive number of individual health care services at those clinics and numerous health care practices throughout the Miami area, Mas could not physically have performed, or even directly supervised, the physical therapy services that were billed through Baracusa Health to GEICO between 2016 and the present.

248.     Even so, the Baracusa Health Defendants routinely falsely represented in the billing they submitted or caused to be submitted through Baracusa Health to GEICO for physical therapy services between 2016 and the present that Mas personally performed, or at least directly supervised, the underlying physical therapy services.

249.      For example:

(i)      On June 22, 2016, the Baracusa Health Defendants purported to provide at least six individual physical therapy services to at least one individual Insured, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 1.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services. That same day, Mas also purported to personally perform, or at least directly supervise: (a) two 45-minute patient examinations at Therapeutic Rehab; (b) at least five additional physical therapy services purportedly provided to at least one additional GEICO Insured at Atlantic

Medical, including at least 1.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (c) at least 31 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at E-Z Medical, including at least 4 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (d) at least 4 <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Med-Advanced, including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; and (e) at least 14 <u>additional</u> physical therapy services purportedly provided to at least two <u>additional</u> GEICO Insureds at Therapeutic Rehab, including at least 2.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 12 hours of services that Mas purported to personally perform, or at least directly supervise, on June 22, 2016.

(ii)     On July 20, 2016, the Baracusa Health Defendants purported to provide at least 10 individual physical therapy services to at least two individual Insureds, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 2.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Mas <u>also</u> purported to personally perform, or at least directly supervise: (a) at least 10 <u>additional</u> physical therapy services purportedly provided to at least two <u>additional</u> GEICO Insureds at Atlantic Medical, including at least 2.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (b) at least eight <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at E-Z Medical, including at least 1 hour of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; and (c) at least 14 <u>additional</u> physical therapy services purportedly provided to at least two <u>additional</u> GEICO Insureds at Therapeutic Rehab, including at least 3 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 8.75 hours of services that Mas purported to personally perform, or at least directly supervise, on July 20, 2016.

(iii)    On January 10, 2017, the Baracusa Health Defendants purported to provide at least five individual physical therapy services to at least one individual Insured, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 1.25 hour of physical therapy services that required direct, one-on-one patient contact between the treating

provider and the Insured throughout the services. That same day, Mas <u>also</u> purported to personally perform, or at least directly supervise: (a) at least 36 <u>additional</u> physical therapy services purportedly provided to at least seven <u>additional</u> GEICO Insureds at Atlantic Medical, including at least 8.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (b) at least six <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Davila Medical, including at least 2.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (c) at least seven <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at E-Z Medical, including at least 1.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (d) at least 10 <u>additional</u> physical therapy services purportedly provided to at least two <u>additional</u> GEICO Insureds at a Florida clinic called Health & Wellness Evolution Co., including at least 2 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (e) at least nine <u>additional</u> physical therapy services purportedly provided to at least two <u>additional</u> GEICO Insureds at We Care Medical, including at least 4.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 20 hours of services that Mas purported to personally perform, or at least directly supervise, on January 10, 2017.

(iv)   On February 16, 2017, the Baracusa Health Defendants purported to provide at least seven individual physical therapy services to at least one individual Insured, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services. That same day, Mas <u>also</u> purported to personally perform, or at least directly supervise: (a) two 45-minute patient examinations at E-Z Medical; (b) two 15-minute patient examinations at E-Z Medical; (c) at least 10 <u>additional</u> physical therapy services purportedly provided to at least two <u>additional</u> GEICO Insureds at Atlantic Medical, including at least 2.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (d) at least six <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Davila Medical, including at least 2 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (e) at least 34 <u>additional</u> physical therapy services purportedly provided to at least five <u>additional</u> GEICO Insureds at E-Z Medical, including at least 5 hours of physical therapy services that required direct, one-on-one patient contact between the

treating provider and the Insureds throughout the services; (f) at least 20 additional physical therapy services purportedly provided to at least four additional GEICO Insureds at Golden Health, including at least 4.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (g) at least six additional physical therapy services purportedly provided to at least one additional GEICO Insured at Therapeutic Rehab, including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; and (h) at least 12 additional physical therapy services purportedly provided to at least two additional GEICO Insureds at We Care Medical, including at least 3 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 21.75 hours of services that Mas purported to personally perform, or at least directly supervise, on February 16, 2017.

(v)     On March 14, 2017, the Baracusa Health Defendants purported to provide at least 12 individual physical therapy services to at least two individual Insureds, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 2.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Mas also purported to personally perform, or at least directly supervise: (a) one 15-minute patient examination at Atlantic Medical; (b) two 5-minute patient examinations at Westchester Medical; (c) at least 10 additional physical therapy services purportedly provided to at least two additional GEICO Insureds at Atlantic Medical, including at least 2.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (d) at least five additional physical therapy services purportedly provided to at least one additional GEICO Insured at Davila Medical, including at least 2 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (e) at least 37 additional physical therapy services purportedly provided to at least five additional GEICO Insureds at E-Z Medical, including at least 5.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (f) at least 9 additional physical therapy services purportedly provided to at least two additional GEICO Insureds at Golden Health, including at least 1.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (g) at least 13 additional physical therapy services purportedly provided to at least two additional GEICO Insureds at Therapeutic Rehab, including at least 3 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (h) at least 12 additional physical therapy services purportedly provided to at least two

<u>additional</u> GEICO Insureds at We Care Medical, including at least 3.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (i) at least 12 <u>additional</u> physical therapy services purportedly provided to at least two <u>additional</u> GEICO Insureds at Westchester Medical, including at least 3.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 24.5 hours of services that Mas purported to personally perform, or at least directly supervise, on March 14, 2017.

(vi)     On March 22, 2017, the Baracusa Health Defendants purported to provide at least 11 individual physical therapy services to at least two individual Insureds, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 2.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Mas <u>also</u> purported to personally perform, or at least directly supervise: (a) three 5-minute patient examinations at Westchester Medical; (b) at least 28 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at E-Z Medical, including at least 4 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (c) at least 20 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at Golden Health, including at least 4.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (d) at least 13 <u>additional</u> physical therapy services purportedly provided to at least two <u>additional</u> GEICO Insureds at Therapeutic Rehab, including at least 3 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (e) at least six <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at We Care Medical, including at least 1.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; and (f) at least 19 <u>additional</u> physical therapy services purportedly provided to at least three <u>additional</u> GEICO insured at Westchester Medical, including at least 4.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 20 hours of services that Mas purported to personally perform, or at least directly supervise, on March 22, 2017.

(vii)     On April 10, 2017, the Baracusa Health Defendants purported to provide at least six individual physical therapy services to at least one individual Insured, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 1.25 hours of physical therapy services that

required direct, one-on-one patient contact between the treating provider and the Insured throughout the services. That same day, Mas also purported to personally perform or at least directly supervise: (a) one 25-minute patient examination at Golden Health; (b) one 10-minute patient examination at Golden Health; (c) four 5-minute patient examinations at Westchester Medical; (d) at least 19 additional physical therapy services purportedly provided to at least four additional GEICO Insureds at Atlantic Medical, including at least 5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (e) at least six additional physical therapy services purportedly provided to at least one additional GEICO Insured at Davila Medical, including at least 2 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (f) at least 34 additional physical therapy services purportedly provided to at least five additional GEICO Insureds at E-Z Medical, including at least 5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (g) at least 30 additional physical therapy services purportedly provided to at least six additional GEICO Insureds at Golden Health, including at least 6.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (h) at least seven additional physical therapy services purportedly provided to at least one additional GEICO Insured at Therapeutic Rehab, including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; and (i) at least 22 additional physical therapy services purportedly provided to at least four additional GEICO Insureds at Westchester Medical, including at least 5.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 27.75 hours of services that Mas purported to personally perform, or at least directly supervise, on April 10, 2017.

(viii)   April 24, 2017, the Baracusa Health Defendants purported to provide at least five individual physical therapy services to at least one individual Insured, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 1.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services. That same day, Mas also purported to personally perform, or at least directly supervise: (a) one 30-minute patient examination at Baracusa Health; (b) one 25-minute patient examination at Golden Health; (c) one 25-minute patient examination at Westchester Medical; (d) one 15-minute patient examination at Atlantic Medical; (e) five 5-minute patient examinations at Westchester Medical; (f) at least 39 additional physical therapy services purportedly provided to at least eight additional GEICO Insureds at Atlantic Medical, including at least 10 hours of physical therapy services that required

direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (g) at least six <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Davila Medical, including at least 2.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (h) at least 43 <u>additional</u> physical therapy services purportedly provided to at least seven <u>additional</u> GEICO Insureds at E-Z Medical, including at least 7 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (i) at least 20 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at Golden Health, including at least 4.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (j) at least 20 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at Starlite Medical, including at least 5.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (k) at least seven <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Therapeutic Rehab, including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; and (l) at least 30 <u>additional</u> physical therapy services purportedly provided to at least six <u>additional</u> GEICO Insureds at Westchester Medical, including at least 7.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 42 hours of services that Mas purported to personally perform, or at least directly supervise, on April 24, 2017.

(ix)    On April 25, 2017, the Baracusa Health Defendants purported to provide at least five individual physical therapy services to at least one individual Insured, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 1.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services. That same day, Mas <u>also</u> purported to personally perform, or at least directly supervise: (a) two 25-minute patient examinations at Westchester Medical; (b) one 25-minute patient examination at Davila Medical; (c) one 15-minute patient examination at Golden Health; (d) four 5-minute patient examinations at Westchester Medical; (e) at least 39 <u>additional</u> physical therapy services purportedly provided to at least eight <u>additional</u> GEICO Insureds at Atlantic Medical, including at least 9.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (f) at least five <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Davila Medical, including at least 2 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured

throughout the services; (g) at least 43 <u>additional</u> physical therapy services purportedly provided to at least seven <u>additional</u> GEICO Insureds at E-Z Medical, including at least 7 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (h) at least 19 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at Golden Health, including at least 4.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (i) at least 20 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at Starlite Medical, including at least 4.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (j) at least seven <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Therapeutic Rehab, including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; and (k) at least 30 <u>additional</u> physical therapy services purportedly provided to at least six <u>additional</u> GEICO Insureds at Westchester Medical, including at least 7 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 39.25 hours of services that Mas purported to personally perform, or at least directly supervise, on April 25, 2017.

(x)     On May 3, 2017, the Baracusa Health Defendants purported to provide at least six individual physical therapy services to at least one individual Insured, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 1.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services. That same day, Mas <u>also</u> purported to personally perform, or at least directly supervise: (a) three 30-minute patient examinations at Starlite Medical; (b) one 15-minute patient examination at Atlantic Medical; (c) three 5-minute patient examinations at Westchester Medical; (d) at least 28 <u>additional</u> physical therapy services purportedly provided to at least six <u>additional</u> GEICO Insureds at Atlantic Medical, including at least 7 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (e) at least five <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Davila Medical, including at least 2 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (f) at least 62 <u>additional</u> physical therapy services purportedly provided to at least 10 <u>additional</u> GEICO Insureds at E-Z Medical, including at least 10 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (g) at least 10 <u>additional</u> physical therapy services purportedly provided to at least two <u>additional</u> GEICO

Insureds at Golden Health, including at least 2 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services additional services; (h) at least 59 <u>additional</u> physical therapy services purportedly provided to at least 12 <u>additional</u> GEICO Insureds at Starlite Medical, including at least 16.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (i) at least seven <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Therapeutic Rehab, including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; and (j) at least 13 <u>additional</u> physical therapy services purportedly provided to at least three <u>additional</u> GEICO Insureds at Westchester Medical, including at least 3.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 45.5 hours of services that Mas purported to personally perform, or at least directly supervise, on May 3, 2017.

250.    These are only representative examples. In the claims for physical therapy services that are identified in Exhibit "3", the Baracusa Health Defendants routinely falsely represented that Mas had performed – or at least directly supervised – an improbable, and often impossible, number of physical therapy services on individual dates, considering the amounts of services he simultaneously was purporting to perform or directly supervise at the other Clinic Defendants and other health care practices.

251.    It is improbable, to the point of impossibility, that Mas – who was advanced in age at the time, and simultaneously working or purporting to work at various other medical practices and clinics – routinely performed or directly supervised such a high volume of physical therapy services on individual dates.

252.    Upon information and belief, the fraudulent billing for physical therapy services that the Baracusa Health Defendants submitted or caused to be submitted through Baracusa Health to GEICO constituted only a fraction of the <u>total</u> fraudulent billing for physical therapy

services that the Baracusa Health Defendants submitted through Baracusa Health to <u>all</u> of the automobile insurers in the Florida automobile insurance market.

253.    As set forth above, GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

254.    It is extremely improbable, to the point of impossibility, that the Baracusa Health Defendants only submitted fraudulent billing to GEICO, and that the Baracusa Health Defendants did not simultaneously bill other automobile insurers.

255.    Thus, upon information and belief, the impossible number of physical therapy services that Mas purported to directly supervise or provide to GEICO Insureds at Baracusa Health on individual dates of service, including the dates of service identified above, constituted only a fraction of the <u>total</u> number of physical therapy services that Mas purported to directly supervise or provide at Baracusa Health, including to individuals insured by companies other than GEICO, on those same dates of service.

256.    In fact, Mas did not perform or directly supervise any of the physical therapy services that were billed through Baracusa Health to GEICO.

257.    What is more, from the date of its incorporation, Baracusa Health did not actually provide any legitimate physical therapy services to GEICO Insureds.

258.    Rather: (i) all of the putative "physical therapy" services that the Baracusa Health Defendants purported to provide through Baracusa Health to Insureds were performed, to the extent that they were performed at all, by Romero, and other massage therapists associated with Baracusa Health, rather than by Mas; (ii) Mas did not even legitimately supervise the putative "physical therapy" services that were billed through Baracusa Health to GEICO; and (iii) none of the putative "physical therapy" services that were billed through Baracusa Health to GEICO

actually constituted physical therapy, because Romero and the other massage therapists associated with Baracusa Health are not and never have been licensed as physical therapists.

259.    As set forth above, the No-Fault Law's billing requirements provide – among other things – that all PIP billing must comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms. See Fla. Stat. § 627.736.

260.    All of the billing that the Baracusa Health Defendants submitted through Baracusa Health to GEICO, including the billing for putative physical therapy services, was submitted on HCFA-1500 forms.

261.    As set forth above, pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, the name of the healthcare provider who actually performed or directly supervised the underlying physical therapy treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

262.    As set forth above, to "directly supervise" a physical therapy treatment, a physician "must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed." See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set, citing 42 C.F.R. 410.32.

263.    Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, to the extent that a physician is not actually "directly supervising" a physical therapy treatment, then the actual name of the person who is

actually performing the physical therapy treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

264.    The Baracusa Health Defendants were well-aware of the fact that – because Romero and other massage therapists associated with Baracusa Health were unsupervised massage therapists, rather than physical therapists – Baracusa Health could not recover PIP Benefits for any services that Romero and other massage therapists associated with Baracusa Health purported to provide with respect to insurance policies issued after January 1, 2013.

265.    As a result, and in order to conceal the fact that Romero and other massage therapists associated with Baracusa Health unlawfully provided, without any legitimate supervision by Mas, all of the "physical therapy" services that were billed through Baracusa Health to GEICO since 2016, the Baracusa Health Defendants deliberately omitted any reference to either Romero or other massage therapists associated with Baracusa Health on the HCFA-1500 forms that they used to bill for the putative physical therapy services.

266.    Instead, in the claims for physical therapy services identified in Exhibit "3", the Baracusa Health Defendants falsely listed Mas on the HCFA-1500 forms as the supposed provider or direct supervisor of the physical therapy services.

267.    For example:

(i)     On or about June 1, 2016, the Baracusa Health Defendants billed GEICO for physical therapy services that purportedly were provided through Baracusa Health to an Insured named CV on May 18, 2016. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Baracusa Health Defendants deliberately omitted any reference to Romero from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Romero, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Romero, without any legitimate supervision by Mas.

(ii)    On or about July 8, 2016, the Baracusa Health Defendants billed GEICO for physical therapy services that purportedly were provided through Baracusa Health to an Insured named CV on July 1, 2016. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Baracusa Health Defendants deliberately omitted any reference to Romero from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Romero, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Romero, without any legitimate supervision by Mas.

(iii)    On or about July 22, 2016, the Baracusa Health Defendants billed GEICO for physical therapy services that purportedly were provided through Baracusa Health to an Insured named LU on July 20, 2016. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Baracusa Health Defendants deliberately omitted any reference to Romero from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Romero, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Romero, without any legitimate supervision by Mas.

(iv)    On or about July 22, 2016, the Baracusa Health Defendants billed GEICO for physical therapy services that purportedly were provided through Baracusa Health to an Insured named CV on July 12, 2016. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Baracusa Health Defendants deliberately omitted any reference to Romero from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Romero, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Romero, without any legitimate supervision by Mas.

(v)    On or about October 18, 2016, the Baracusa Health Defendants billed GEICO for physical therapy services that purportedly were provided through Baracusa Health to an Insured named DM on October 10, 2016. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Baracusa Health Defendants deliberately omitted any reference to Romero from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Romero, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Romero, without any legitimate supervision by Mas.

(vi)    On or about October 18, 2016, the Baracusa Health Defendants billed GEICO for physical therapy services that purportedly were provided through Baracusa Health to an Insured named LU on October 13, 2016. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Baracusa Health Defendants deliberately omitted any reference to Romero from the HCFA-1500 form. However, the

underlying physical therapy treatment notes were signed by Romero, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Romero, without any legitimate supervision by Mas.

(vii)     On or about November 15, 2016, the Baracusa Health Defendants billed GEICO for physical therapy services that purportedly were provided through Baracusa Health to an Insured named DM on November 14, 2016. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Baracusa Health Defendants deliberately omitted any reference to Romero from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Romero, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Romero, without any legitimate supervision by Mas.

(viii)    On or about March 17, 2017, the Baracusa Health Defendants billed GEICO for physical therapy services that purportedly were provided through Baracusa Health to an Insured named MD on February 28, 2017. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Baracusa Health Defendants deliberately omitted any reference to Romero from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Romero, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Romero, without any legitimate supervision by Mas.

(ix)      On or about March 24, 2017, the Baracusa Health Defendants billed GEICO for physical therapy services that purportedly were provided through Baracusa Health to an Insured named TM on March 22, 2017. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Baracusa Health Defendants deliberately omitted any reference to Romero from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Romero, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Romero, without any legitimate supervision by Mas.

(x)       On or about March 31, 2017, the Baracusa Health Defendants billed GEICO for physical therapy services that purportedly were provided through Baracusa Health to an Insured named MD on March 27, 2017. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Baracusa Health Defendants deliberately omitted any reference to Romero from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Romero, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Romero, without any legitimate supervision by Mas.

268.    These are only representative examples. In the vast majority of the claims for physical therapy services that are identified in Exhibit "3", the Baracusa Health Defendants falsely represented in the HCFA-1500 forms they submitted to GEICO that Mas had performed or at least directly supervised the underlying physical therapy services, when in fact the services were performed by Romero or another massage therapist associated with Baracusa Health, to the extent that they were performed at all, without any supervision by Mas.

269.    In the claims for physical therapy services identified in Exhibit "3", the Baracusa Health Defendants routinely fraudulently misrepresented that the physical therapy services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative physical therapy services were illegally performed – to the extent they were performed at all – by massage therapists, without any supervision by any licensed physicians or physical therapists, in contravention of Florida law;

(ii)    Baracusa Health could not lawfully recover PIP Benefits for the putative physical therapy services, because they were illegally performed by massage therapists, without any supervision by any licensed physicians or physical therapists, in contravention of Florida law; and

(iii)   the Baracusa Health Defendants systematically fraudulently misrepresented and concealed the identities of the individuals who performed the putative physical therapy services in their billing for the putative "physical therapy" services.

270.    These fraudulent misrepresentations and acts of fraudulent concealment demonstrate that Baracusa Health was operated without a legitimate medical director.

271.    For instance, Mas – who purported to serve as the "medical director" of Baracusa Health from May 2016 – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

272.    Nor, for that matter, did Mas "[e]nsure that all practitioners providing health care services or supplies to patients maintain[ed] a current active and unencumbered Florida license",

91

or "[e]nsure that all health care practitioners at the clinic [had] active appropriate certification or licensure for the level of care being provided." See Fla. Stat. § 400.9935(1).

273.    Had Mas actually fulfilled his statutory role as medical director at Baracusa Health, he would have noted – among other things – that the Baracusa Health Defendants routinely fraudulently represented in Baracusa Health's billing that the physical therapy services were performed or at least directly supervised by Mas.

274.    Had Mas actually fulfilled his statutory role as medical director at Baracusa Health, he would have noted – among other things – that the Baracusa Health Defendants routinely fraudulently concealed the fact that the physical therapy services were provided – to the extent that they were provided at all – by Romero and other massage therapists associated with Baracusa Health, who were unsupervised massage therapists and not physical therapists, and therefore were unreimbursable under the No-Fault Law.

275.    Had Mas actually fulfilled his statutory role as medical director at Baracusa Health, he would have ensured – among other things – that all of the individuals providing physical therapy services had active appropriate licensure to perform physical therapy services. Mas also would have ensured that individuals providing physical therapy were being supervised by a licensed physician while the treatment was being rendered.

276.    Mas did none of these things, because he never actually served as a legitimate medical director at Baracusa Health in the first instance, rendering Baracusa Health ineligible to collect PIP Benefits in the first instance.

**4.    The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at Westchester Medical**

277.    Like the E-Z Medical Defendants, the Davila Medical Defendants, and the Baracusa Health Defendants, Westchester Medical, Morales, and Mas (collectively, the

"Westchester Medical Defendants") billed for a limited range of health care services through Westchester Medical, specifically: (i) purported initial patient examinations; (ii) purported follow-up patient examinations; and (iii) purported physical therapy services, including hot/cold packs, mechanical traction, infrared therapy, ultrasound therapy, neuromuscular reeducation, manual therapy, therapeutic activities, and electrical stimulation.

278.    As set forth in Exhibit "4", the purported physical therapy services constituted the vast majority of the services that the Westchester Medical Defendants billed through Westchester Medical to GEICO.

279.    Mas was between approximately 69 and 70 years old during the period from 2017 to the present when he falsely purported to serve as "medical director" at Westchester Medical.

280.    Even so, during Mas's tenure as Westchester Medical's purported "medical director", Mas also purported to serve as the "medical director" for numerous other medical clinics, including E-Z Medical, Davila Medical, and Golden Health, and purported to personally perform or directly supervise a massive amount of medical services for those clinics and other health care providers.

281.    As a result, Mas was only occasionally physically present at Westchester Medical, and did not personally perform – or even directly supervise – the massive amount of physical therapy services that Westchester Medical purported to provide to GEICO Insureds.

282.    Indeed, during his tenure as Westchester Medical's purported "medical director", Mas only visited the clinic sporadically to purport to conduct initial and follow-up patient examinations – to the extent the examinations were performed at all – and to sign bills and treatment reports prepared by other Westchester Medical personnel, including Morales, at Morales's direction.

283.    Even when Mas was physically present at Westchester Medical, he never provided, supervised, ordered, or prescribed the physical therapy services purportedly provided at Westchester Medical.

284.    All of the physical therapy services that Westchester Medical purported to provide between 2017 and the present were performed by Morales or other unsupervised massage therapists at Westchester Medical who reported directly to Morales without any legitimate supervision or oversight by Mas or any other licensed physician.

285.    As set forth above, prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics, to collect PIP Benefits for massage therapy, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed" by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting. See 2012 Fla. ALS 197.

286.    However – and again, as set forth above – in response to rampant PIP fraud involving massage therapists and massage, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for services provided by massage therapists. See 2012 Fla. ALS 197; see also Fla. Stat. § 627.736(1)(a)(5).

287.    What is more, and as set forth above, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy. See Fla. Stat. § 486.028.

288.    Morales was licensed as a massage therapist. Morales was never licensed as a physical therapist.

289.     As a result, with respect to insurance policies issued after January 1, 2013, the No-Fault Law prohibited Westchester Medical from recovering PIP Benefits for services – including but not limited to physical therapy services – provided by unsupervised massage therapists such as Morales.

290.     The Westchester Medical Defendants were well-aware of the fact that – with respect to insurance policies issued after January 1, 2013 – Westchester Medical could not legally recover PIP Benefits for services provided by unsupervised massage therapists such as Morales. For example, and as set forth above, the amendments to the No-Fault Law prohibiting PIP reimbursement for massage or for services provided by massage therapists were widely reported, as was the preceding legal struggle by various massage therapists and massage trade organizations to fight the amendments.

291.     In keeping with the fact that the Westchester Medical Defendants knew that – with respect to insurance policies issued after January 1, 2013 – they could not lawfully recover PIP Benefits for services provided by unsupervised massage therapists, in March 2017 the Westchester Medical Defendants began to list Mas as the treating provider on virtually every single bill submitted to GEICO for virtually every single service that the Westchester Medical Defendants purported to provide to GEICO Insureds, including almost every individual physical therapy service that was billed through Westchester Medical to GEICO.

292.     Considering his advanced age, and the fact that he simultaneously was purporting to serve as medical director at no fewer than five health care clinics and to perform a massive number of individual health care services at numerous health care practices throughout the Miami area, Mas could not physically have performed, or even directly supervised, the physical

therapy services that were billed through Westchester Medical to GEICO between 2017 and the present.

293.   Even so, the Westchester Medical Defendants routinely falsely represented in the billing they submitted or caused to be submitted through Westchester Medical to GEICO for physical therapy services between 2017 and the present that Mas personally performed, or at least directly supervised, the underlying physical therapy services.

294.   For example:

(i)   On March 14, 2017, the Westchester Medical Defendants purported to provide at least 12 individual physical therapy services to at least two individual Insureds, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 3.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Mas also purported to personally perform, or at least directly supervise: (a) one 15-minute patient examination at Atlantic Medical; (b) two 5-minute patient examinations at Westchester Medical; (c) at least 10 additional physical therapy services purportedly provided to at least two additional GEICO Insureds at Atlantic Medical, including at least 2.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (d) at least 12 additional physical therapy services purportedly provided to at least two additional GEICO Insureds at Baracusa Health, including at least 2.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (e) at least five additional physical therapy services purportedly provided to at least one additional GEICO Insured at Davila Medical, including at least 2 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (f) at least 37 additional physical therapy services purportedly provided to at least five additional GEICO Insureds at E-Z Medical, including at least 5.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (g) at least 9 additional physical therapy services purportedly provided to at least two additional GEICO Insureds at Golden Health, including at least 1.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (h) at least 13 additional physical therapy services purportedly provided to at least two additional GEICO Insureds at Therapeutic Rehab, including at least 3 hours of physical therapy services that required direct, one-on-one patient contact between

the treating provider and the Insureds throughout the services; and (i) at least 12 <u>additional</u> physical therapy services purportedly provided to at least two <u>additional</u> GEICO Insureds at We Care Medical, including at least 3.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 24.5 hours of services that Mas purported to personally perform, or at least directly supervise, on March 14, 2017.

(ii)     On April 10, 2017, the Westchester Medical Defendants purported to provide at least 22 individual physical therapy services to at least four individual Insureds, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 5.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Mas <u>also</u> purported to personally perform or at least directly supervise: (a) one 25-minute patient examination at Golden Health; (b) one 10-minute patient examination at Golden Health; (c) four 5-minute patient examinations at Westchester Medical; (d) at least 19 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at Atlantic Medical, including at least 5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (e) at least six <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Baracusa Health, including at least 1.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (f) at least six <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Davila Medical, including at least 2 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (g) at least 34 <u>additional</u> physical therapy services purportedly provided to at least five <u>additional</u> GEICO Insureds at E-Z Medical, including at least 5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (h) at least 30 <u>additional</u> physical therapy services purportedly provided to at least six <u>additional</u> GEICO Insureds at Golden Health, including at least 6.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (i) at least seven <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Therapeutic Rehab, including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services. In all, GEICO received billing for at least 27.75 hours of services that Mas purported to personally perform, or at least directly supervise, on April 10, 2017.

(iii)     On April 24, 2017, the Westchester Medical Defendants purported to provide at least 30 individual physical therapy services to at least six individual Insureds, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 7.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Mas <u>also</u> purported to personally perform, or at least directly supervise: (a) one 30-minute patient examination at Baracusa Health; (b) one 25-minute patient examination at Golden Health; (c) one 25-minute patient examination at Westchester Medical; (d) one 15-minute patient examination at Atlantic Medical; (e) five 5-minute patient examinations at Westchester Medical; (f) at least 39 <u>additional</u> physical therapy services purportedly provided to at least eight <u>additional</u> GEICO Insureds at Atlantic Medical, including at least 10 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (g) at least five <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Baracusa Health, including at least 1.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (h) at least six <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Davila Medical, including at least 2.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (i) at least 43 <u>additional</u> physical therapy services purportedly provided to at least seven <u>additional</u> GEICO Insureds at E-Z Medical, including at least 7 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (j) at least 20 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at Golden Health, including at least 4.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (k) at least 20 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at Starlite Medical, including at least 5.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (l) at least seven <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Therapeutic Rehab, including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services. In all, GEICO received billing for at least 42 hours of services that Mas purported to personally perform, or at least directly supervise, on April 24, 2017.

(iv)     On April 25, 2017, the Westchester Medical Defendants purported to provide at least 30 individual physical therapy services to at least six individual Insureds, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is

more, those putative treatments included at least 7 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Mas <u>also</u> purported to personally perform, or at least directly supervise: (a) two 25-minute patient examinations at Westchester Medical; (b) one 25-minute patient examination at Davila Medical; (c) one 15-minute patient examination at Golden Health; (d) four 5-minute patient examinations at Westchester Medical; (e) at least 39 <u>additional</u> physical therapy services purportedly provided to at least eight <u>additional</u> GEICO Insureds at Atlantic Medical, including at least 9.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (f) at least five <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Baracusa Health, including at least 1.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (g) at least five <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Davila Medical, including at least 2 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (h) at least 43 <u>additional</u> physical therapy services purportedly provided to at least seven <u>additional</u> GEICO Insureds at E-Z Medical, including at least 7 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (i) at least 19 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at Golden Health, including at least 4.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (j) at least 20 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at Starlite Medical, including at least 4.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (k) at least seven <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Therapeutic Rehab, including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services. In all, GEICO received billing for at least 39.25 hours of services that Mas purported to personally perform, or at least directly supervise, on April 25, 2017.

(v)     On May 3, 2017, the Westchester Medical Defendants purported to provide at least 13 individual physical therapy services to at least three individual Insureds, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 3.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Mas <u>also</u> purported to personally perform, or at least directly supervise: (a) three 30-minute

patient examinations at Starlite Medical; (b) one 15-minute patient examination at Atlantic Medical; (c) three 5-minute patient examinations at Westchester Medical; (d) at least 28 additional physical therapy services purportedly provided to at least six additional GEICO Insureds at Atlantic Medical, including at least 7 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (e) at least six additional physical therapy services purportedly provided to at least one additional GEICO Insured at Baracusa Health, including at least 1.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (f) at least five additional physical therapy services purportedly provided to at least one additional GEICO Insured at Davila Medical, including at least 2 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (g) at least 62 additional physical therapy services purportedly provided to at least 10 additional GEICO Insureds at E-Z Medical, including at least 10 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (h) at least 10 additional physical therapy services purportedly provided to at least two additional GEICO Insureds at Golden Health, including at least 2 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services additional services; (i) at least 59 additional physical therapy services purportedly provided to at least 12 additional GEICO Insureds at Starlite Medical, including at least 16.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (j) at least seven additional physical therapy services purportedly provided to at least one additional GEICO Insured at Therapeutic Rehab, including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services. In all, GEICO received billing for at least 45.5 hours of services that Mas purported to personally perform, or at least directly supervise, on May 3, 2017.

(vi)  On May 17, 2017, the Westchester Medical Defendants purported to provide at least 28 individual physical therapy services to at least six individual Insureds, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 6.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Mas also purported to personally perform, or at least directly supervise: (a) one 45-minute patient examination at Atlantic Medical; (b) one 25-minute patient examination at Westchester Medical; (c) five 5-minute patient examinations at Westchester Medical; (d) at least 29 additional physical therapy services purportedly provided to at least six additional GEICO Insureds at Atlantic Medical, including at least 7.25 hours of physical therapy services that required direct, one-on-one patient

contact between the treating provider and the Insureds throughout the services; (e) at least 12 <u>additional</u> physical therapy services purportedly provided to at least two <u>additional</u> GEICO Insureds at Davila Medical, including at least 4 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (f) at least 47 <u>additional</u> physical therapy services purportedly provided to at least seven <u>additional</u> GEICO Insureds at E-Z Medical, including at least 7 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (g) at least 29 <u>additional</u> physical therapy services purportedly provided to at least six <u>additional</u> GEICO Insureds at Starlite Medical, including at least 8 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 34.25 hours of services that Mas purported to personally perform, or at least directly supervise, on May 17, 2017.

(vii)     On June 13, 2017, the Westchester Medical Defendants purported to provide at least 27 individual physical therapy services to at least seven individual Insureds, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 7.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Mas <u>also</u> purported to personally perform, or at least directly supervise: (a) one 25-minute patient examination at Westchester Medical; (b) one 25-minute patient examination at Atlantic Medical; (c) six 5-minute patient examinations at Westchester Medical; (d) at least 10 <u>additional</u> physical therapy services purportedly provided to at least two <u>additional</u> GEICO Insureds at Atlantic Medical, including at least 2.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (e) at least 29 <u>additional</u> physical therapy services purportedly provided to at least five <u>additional</u> GEICO Insureds at Davila Medical, including at least 10 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (f) at least 62 <u>additional</u> physical therapy services purportedly provided to at least nine <u>additional</u> GEICO Insureds at E-Z Medical, including at least 9 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (g) at least 45 <u>additional</u> physical therapy services purportedly provided to at least nine <u>additional</u> GEICO Insureds at Starlite Medical, including at least 12.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 42.75 hours of services that Mas purported to personally perform, or at least directly supervise, on June 13, 2017.

(viii)   On December 6, 2017, the Westchester Medical Defendants purported to provide at least 19 individual physical therapy services to at least six individual Insureds, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 7 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Mas <u>also</u> purported to personally perform, or at least directly supervise: (a) one 45-minute patient examination at Angels Diagnostic; (b) two 15-minute patient examinations at Angels Diagnostic; (c) six 5-minute patient examinations at Westchester Medical; (d) at least 26 <u>additional</u> physical therapy services purportedly provided to at least five <u>additional</u> GEICO Insureds at Davila Medical, including at least 10.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (e) at least 27 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at E-Z Medical, including at least 4.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (f) at least six <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Health Solutions, including at least 1.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (g) at least 12 <u>additional</u> physical therapy services purportedly provided to at least two <u>additional</u> GEICO Insureds at Star Medical, including at least 2.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (h) at least 55 <u>additional</u> physical therapy services purportedly provided to at least 11 <u>additional</u> GEICO Insureds at Starlite Medical, including at least 15.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (i) at least 18 <u>additional</u> physical therapy services purportedly provided to at least three <u>additional</u> GEICO Insureds at Therapeutic Rehab, including at least 4.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 48.25 hours of services that Mas purported to personally perform, or at least directly supervise, on December 6, 2017.

(ix)   On December 12, 2017, the Westchester Medical Defendants purported to provide at least 24 individual physical therapy services to at least eight individual Insureds, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 7.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Mas <u>also</u> purported to personally perform, or at least directly supervise: (a) one 45-minute patient examination at E-Z Medical; (b) two 45-minute patient

examinations at Westchester Medical; (c) one 30-minute patient examination at E-Z Medical; (d) one 25-minute patient examination at Davila Medical; (e) one 25-minute patient examination at Starlite Medical; (f) six 5-minute patient examinations at Westchester Medical; (g) at least 37 <u>additional</u> physical therapy services purportedly provided to at least seven <u>additional</u> GEICO Insureds at Davila Medical, including at least 14.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (h) at least 33 <u>additional</u> physical therapy services purportedly provided to at least five <u>additional</u> GEICO Insureds at E-Z Medical, including at least 5.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (i) at least six <u>additional</u> physical therapy services purportedly provided to at least one <u>additional</u> GEICO Insured at Health Solutions, including at least 1.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (j) at least 24 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at Star Medical, including at least 5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (k) at least 45 <u>additional</u> physical therapy services purportedly provided to at least nine <u>additional</u> GEICO Insureds at Starlite Medical, including at least 11 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (l) at least 11 <u>additional</u> physical therapy services purportedly provided to at least two <u>additional</u> GEICO Insureds at Therapeutic Rehab, including at least 3 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 51.75 hours of services that Mas purported to personally perform, or at least directly supervise, on December 12, 2017.

(x)     On January 11, 2018, the Westchester Medical Defendants purported to provide at least 12 individual physical therapy services to at least three individual Insureds, and falsely contended in the resulting bills to GEICO that Mas personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 3.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Mas <u>also</u> purported to personally perform, or at least directly supervise: (a) one 15-minute patient examination at E-Z Medical; (b) three 5-minute patient examinations at Westchester Medical; (c) at least 32 <u>additional</u> physical therapy services purportedly provided to at least five <u>additional</u> GEICO Insureds at Davila Medical, including at least 12.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (d) at least 22 <u>additional</u> physical therapy services purportedly provided to at least three <u>additional</u> GEICO Insureds at E-Z Medical, including at least 3.75 hours of physical therapy services that required direct, one-

on-one patient contact between the treating provider and the Insureds throughout the services; (e) at least 24 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at Star Medical, including at least 5.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (f) at least 35 <u>additional</u> physical therapy services purportedly provided to at least seven <u>additional</u> GEICO Insureds at Starlite Medical, including at least 9 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (g) at least 21 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at Therapeutic Rehab, including at least 6 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 40.75 hours of services that Mas purported to personally perform, or at least directly supervise, on January 11, 2018.

295. These are only representative examples. In the claims for physical therapy services that are identified in Exhibit "4", the Westchester Medical Defendants routinely falsely represented that Mas had performed – or at least directly supervised – an improbable, and often impossible, number of physical therapy services on individual dates, considering the amounts of services he simultaneously was purporting to perform or directly supervise at the other Clinic Defendants, and other health care practices.

296. It is improbable, to the point of impossibility, that Mas – who was advanced in age at the time, and simultaneously working or purporting to work at various other medical practices and clinics – routinely performed or directly supervised such a high volume of physical therapy services on individual dates.

297. Upon information and belief, the fraudulent billing for physical therapy services that the Westchester Medical Defendants submitted or caused to be submitted through Westchester Medical to GEICO constituted only a fraction of the <u>total</u> fraudulent billing for physical therapy services that the Westchester Medical Defendants submitted through

Westchester Medical to <u>all</u> of the automobile insurers in the Florida automobile insurance market.

298.    As set forth above, GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

299.    It is extremely improbable, to the point of impossibility, that the Westchester Medical Defendants only submitted fraudulent billing to GEICO, and that the Westchester Medical Defendants did not simultaneously bill other automobile insurers.

300.    Thus, upon information and belief, the impossible number of physical therapy services that Mas purported to directly supervise or provide to GEICO Insureds at Westchester Medical on individual dates of service, including the dates of service identified above, constituted only a fraction of the <u>total</u> number of physical therapy services that Mas purported to directly supervise or provide at Westchester Medical, including to individuals insured by companies other than GEICO, on those same dates of service.

301.    In fact, Mas did not perform or directly supervise any of the physical therapy services that were billed through Westchester Medical to GEICO.

302.    What is more, from the date of its incorporation, Westchester Medical did not actually provide any legitimate physical therapy services to GEICO Insureds.

303.    Rather: (i) all of the putative "physical therapy" services that the Westchester Medical Defendants purported to provide through Westchester Medical to Insureds were performed, to the extent that they were performed at all, by Morales, and other massage therapists associated with Westchester Medical, rather than by Mas; (ii) Mas did not even legitimately supervise the putative "physical therapy" services that were billed through Westchester Medical to GEICO; and (iii) none of the putative "physical therapy" services that

were billed through Westchester Medical to GEICO actually constituted physical therapy, because Morales, and the other massage therapists associated with Westchester Medical, are not and never have been licensed as physical therapists.

304.   As set forth above, the No-Fault Law's billing requirements provide – among other things – that all PIP billing must comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms. See Fla. Stat. § 627.736.

305.   All of the billing that the Westchester Medical Defendants submitted through Westchester Medical to GEICO, including the billing for putative physical therapy services, was submitted on HCFA-1500 forms.

306.   As set forth above, pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, the name of the healthcare provider who actually performed or directly supervised the underlying physical therapy treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

307.   As set forth above, to "directly supervise" a physical therapy treatment, a physician "must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed." See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set, citing 42 C.F.R. 410.32.

308.   Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, to the extent that a physician is not actually

"directly supervising" a physical therapy treatment, then the actual name of the person who is actually performing the physical therapy treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

309.    The Westchester Medical Defendants were well-aware of the fact that – because Morales and other massage therapists associated with Westchester Medical were unsupervised massage therapists, rather than physical therapists – Westchester Medical could not recover PIP Benefits for any services that Morales and other massage therapists purported to provide with respect to insurance policies issued after January 1, 2013.

310.    As a result, and in order to conceal the fact that Morales and other massage therapists unlawfully provided, without any legitimate supervision by Mas, all of the "physical therapy" services that were billed through Westchester Medical to GEICO since 2017, the Westchester Medical Defendants deliberately omitted any reference to Morales and other massage therapists on the HCFA-1500 forms that they used to bill for the putative physical therapy services.

311.    Instead, in the claims for physical therapy services identified in Exhibit "4", the Westchester Medical Defendants falsely listed Mas on the HCFA-1500 forms as the supposed provider or direct supervisor of the physical therapy services.

312.    For example:

(i)     On or about March 30, 2017, the Westchester Medical Defendants billed GEICO for physical therapy services that purportedly were provided through Westchester Medical to an Insured named MF on March 21, 2017. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Westchester Medical Defendants deliberately omitted any reference to Morales from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Morales or another massage therapist associated with Westchester Medical, in

keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Morales or another massage therapist associated with Westchester Medical, without any legitimate supervision by Mas.

(ii)     On or about April 18, 2017, the Westchester Medical Defendants billed GEICO for physical therapy services that purportedly were provided through Westchester Medical to an Insured named LD on April 4, 2017. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Westchester Medical Defendants deliberately omitted any reference to Morales from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Morales or another massage therapist associated with Westchester Medical, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Morales or another massage therapist associated with Westchester Medical, without any legitimate supervision by Mas.

(iii)    On or about April 18, 2017, the Westchester Medical Defendants billed GEICO for physical therapy services that purportedly were provided through Westchester Medical to an Insured named IL on April 4, 2017. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Westchester Medical Defendants deliberately omitted any reference to Morales from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Morales or another massage therapist associated with Westchester Medical, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Morales or another massage therapist associated with Westchester Medical, without any legitimate supervision by Mas.

(iv)    On or about May 12, 2017, the Westchester Medical Defendants billed GEICO for physical therapy services that purportedly were provided through Westchester Medical to an Insured named VP on April 28, 2017. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Westchester Medical Defendants deliberately omitted any reference to Morales from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Morales or another massage therapist associated with Westchester Medical, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Morales or another massage therapist associated with Westchester Medical, without any legitimate supervision by Mas.

(v)     On or about August 31, 2017, the Westchester Medical Defendants billed GEICO for physical therapy services that purportedly were provided through Westchester Medical to an Insured named DR on August 23, 2017. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Westchester Medical Defendants deliberately omitted any reference to Morales from the HCFA-1500 form.

However, the underlying physical therapy treatment notes were signed by Morales or another massage therapist associated with Westchester Medical, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Morales or another massage therapist associated with Westchester Medical, without any legitimate supervision by Mas.

(vi)     On or about August 31, 2017, the Westchester Medical Defendants billed GEICO for physical therapy services that purportedly were provided through Westchester Medical to an Insured named MG on August 31, 2017. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Westchester Medical Defendants deliberately omitted any reference to Morales from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Morales or another massage therapist associated with Westchester Medical, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Morales or another massage therapist associated with Westchester Medical, without any legitimate supervision by Mas.

(vii)    On or about October 31, 2017, the Westchester Medical Defendants billed GEICO for physical therapy services that purportedly were provided through Westchester Medical to an Insured named DR on October 24, 2017. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Westchester Medical Defendants deliberately omitted any reference to Morales from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Morales or another massage therapist associated with Westchester Medical, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Morales or another massage therapist associated with Westchester Medical, without any legitimate supervision by Mas.

(viii)   On or about December 6, 2017, the Westchester Medical Defendants billed GEICO for physical therapy services that purportedly were provided through Westchester Medical to an Insured named JR on November 27, 2017. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Westchester Medical Defendants deliberately omitted any reference to Morales from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Morales or another massage therapist associated with Westchester Medical, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Morales or another massage therapist associated with Westchester Medical, without any legitimate supervision by Mas.

(ix)     On or about January 25, 2018, the Westchester Medical Defendants billed GEICO for physical therapy services that purportedly were provided through Westchester Medical to an Insured named IZ on January 4, 2018. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the

109

pertinent physical therapy services, and the Westchester Medical Defendants deliberately omitted any reference to Morales from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Morales or another massage therapist associated with Westchester Medical, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Morales or another massage therapist associated with Westchester Medical, without any legitimate supervision by Mas.

(x)     On or about March 8, 2018, the Westchester Medical Defendants billed GEICO for physical therapy services that purportedly were provided through Westchester Medical to an Insured named IZ on February 20, 2018. The HCFA-1500 form falsely represented that Mas performed, or at least directly supervised, the pertinent physical therapy services, and the Westchester Medical Defendants deliberately omitted any reference to Morales from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Morales or another massage therapist associated with Westchester Medical, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Morales or another massage therapist associated with Westchester Medical, without any legitimate supervision by Mas.

313.    These are only representative examples. In virtually all of the claims for physical therapy services that are identified in Exhibit "4", the Westchester Medical Defendants falsely represented in the HCFA-1500 forms they submitted to GEICO that Mas had performed or at least directly supervised the underlying physical therapy services, when in fact the services were performed by Morales or another massage therapist associated with Westchester Medical, to the extent that they were performed at all, without any supervision by Mas.

314.    In the claims for physical therapy services identified in Exhibit "4", the Westchester Medical Defendants routinely fraudulently misrepresented that the physical therapy services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative physical therapy services were illegally performed – to the extent they were performed at all – by massage therapists, without any supervision by any licensed physicians or physical therapists, in contravention of Florida law;

(ii)    Westchester Medical could not lawfully recover PIP Benefits for the putative physical therapy services, because they were illegally performed by massage

110

therapists, without any supervision by any licensed physicians or physical therapists, in contravention of Florida law; and

(iii)     the Westchester Medical Defendants systematically fraudulently misrepresented and concealed the identities of the individuals who performed the putative physical therapy services in their billing for the putative "physical therapy" services.

315.     These fraudulent misrepresentations and acts of fraudulent concealment demonstrate that Westchester Medical was operated without a legitimate medical director.

316.     For instance, Mas – who purported to serve as the "medical director" of Westchester Medical since August 2017 – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

317.     Nor, for that matter, did Mas "[e]nsure that all practitioners providing health care services or supplies to patients maintain[ed] a current active and unencumbered Florida license", or "[e]nsure that all health care practitioners at the clinic [had] active appropriate certification or licensure for the level of care being provided." See Fla. Stat. § 400.9935(1).

318.     Had Mas actually fulfilled his statutory role as medical director at Westchester Medical, he would have noted – among other things – that the Westchester Medical Defendants routinely fraudulently represented in Westchester Medical's billing that the physical therapy services were performed, or at least directly supervised, by Mas.

319.     Had Mas actually fulfilled his statutory role as medical director at Westchester Medical, he would have noted – among other things – that the Westchester Medical Defendants routinely fraudulently concealed the fact that the physical therapy services were provided – to the extent that they were provided at all – by Morales and other massage therapists associated with

Westchester Medical, who were massage therapists and not physical therapists, and therefore were unreimbursable under the No-Fault Law.

320.    Had Mas actually fulfilled his statutory role as medical director at Westchester Medical, he would have ensured – among other things – that all of the individuals providing physical therapy services had active appropriate licensure to perform physical therapy services. Mas also would have ensured that individuals providing physical therapy were being supervised by a licensed physician while the treatment was being rendered.

321.    Mas did none of these things, because he never actually served as a legitimate medical director at Westchester Medical in the first instance, rendering Westchester Medical ineligible to collect PIP Benefits in the first instance.

**C.    The Defendants' Fraudulent Treatment and Billing Protocols**

322.    In the claims identified in Exhibits "1" – "4", the vast majority of the Insureds whom the Defendants purported to treat at the Clinic Defendants were involved in minor, low-speed, low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

323.    Concomitantly, in the claims identified in Exhibits "1" – "4", almost none of the Insureds whom the Defendants purported to treat at the Clinic Defendants suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

324.    Even so, in the claims identified in Exhibits "1" – "4", the Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" that was provided pursuant to pre-determined, fraudulent protocols designed to maximize the billing that they could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

325.    The Defendants purported to provide their pre-determined fraudulent treatment protocols to the Insureds in the claims identified in Exhibits "1" – "4" without regard for the Insureds' individual symptoms or presentation, or – in most cases – the total absence of any actual continuing medical problems arising from any actual automobile accidents.

326.    Each step in the Defendants' fraudulent treatment protocols was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

327.    No legitimate physician, physical therapist, clinic, or other health care provider would permit the fraudulent treatment and billing protocols described below to proceed under his, her, or its auspices.

328.    The Defendants permitted the fraudulent treatment and billing protocols described below to proceed under their auspices because: (i) the Clinic Defendants were, at all relevant times, operating in violation of the Clinic Act, without legitimate medical directors who legitimately fulfilled their statutory duties as medical directors; (ii) all decision-making with respect to medical care and billing at the Clinic Defendants was, at all relevant times, vested entirely with non-physicians – specifically Diaz-Pairol at E-Z Medical, Davila at Davila Medical, Corrales at Baracusa Health, and Morales at Westchester Medical – in violation of Florida law; (iii) virtually all of the putative "physical therapy" services that purportedly were provided to Insureds through the Clinic Defendants were provided – to the extent that they were provided at all – by physical therapist assistants and/or massage therapists without legitimate oversight and supervision, rather than by or under the supervision of licensed physical therapists or physicians,

in further violation of Florida law; and (iv) the Defendants sought to profit from the fraudulent billing they submitted to GEICO and other insurers.

1.       **The E-Z Medical Defendants' Fraudulent Treatment and Billing Protocol**

(i)      **The Fraudulent Charges for Initial Examinations at E-Z Medical**

329.    As an initial step in the E-Z Medical Defendants' fraudulent treatment and billing protocol, E-Z Medical, Diaz-Pairol, and Mas purported to provide each of the Insureds in the claims identified in Exhibit "1" with a putative initial examination.

330.    Mas purported to personally perform or at least supervise virtually all of the initial examinations in the claims identified in Exhibit "1".

331.    As set forth in Exhibit "1", E-Z Medical, Diaz-Pairol, and Mas then billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT codes 99203 and 99204, resulting in charges of either $300.00 or $350.00 for each initial examination that they purported to provide.

332.    In the claims for initial examinations identified in Exhibit "1", the charges for the initial examinations were fraudulent in that they misrepresented E-Z Medical's eligibility to collect PIP Benefits in the first instance.

333.    In fact, and as set forth above, E-Z Medical never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act.

334.    As set forth below, the charges for the initial examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

a.      **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

335.    As set forth above, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the AMA in connection with the use of current procedural terminology, or CPT, codes. See Fla. Stat. § 627.736.

336.    The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

337.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination represents that the Insured presented with problems of moderate severity.

338.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately severe, and thereby justify the use of CPT code 99203 to bill for an initial patient examination.

339.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99203 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)    Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)   Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)    Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)     Initial office visit with couple for counseling concerning voluntary vasectomy for sterility Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

340.    Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

341.    Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial patient examination represents that the Insured presented with problems of moderate to high severity.

342.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99204 to bill for an initial patient examination.

343.    For example, the CPT Assistant provides the following clinical examples of presenting problems that support the use of CPT code 99204 to bill for an initial patient examination:

(i)      Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)     Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)    Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)    Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)     Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)    Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

(vii)   Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

116

344.    Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

345.    By contrast, to the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

346.    For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "1" either had no presenting problems at all as the result of their minor automobile accidents, or else problems of low severity, in the majority of the claims identified in Exhibit "1" the Insureds did not seek treatment at any hospital as the result of their accidents. To the limited extent that the Insureds in the claims identified in Exhibit "1" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis and then discharged with nothing more serious than a soft tissue injury diagnosis.

347.    Furthermore, in many of the claims identified in Exhibit "1", contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were functional following the accidents, and that no one was injured in the accidents.

348.    Even so, in the claims for initial examinations identified in Exhibit "1", E-Z Medical, Diaz-Pairol, and Mas routinely billed for their putative initial examinations using CPT codes 99203 and 99204, and thereby falsely represented that the Insureds presented with problems of moderate severity or moderate to high severity.

349.    For example:

(i)     On January 29, 2014, an Insured named YD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact, rear-end collision, that YD's vehicle was drivable following the accident, and that YD was not injured in the accident. In keeping with the fact that YD was not seriously injured in the accident, YD did not visit any hospital emergency room following the accident. To the extent that YD experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination of YD by or under the purported supervision of Mas on January 30, 2014, E-Z Medical, Diaz-Pairol, and Mas billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that YD presented with moderately severe health problems as the result of the minor accident.

(ii)    On April 29, 2016, an Insured named CB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact, rear-end collision, that the airbags in CB's vehicle did not deploy, that CB's vehicle was drivable following the accident, and that CB was not injured in the accident. In keeping with the fact that CB was not seriously injured in minor accident, CB did not visit any hospital emergency room following the accident. To the extent that CB experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination of CB by or under the purported supervision of Mas on May 2, 2016, E-Z Medical, Diaz-Pairol, and Mas billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that CB presented with moderate to highly severe health problems as the result of the minor accident.

(iii)   On April 29, 2016, an Insured named RG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact, rear-end collision, that the airbags in RG's vehicle did not deploy, that RG's vehicle was drivable following the accident, and that RG was not injured in the accident. In keeping with the fact that CB was not seriously injured in the minor accident, RG did not visit any hospital emergency room following the accident. To the extent that RG experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination of RG by or under the purported supervision of Mas on May 13, 2016, E-Z Medical, Diaz-Pairol, and Mas billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that RG presented with moderate to highly severe health problems as the result of the minor accident.

(iv)   On April 13, 2017, an Insured named RR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that RR's vehicle was drivable following the accident, and that RR was not injured in the accident. In keeping with the fact that RR was not seriously injured in the minor accident, RR did not visit any hospital emergency

room following the accident. To the extent that RR experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination of RR by or under the purported supervision of Mas on April 20, 2017, E-Z Medical, Diaz-Pairol, and Mas billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that RR presented with moderate to highly severe health problems as a result of the minor accident.

(v)     On April 13, 2017, an Insured named HE was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that HE's vehicle was drivable following the accident, and that HE was not injured in the accident. In keeping with the fact that HE was not seriously injured in the minor accident, HE did not visit any hospital emergency room following the accident. To the extent that HE experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination HE by or under the purported supervision of Mas on April 20, 2017, E-Z Medical, Diaz-Pairol, and Mas billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that HE presented with moderate to highly severe health problems as a result of the minor accident.

(vi)    On January 19, 2017, an Insured named MF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that the airbags in MF's vehicle did not deploy, that MF's vehicle was drivable following the accident, and that MF was not injured in the accident. In keeping with the fact that MF was not seriously injured in the minor accident, MF did not visit any hospital emergency room following the accident. To the extent that MF experienced any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of MF by or under the purported supervision of Mas on January 26, 2017, E-Z Medical, Diaz-Pairol, and Mas billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that MF presented with moderate to highly severe health problems as the result of the minor accident.

350.    These are only representative examples. In virtually all of the claims for initial examinations identified in Exhibit "1", E-Z Medical, Diaz-Pairol, and Mas falsely represented that the Insureds presented with problems of moderate severity or moderate to high severity, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

351.    In the claims for initial examinations identified in Exhibit "1", E-Z Medical, Diaz-Pairol, and Mas routinely falsely represented that the Insureds presented with problems of moderate severity or moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99203 and 99204, because examinations billable under CPT code 99203 and 99204 are reimbursable at higher rates than examinations involving presenting problems of low severity, or no severity.

352.    In the claims for initial examinations identified in Exhibit "1", E-Z Medical, Diaz-Pairol, and Mas also routinely falsely represented that the Insureds presented with problems of moderate or moderate to high severity in order to create a false basis for the laundry list of other Fraudulent Services that the E-Z Medical Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations and physical therapy services.

**b.    Misrepresentations    Regarding    "Detailed"    or    "Comprehensive"    Physical Examinations**

353.    Moreover, in every claim identified in Exhibit "1" for initial examinations under CPT code 99203 and 99204, E-Z Medical, Diaz-Pairol, and Mas falsely represented the extent of the underlying physical examinations.

354.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician who performed the examination conducted a "detailed" physical examination.

355.    Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician who performed the examination conducted a "comprehensive" physical examination.

356.    As set forth in Exhibit "1", E-Z Medical, Diaz-Pairol, and Mas virtually always billed for their putative initial examinations using CPT code 99203 or 99204, and thereby

represented that the physician who purported to conduct the examinations – namely Mas – conducted detailed or comprehensive physical examinations of the Insureds who purportedly received the examinations.

357. Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the physician performing the examination conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

358. To the extent that the Insureds in the claims identified in Exhibit "1" had any actual complaints at all as the result of their minor automobile accidents, the complaints were limited to minor musculoskeletal complaints, specifically sprains and strains.

359. Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted an extended examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to the following:

(i) measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii) general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii) examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv) palpation of lymph nodes in neck, axillae, groin and/or other location;

(v) brief assessment of mental status;

(vi) examination of gait and station;

(vii) inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii) coordination;

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)    examination of sensation.

360.    In the claims for initial examinations identified in Exhibit "1", when E-Z Medical, Diaz-Pairol, and Mas billed for the initial examinations under CPT code 99203, they falsely represented that Mas performed "detailed" patient examinations on the Insureds he purported to treat during the initial examinations.

361.    In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", Mas never conducted an extended examination of the Insureds' musculoskeletal systems.

362.    For instance, in each of the claims under CPT code 99203 identified in Exhibit "1", Mas did not conduct an extended examination of the Insureds' musculoskeletal systems, inasmuch as he did not document findings with respect to the following:

(i)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(ii)    brief assessment of mental status;

(iii)    examination of gait and station;

(iv)    inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(v)    coordination;

(vi)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(vii)    examination of sensation.

363.    For example, on January 30, 2014, E-Z Medical, Diaz-Pairol, and Mas billed GEICO under CPT code 99203 for an initial examination that Mas purported to perform on an Insured named YD, and thereby represented that they had provided a "detailed" physical examination to YD.   However, Mas did not document an extended examination of the musculoskeletal system of YD, despite the fact that – to the extent YD had any complaints at all as the result of her automobile accident – they were limited to minor musculoskeletal complaints.

364.    Pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the examining physician either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

365.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

366.    The CPT Assistant recognizes the following organ systems:

(i)      constitutional symptoms (e.g., fever, weight loss);

(ii)     eyes;

(iii)    ears, nose, mouth, throat;

(iv)     cardiovascular;

(v)      respiratory;

(vi)     gastrointestinal;

(vii)    genitourinary;

(viii)   musculoskeletal;

(ix)     integumentary (skin and/or breast);

(x)     neurological;

(xi)    psychiatric;

(xii)   endocrine;

(xiii)  hematologic/lymphatic; and

(xiv)   allergic/immunologic

367.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)  coordination, deep tendon reflexes, and sensation; and

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

124

368.    In the claims for initial examinations identified in Exhibit "1", when E-Z Medical, Diaz-Pairol, and Mas billed for the initial examinations under CPT code 99204, they falsely represented that Mas performed "comprehensive" patient examinations on the Insureds he purported to treat during the initial examinations.

369.    In fact, with respect to the claims for initial examinations under CPT code 99204 that are identified in Exhibit "1", Mas never conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

370.    For instance, in each of the claims under CPT code 99204 identified in Exhibit "1", Mas did not conduct any general examination of multiple patient organ systems, inasmuch as he did not document findings with respect to at least eight organ systems.

371.    Furthermore, although Mas often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems in the claims for initial examinations identified in Exhibit "1", the musculoskeletal examinations did not qualify as "complete", because he failed to document:

(i)     the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(ii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iii)   palpation of lymph nodes in neck, axillae, groin, and/or other location;

(iv)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(v)     coordination, deep tendon reflexes, and sensation; and/or

(vi)    mental status, including orientation to time, place and person, as well as mood and affect.

372.    For example:

(i)     On April 16, 2016, E-Z Medical, Diaz-Pairol, and Mas billed GEICO under CPT code 99204 for an initial examination that Mas purported to perform or supervise on an Insured named LP, and thereby represented that they had provided a "comprehensive" physical examination to LP.  However, Mas did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(ii)    On May 2, 2016, E-Z Medical, Diaz-Pairol, and Mas billed GEICO under CPT code 99204 for an initial examination that Mas purported to perform or supervise on an Insured named CB, and thereby represented that they had provided a "comprehensive" physical examination to CB.  However, Mas did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(iii)   On May 13, 2016, E-Z Medical, Diaz-Pairol, and Mas billed GEICO under CPT code 99204 for an initial examination that Mas purported to perform or supervise on an Insured named RG, and thereby represented that they had provided a "comprehensive" physical examination to RG.  However, Mas did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(iv)    On January 26, 2017, E-Z Medical, Diaz-Pairol, and Mas billed GEICO under CPT code 99204 for an initial examination that Mas purported to perform or supervise on an Insured named MF, and thereby represented that they had provided a "comprehensive" physical examination to MF. However, Mas did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(v)     On April 20, 2017, E-Z Medical, Diaz-Pairol, and Mas billed GEICO under CPT code 99204 for initial examinations of Insureds named HE and RR that Mas purported to perform or supervise, and thereby represented that they had provided "comprehensive" physical examinations to HE and RR.  However, Mas did not document findings with respect to at least eight of the Insureds' organ systems, nor did he document a "complete" examination of the Insureds' musculoskeletal systems or any of the Insureds' other organ systems.

373.    These are only representative examples. In all of the claims for initial examinations under CPT codes 99203 and 99204 that are identified in Exhibit "1", E-Z Medical,

Diaz-Pairol, and Mas falsely represented that they had provided either "detailed" or "comprehensive" physical examinations. In fact, they had not provided detailed or comprehensive physical examinations because Mas had not documented findings with respect to at least eight of the Insureds' organ systems, had not documented "complete" examinations of the Insureds' musculoskeletal systems or any of the Insureds' other organ systems, and had not even documented an "extended" examination of the Insureds' musculoskeletal systems or any of the Insureds' other systems.

374.    In the claims for initial examinations under CPT codes 99203 and 99204 that are identified in Exhibit "1", E-Z Medical, Diaz-Pairol, and Mas falsely represented that they had provided "comprehensive" or "detailed" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT codes 99203 and 99204, because examinations billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations that do not require the examining physician to provide "detailed" or "comprehensive" physical examinations.

## C.    Misrepresentations Regarding the Extent of Medical Decision-Making

375.    Furthermore, pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician who performed the examination engaged in "low complexity" medical decision-making. Additionally, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician who performed the examination engaged in "moderate complexity" medical decision-making.

376.    In addition, pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and

other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

377.    As set forth above, and in Exhibit "1", E-Z Medical, Diaz-Pairol, and Mas billed for all of their putative initial patient examinations using CPT code 99203 and 99204, and thereby represented that Mas engaged in some genuine, low-complexity or moderate-complexity medical decision-making during the initial examinations.

378.    In actuality, however, the purported initial examinations did not involve any legitimate medical decision-making at all.

379.    First, in E-Z Medical, Diaz-Pairol, and Mas's claims for initial examinations identified in Exhibit "1", the initial examinations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information.

380.    When the Insureds in the claims identified in Exhibit "1" presented to E-Z Medical for "treatment", they did not arrive with any medical records.

381.    Furthermore, prior to the initial examinations, E-Z Medical, Diaz-Pairol, and Mas neither requested any medical records from any other providers, nor conducted any complex diagnostic tests beyond the basic range of motion and muscle strength testing that is attendant to any physical examination.

382.    Second, in E-Z Medical, Diaz-Pairol, and Mas's claims for initial examinations identified in Exhibit "1",  there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

383.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the E-Z Medical Defendants, to the extent that the E-Z Medical Defendants provided any such diagnostic procedures or treatment options in the first instance.

384.    In virtually every one of the claims identified in Exhibit "1", any diagnostic procedures and "treatments" that the E-Z Medical Defendants actually provided were limited to a series of medically unnecessary follow-up examinations and physical therapy treatments, none of which was health-or life-threatening if properly administered.

385.    Third, in E-Z Medical, Diaz-Pairol, and Mas's claims for initial examinations identified in Exhibit "1", Mas did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

386.    Rather, to the extent that the initial examinations were conducted in the first instance, E-Z Medical and Mas – at the direction of Diaz-Pairol – provided a nearly identical, pre-determined "diagnosis" for every Insured, and prescribed a virtually identical course of treatment for every Insured.

387.    Specifically, in almost every instance in the claims identified in Exhibit "1", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

388.    Even so, E-Z Medical, Diaz-Pairol, and Mas prepared initial examination reports in which they provided phony, boilerplate sprain/strain "diagnoses" to virtually every Insured.

389.    Then, based upon these phony "diagnoses", E-Z Medical, Diaz-Pairol, and Mas directed virtually every Insured to return to E-Z Medical four to five times each week for medically unnecessary physical therapy during the first three weeks of "treatment".

390.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

391.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

392.    As set forth above, in the claims identified in Exhibit "1", virtually all of the Insureds whom the E-Z Medical Defendants purported to treat were involved in relatively minor accidents, to the extent that they were involved in any actual accidents at all.

393.    It is extremely improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "1" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

394.    It is even more improbable – to the point of impossibility – that this would occur over and over again.

395.    It likewise is improbable – to the point of impossibility – that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "1" would present for an initial examination with substantially identical symptoms, and receive substantially identical diagnoses, requiring a substantially identical course of treatment, on the exact same date after their underlying automobile accident.

396.    Even so, in keeping with the fact that these putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, E-Z Medical and Mas – at the direction of Diaz-Pairol – frequently issued substantially identical, phony "diagnoses", on or about the same date, to more than one Insured

involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

397.    For example:

(i)    On April 29, 2016, two Insureds – CB and RG – were involved in the same automobile accident. Thereafter, both Insureds presented at E-Z Medical for initial examinations by Mas. CB presented on May 2, 2016, and RG presented on May 13, 2016. CB and RG were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that CB and RG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, E-Z Medical and Mas – at the direction of Diaz-Pairol – provided CB and RG with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them.

(ii)    On February 11, 2017, two Insureds – JR and IZ – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at E-Z Medical for initial examinations by Mas on the <u>exact same date</u>, February 16, 2017. JR and IZ were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JR and IZ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, E-Z Medical and Mas – at the direction of Diaz-Pairol – provided JR and IZ with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them.

(iii)    On April 13, 2017, two Insureds – HE and RR – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at E-Z Medical for initial examinations by Mas on the exact same date, April 20, 2017. HE and RR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that HE and RR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, E-Z Medical and Mas – at the direction of Diaz-Pairol – provided HE and RR with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them.

(iv)    On April 25, 2017, three Insureds – AM, SM, and MR – were involved in the same automobile accident. Thereafter – incredibly – all three Insureds presented at E-Z Medical for initial examinations by Mas on the <u>exact same date</u>, April 27, 2017. AM, SM, and MR were different ages, in different physical conditions,

located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AM, SM, and MR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, E-Z Medical and Mas – at the direction of Diaz-Pairol – provided AM, SM, and MR with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to all three of them.

(v)     On November 19, 2017, two Insureds – LG and MG – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at E-Z Medical for initial examinations by Mas <u>on the exact same date</u>, November 30, 2017. LG and MG were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that LG and MG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, E-Z Medical and Mas – at the direction of Diaz-Pairol – provided LG and MG with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them.

398.    E-Z Medical, Diaz-Pairol, and Mas routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the E-Z Medical Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations and physical therapy services.

399.    In keeping with the fact that E-Z Medical, Diaz-Pairol, and Mas routinely inserted false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, for virtually every one of the Insureds in the claims identified in Exhibit "1", E-Z Medical and Mas – at the direction of Diaz-Pairol – diagnosed the Insureds with virtually identical neck and back injuries, and appended to virtually every initial examination report a "Notice of Medical Emergency," stating that that the patient had "sustained symptoms of sufficient severity . . . such that the

absence of immediate medical attention could reasonably be expected to result in in any of the following: A) serious jeopardy to patient health, B) serious impairment to bodily functions, C) serious dysfunction of a bodily organ or part."

400. It is extremely improbable that virtually every one of the Insureds in the claims identified in Exhibit "1" would have strains in their cervical spine, thoracic spine, and lumbar spine, one or both shoulders, one or both knees, and one or both elbows.

401. It is even more improbable – to the point of impossibility – that this would occur over and over again, in the context of minor automobile accidents that could not possibly have caused "symptoms of sufficient severity . . . such that the absence of immediate medical attention could reasonably be expected to result in in any of the following: A) serious jeopardy to patient health, B) serious impairment to bodily functions, C) serious dysfunction of a bodily organ or part."

402. For example:

(i) On April 29, 2016, two Insureds – CB and RG – were involved in the same automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that the vehicle was not towed subsequent to the accident, and that no one was injured in the accident. In keeping with the fact that CB and RG were not seriously injured in the minor accident, neither CB nor RG visited any hospital following the accident. To the extent that CB and RG experienced any health problems at all as the result of their minor accident, they were of low severity. Even so, following purported initial examinations of CB and RG by or under the supervision of Mas on May 2, 2016 and May 13, 2016, respectively, E-Z Medical and Mas – at the direction of Diaz-Pairol – falsely reported that CB and RG experienced cervical, thoracic, and lumbar spine pain, as well as pain in one or both shoulders, elbows, wrists, and knees, and further falsely reported that both parties "suffered an EMERGENCY MEDICAL CONDITION, as a result of the accident...." Additionally, the "Notice of Emergency Medical Condition" form filled out for CB and "Notice of Emergency Medical Condition" form filled out for RG both have the same incorrect date of April 30, 2016 listed as the date the accident occurred.

(ii) On February 11, 2017, two Insureds - JR and IZ were involved in an automobile accident. In keeping with the fact that JR and IZ were not seriously injured in the

minor accident, neither JR nor IZ visited any hospital following the accident. To the extent that JR and IZ experienced any health problems at all as the result of their minor accident, they were of low severity. Even so, following purported initial examinations of JR and IZ by or under the supervision of Mas on February 16, 2017, E-Z Medical and Mas – at the direction of Diaz-Pairol – falsely reported that JR and IZ suffered from high levels of pain in the cervical, thoracic, and lumbar spine, as well as pain in both shoulders, both elbows, and both wrists, and knees, and that both parties "suffered an EMERGENCY MEDICAL CONDITION, as a result of the accident…."

(iii)    On April 13, 2017, two Insureds - RR and HE were involved in an automobile accident.  The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that the vehicle was not towed subsequent to the accident, and that no one was injured in the accident. In keeping with the fact that RR and HE were not seriously injured in the minor accident, neither RR nor HE visited any hospital following the accident. To the extent that RR and HE experienced any health problems at all as the result of their minor accident, they were of low severity. Even so, following purported initial examinations of RR and HE by or under the supervision of Mas on April 20, 2017, E-Z Medical and Mas – at the direction of Diaz-Pairol – falsely reported that RR and HE suffered from cervical, thoracic, and lumbar spine pain, as well as pain in both shoulders, both elbows, and pain in one or both knees, and further falsely reported that both parties "suffered an EMERGENCY MEDICAL CONDITION, as a result of the accident…."

403.    These are only representative examples. In virtually every claim for initial examinations identified in Exhibit "1", E-Z Medical, Diaz-Pairol, and Mas falsely reported that the Insureds suffered from such pain in their neck, back, and extremities, that it was a "medical emergency condition", which could "reasonably be expected to result in any of the following: A) serious jeopardy to patient health, B) serious impairment to bodily functions, C) serious dysfunction of a bodily organ or part."

404.    E-Z Medical, Diaz-Pairol, and Mas routinely inserted this false information in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the E-Z Medical Defendants purported to

provide to the Insureds, including medically unnecessary follow-up examinations and physical therapy services.

405.     To the extent that the Insureds in the claims identified in Exhibit "1" ever had any genuine medical problems at all as the result of their minor automobile accidents, the problems virtually always were limited to ordinary sprains or strains of the back, neck, or extremities.

406.     The diagnosis and treatment of these ordinary sprains and strains did not require any "low complexity" or "moderate complexity" medical decision-making on the part of Mas or anyone else.

407.     To the contrary, and as set forth above, Mas did not engage in any legitimate medical decision-making at all in connection with the initial examinations in the claims identified in Exhibit "1", because the purported "results" of the examinations were pre-determined, phony, and designed to provide a false justification for the laundry-list of other Fraudulent Services that the E-Z Medical Defendants purported to provide.

408.     In the claims for initial examinations identified in Exhibit "1", E-Z Medical, Diaz-Pairol, and Mas routinely falsely represented that the initial examinations involved medical decision-making of low complexity or moderate complexity in order to provide a false basis to bill for the initial examinations under CPT codes 99203 or 99204, because CPT codes 99203 and 99204 are reimbursable at a higher rate than examinations that do not require low complexity or moderate complexity medical decision-making.

409.     In the claims for initial examinations identified in Exhibit "1", E-Z Medical, Diaz-Pairol, and Mas routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)      the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)     the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)    E-Z Medical never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it unlawfully was operated without a legitimate medical director.

410.    In this context, Mas – who at all relevant times purported to serve as the "medical director" at E-Z Medical – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

411.    Had Mas actually fulfilled his statutory role as medical director at E-Z Medical, he would have noted – among other things – that the E-Z Medical Defendants routinely fraudulently represented in E-Z Medical's billing that the putative initial examinations were legitimately and lawfully performed.

412.    Mas failed to do so, because he never actually served as a legitimate medical director at E-Z Medical in the first instance.

**(ii)     The Fraudulent Charges for Follow-Up Examinations at E-Z Medical**

413.    In addition to their fraudulent initial examinations, E-Z Medical, Diaz-Pairol, and Mas virtually always purported to subject each of the Insureds in the claims identified in Exhibit "1" to multiple, fraudulent follow-up examinations during the course of their fraudulent treatment and billing protocol.

414.    Mas purported to personally perform virtually all of the follow-up examinations in the claims identified in Exhibit "1".

415. As set forth in Exhibit "1", E-Z Medical, Diaz-Pairol, and Mas then, for the vast majority of patients, billed GEICO for at least two follow-up examinations under CPT code 99213, virtually always resulting in charges of $250.00 for each follow-up examination that they purported to provide.

416. In the claims for follow-up examinations identified in Exhibit "1", the charges for the follow-up examinations were fraudulent in that they misrepresented E-Z Medical's eligibility to collect PIP Benefits in the first instance.

417. In fact, and as set forth above, E-Z Medical never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing requirements set forth in the Clinic Act.

418. As set forth below, the charges for the follow-up examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

**a.     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

419. Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

420. The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as problems of low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination.

421. For example, the CPT Assistant provides the following clinical examples of presenting problems that might qualify as problems of low to moderate severity, and therefore support the use of CPT code 99213 to bill for a follow-up patient examination:

(i) Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

137

    (ii)     Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

    (iii)    Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

    (iv)    Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

    (v)     Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

    (vi)    Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

    (vii)   Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

422.    Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some ongoing, real threat to the patient's health.

423.    By contrast, and as set forth above, to the limited extent that the Insureds in the claims identified in Exhibit "1" experienced any injuries at all in their relatively minor automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains, which were not severe at all.

424.    In keeping with the fact that the Insureds in the claims identified in Exhibit "1" almost never experienced any injuries more serious than garden-variety soft tissue injuries such as sprains and strains, in the majority of the claims identified in Exhibit "1" the Insureds did not seek treatment at any hospital as the result of their accidents.

425.    Furthermore, in the substantial majority of cases, contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the

Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

426.    Ordinary strains and sprains virtually always resolve after a short course of conservative treatment such as rest, ice, compression, and elevation, or no treatment at all.

427.    By the time the Insureds in the claims identified in Exhibit "1" presented at E-Z Medical for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their relatively minor automobile accidents, or their presenting problems were minimal.

428.    Even so, in the claims for follow-up examinations identified in Exhibit "1", E-Z Medical, Diaz-Pairol, and Mas routinely billed for their putative follow-up examinations under CPT codes 99213, and thereby falsely represented that the Insureds continued to suffer from presenting problems of low to moderate severity at the time of the follow-up examinations.

429.    For example:

(i)     On January 29, 2014, an Insured named YD was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, YD's vehicle was not towed subsequent to the accident, and the police report made no mention of any injuries. In keeping with the fact that YD was not seriously injured in the minor accident, YD did not visit any hospital following the accident. To the extent that YD experienced any health problems at all as the result of her minor accident, they were of low severity at the outset, and had resolved within a few weeks. Even so, following purported follow-up examinations of YD on February 14, 2014 and March 14, 2014, E-Z Medical, Diaz-Pairol, and Mas billed GEICO for the follow-up examinations using CPT code 99213 and thereby falsely represented that YD presented with problems of low to moderate severity.

(ii)    On April 29, 2016, two Insureds – CB and RG – were involved in the same automobile accident.  The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that the vehicle was not towed subsequent to the accident, and that no one was injured in the accident. In keeping with the fact that CB and RG were not seriously injured in the minor accident, neither CB nor RG visited any hospital following the accident. To the extent that CB and RG experienced any health problems at all as the result of their minor

accident, they were of low severity at the outset, and had resolved within a few weeks. Even so, following purported follow-up examinations of CB on May 12, 2016 and June 9, 2016, and follow up examinations of RG on June 2, 2016 and June 30, 2016, E-Z Medical, Diaz-Pairol, and Mas billed GEICO for the follow-up examinations using CPT code 99213 and thereby falsely represented that CB and RG presented with problems of low to moderate severity.

(iii)   On January 19, 2017, an Insured named MF was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, MF's vehicle was not towed subsequent to the accident, and that there were no injuries as a result of the accident. To the extent that MF experienced any health problems at all as the result of her minor accident, they were of low severity. In keeping with the fact that MF was not seriously injured in the minor accident, MF did not visit any hospital following the accident. To the extent MF experienced any health problems at all as the result of her minor accident, they were of low severity at the outset, and had resolved within a few weeks. Even so, following purported follow-up examinations of MF on February 9, 2017 and March 9, 2017, E-Z Medical, Diaz-Pairol, and Mas billed GEICO for the follow-up examinations using CPT code 99213 and thereby falsely represented that MF presented with problems of low to moderate severity.

(iv)   On April 13, 2017, two Insureds - RR and HE were involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that the vehicle was not towed subsequent to the accident, and that no one was injured in the accident. In keeping with the fact that RR and HE were not seriously injured in the minor accident, neither RR nor HE visited any hospital following the accident. To the extent that RR and HE experienced any health problems at all as the result of their minor accident, they were of low severity at the outset, and had resolved within a few weeks. Even so, following purported follow-up examinations of RR on May 4, 2017 and June 1, 2017, and follow up examinations of HE on May 4, 2017 and June 15, 2017, E-Z Medical, Diaz-Pairol, and Mas billed GEICO for the follow-up examinations using CPT code 99213 and thereby falsely represented that RR and HE presented with problems of low to moderate severity.

430.   These are only representative examples. In all of the claims for follow-up examinations identified in Exhibit "1", E-Z Medical, Diaz-Pairol, and Mas falsely represented that the Insureds presented with problems of low to moderate severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

431.   In the claims for follow-up examinations identified in Exhibit "1", E-Z Medical, Diaz-Pairol, and Mas routinely falsely represented that the Insureds presented with problems of low to moderate severity in order to create a false basis for their charges for the examinations under CPT code 99213, because follow-up examinations billable under CPT code 99213 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

432.   In the claims for follow-up examinations identified in Exhibit "1", E-Z Medical, Diaz-Pairol, and Mas also routinely falsely represented that the Insureds presented with problems of low to moderate severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds, including additional, medically unnecessary follow-up examinations and physical therapy.

**b.     Misrepresentations Regarding the Results of the Follow-Up Examinations**

433.   What is more, pursuant to the CPT Assistant, when E-Z Medical, Diaz-Pairol, and Mas billed for their putative follow-up examinations under CPT code 99213, they represented that Mas performed at least two of the following three components: (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused physical examination"; and (iii) engaged in medical decision-making of "low complexity".

434.   In actuality, however, in the claims for follow-up examinations identified in Exhibit "1", Mas did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

435.   Rather, following their purported follow-up examinations, E-Z Medical and Mas – at the direction of Diaz-Pairol – simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either  (ii) referred the Insureds back to E-Z Medical for

even more medically unnecessary physical therapy services, despite the fact that the Insureds purportedly already had received extensive physical therapy services from E-Z Medical that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

436.    In keeping with the fact that the purported "results" of the follow-up examinations were pre-determined, and had no legitimate connection to the Insureds' true medical circumstances or presentation, E-Z Medical and Mas – at the direction of Diaz-Pairol – recommended a substantially identical course of medically unnecessary "treatment" to virtually every one of the Insureds identified in Exhibit "1", irrespective of the Insureds' actual presenting problems, to the extent the Insureds experienced any legitimate injuries at all.

437.    Specifically, E-Z Medical and Mas – at the direction of Diaz-Pairol – directed the vast majority of its Insureds to receive two to four months of purported "physical therapy" treatments, typically consisting of daily physical therapy five days a week for the first two weeks of treatment, followed by physical therapy four times per week for the subsequent four weeks, followed by physical therapy three times a week for the final four weeks.

438.    In addition, E-Z Medical and Mas – at the direction of Diaz-Pairol – directed virtually every Insured to receive substantially identical types of physical therapy services, including: (i) cold/hot packs/electricity; (ii) manual therapy techniques; (iii) electric stimulation; (iv) un-listed modality; and (v) infrared therapy and/or ultrasound therapy. See Exhibit "1".

439.    In a legitimate clinical setting, each individual patient's physical therapy schedule, and the specific physical therapy modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

440.     In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy is constantly adjusted for each individual patient based on each patient's treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy.

441.     By contrast, at E-Z Medical, the nature and extent of the physical therapy that each Insured purportedly received was pre-determined, and had no legitimate connection to the Insureds' individual circumstances, presentation, or progress through the E-Z Medical Defendants' fraudulent treatment and billing protocol.

442.     The phony "follow-up examinations" that E-Z Medical, Diaz-Pairol, and Mas purported to provide the Insureds in the claims identified in Exhibit "1" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were pre-determined to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into E-Z Medical's offices.

443.     In the claims for follow-up examinations identified in Exhibit "1", E-Z Medical Health, Diaz-Pairol, and Mas routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)     the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   E-Z Medical never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it unlawfully was operated without a legitimate medical director.

444.   In this context, Mas – who at all relevant times purported to serve as the "medical director" at E-Z Medical – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

445.   Had Mas actually fulfilled his statutory role as medical director at E-Z Medical, he would have noted – among other things – that the Defendants routinely fraudulently represented in E-Z Medical's billing that the putative follow-up examinations were legitimately and lawfully performed and billed.

446.   Mas failed to do so, because he never actually served as a legitimate medical director at E-Z Medical in the first instance.

**(iii)   The Fraudulent Charges for Physical Therapy at E-Z Medical**

447.   In addition to the fraudulent initial examinations and follow-up examinations, the E-Z Medical Defendants virtually always purported to subject each of the Insureds in the claims identified in Exhibit "1" to between two and four months of medically unnecessary physical therapy.

448.   As set forth above, though Mas falsely purported to personally perform or directly supervise virtually all of the physical therapy services in the claims identified in Exhibit "1", the physical therapy services actually were performed without supervision by Fernandez, Y. Rodriguez, and other physical therapist assistants associated with E-Z Medical, to the extent that they were even provided at all.

449.     As set forth in Exhibit "1", the E-Z Medical Defendants then billed the purported

physical therapy services to GEICO under:

(i)      CPT code 97010 for putative hot/cold/compression treatments, resulting in a charge of $20.00 for each round of hot/cold/compression treatments they purported to provide;

(ii)     CPT code 97012, for putative mechanical traction therapy, resulting in a charge of $35.00 for each round of mechanical traction therapy they purported to provide

(iii)    CPT code 97016, for putative vasopneumatic therapy, resulting in a charge of $40.00 for each round of mechanical traction therapy they purported to provide;

(iv)     CPT code 97018, for putative paraffin bath therapy, resulting in a charge of $30.00 for each round of paraffin bath therapy they purported to provide;

(i)      CPT code 97026, for putative infrared therapy , resulting in a charge of $40.00 for each round of electrical stimulation they purported to provide;

(ii)     CPT code 97032, for putative electrical stimulation, resulting in a charge of $30.00 for each round of electrical stimulation they purported to provide;

(iii)    CPT code 97035, for putative ultrasound, resulting in a charge of $40.00 for each round of ultrasound they purported to provide;

(iv)     CPT code 97039, for unlisted modality treatments, resulting in a charge of $40.00 for each round of unlisted modality treatments they purported to provide;

(v)      CPT code 97110, for putative therapeutic exercises, resulting in a charge between $55.00 and $75.00 for each round of therapeutic exercises they purported to provide;

(vi)     CPT code 97112, for putative neuromuscular reeducation, resulting in a charge between $40.00 and $75.00 for each round of neuromuscular reeducation they purported to provide;

(vii)    CPT code 97140, for putative manual therapy, resulting in a charge of $60.00 for each round of manual therapy they purported to provide;

450.     In the claims for physical therapy services identified in Exhibit "1", the charges

for the physical therapy services were fraudulent in that they misrepresented E-Z Medical's

eligibility to collect PIP Benefits in the first instance.

451.    In fact, and as set forth above, E-Z Medical never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act.

452.    What is more, and as set forth above, in the claims for physical therapy services identified in Exhibit "1", the E-Z Medical Defendants falsely represented that the physical therapy services lawfully had been performed or directly supervised by Mas, when in fact they were unlawfully performed without any supervision by Fernandez, Y. Rodriguez, and other physical therapist assistants associated with E-Z Medical, who are not and never have been licensed as physical therapists.

453.    As set forth above, in order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

454.    Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

455.    In each of the claims for physical therapy services identified in Exhibit "1", the E-Z Medical Defendants falsely represented that the services were lawfully provided and eligible for PIP reimbursement.

456.    In fact, in the claims for physical therapy services identified in Exhibit "1", the services were not lawfully provided, inasmuch as: (i) the putative physical therapy services were performed – to the extent that they were performed at all – without supervision by Fernandez, Y. Rodriguez, and other physical therapist assistants associated with E-Z Medical, who were individuals who were not licensed to practice physical therapy; and (ii) the E-Z Medical

Defendants deliberately misrepresented the identities of the individuals who purported to perform or directly supervise the physical therapy services in their billing for the physical therapy services, in a calculated attempt to induce GEICO to pay the unreimbursable charges.

**2.      The Davila Medical Defendants' Fraudulent Treatment and Billing Protocol**

**(i)      The Fraudulent Charges for Initial Examinations at Davila Medical**

457.      As an initial step in the Davila Medical Defendants' fraudulent treatment and billing protocol, Davila Medical, Davila, and Mas purported to provide each of the Insureds in the claims identified in Exhibit "2" with a putative initial examination.

458.      Mas purported to personally perform or directly supervise most of the initial examinations at Davila Medical in the claims identified in Exhibit "2".

459.      As set forth in Exhibit "2", Davila Medical, Davila, and Mas then billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99204, resulting in charges of either $330.00 for each initial examination that they purported to provide.

460.      In the claims for initial examinations identified in Exhibit "2", the charges for the initial examinations were fraudulent in that they misrepresented Davila Medical's eligibility to collect PIP Benefits in the first instance.

461.      In fact, and as set forth above, Davila Medical never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act.

462.      As set forth below, the charges for the initial examinations identified in Exhibit "2" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

147

a.      **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

463.    As set forth above, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the AMA in connection with the use of current procedural terminology, or CPT, codes. See Fla. Stat. § 627.736.

464.    The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

465.    Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial patient examination represents that the Insured presented with problems of moderate to high severity.

466.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99204 to bill for an initial patient examination.

467.    Specifically, the CPT Assistant provides the following clinical examples of presenting problems that support the use of CPT code 99204 to bill for an initial patient examination:

(i)      Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)     Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)    Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)     Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)      Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)     Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

(vii)    Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

468.    Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

469.    By contrast, to the extent that the Insureds in the claims identified in Exhibit "2" had any presenting problems at all as the result of their minor automobile accidents, the problems were low severity soft tissue injuries such as sprains and strains.

470.    For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "2" either had no presenting problems at all as the result of their minor automobile accidents, or else problems of low severity, in most of the claims identified in Exhibit "2" the Insureds did not seek treatment at any hospital as the result of their accidents.

471.    To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain or strain diagnosis.

472.    Furthermore, to the extent that police reports existed with respect to the claims identified in Exhibit "2", the contemporaneous police reports virtually always indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were functional following the accidents, and that no one was injured in the accidents.

473.    Even so, in the claims for initial examinations identified in Exhibit "2", Davila Medical, Davila, and Mas routinely billed for their putative initial examinations using CPT code

149

99204, and thereby falsely represented that the Insureds presented with problems of moderate to high severity.

474.    For example:

(i)      On November 15, 2017, an Insured named MA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, that the airbags in MA's vehicle did not deploy, that MA's vehicle was drivable following the accident, and that MA was not injured in the accident. In keeping with the fact that MA was not seriously injured in the accident, MA did not visit any hospital emergency room following the accident. To the extent that MA experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of MA by Mas on November 28, 2017, Davila Medical, Davila, and Mas billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that MA presented with moderately to highly severe health problems as the result of the accident.

(ii)     On December 7, 2017, an Insured named AT was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, that the airbags in AT's vehicle did not deploy, that AT's vehicle was drivable following the accident, and that AT was not injured in the accident. In keeping with the fact that AT was not seriously injured in the accident, AT did not visit any hospital emergency room following the accident. To the extent that AT experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of AT by Mas on December 8, 2017, Davila Medical, Davila, and Mas billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that AT presented with moderately to highly severe health problems as the result of the accident.

(iii)    On December 7, 2017, an Insured named RC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, that the airbags in RC's vehicle did not deploy, that RC's vehicle was drivable following the accident, and that RC was not injured in the accident. In keeping with the fact that RC was not seriously injured in the accident, RC did not visit any hospital emergency room following the accident. To the extent that RC experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of RC by Mas on December 8, 2017, Davila Medical, Davila, and Mas billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that RC presented with moderately to highly severe health problems as the result of the accident.

(iv)   On December 17, 2017, an Insured named RC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, that the airbags in RC's vehicle did not deploy, that RC's vehicle was drivable following the accident, and that RC was not injured in the accident. In keeping with the fact that RC was not seriously injured in the accident, RC did not visit any hospital emergency room following the accident. To the extent that RC experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of RC by Mas on December 19, 2017, Davila Medical, Davila, and Mas billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that RC presented with moderately to highly severe health problems as the result of the accident.

(v)   On December 17, 2017, an Insured named EP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, that the airbags in EP's vehicle did not deploy, that EP's vehicle was drivable following the accident, and that EP was not injured in the accident. In keeping with the fact that EP was not seriously injured in the accident, EP did not visit any hospital emergency room following the accident. To the extent that EP experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of EP by Mas on December 19, 2017, Davila Medical, Davila, and Mas billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that EP presented with moderately to highly severe health problems as the result of the accident.

475.   In all of the claims for initial examinations identified in Exhibit "2", Davila Medical, Davila, and Mas falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

476.   In the claims for initial examinations identified in Exhibit "2", Davila Medical, Davila, and Mas routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for their charges for the examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at higher rates than examinations involving presenting problems of low severity, or no severity.

477.    In the claims for initial examinations identified in Exhibit "2", Davila Medical, Davila, and Mas also routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for the laundry list of other Fraudulent Services that the Davila Medical Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations and physical therapy services.

**b.      Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

478.    What is more, in every claim identified in Exhibit "2" for initial examinations under CPT code 99204, Davila Medical, Davila, and Mas misrepresented and exaggerated the amount of face-to-face time that the examining physician – typically Mas – spent with the Insureds or the Insureds' families during the putative initial examination.

479.    Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination typically represents that the physician who conducted the examination spent at least 45 minutes of face-to-face time with the patient or the patient's family.

480.    As set forth in Exhibit "2", Davila Medical, Davila, and Mas always billed for their putative initial examinations using CPT code 99204, and thereby represented that the physician who purported to conduct the examinations – typically Mas – spent at least 45 minutes of face-to-face time with the Insureds or their families during the examinations.

481.    In fact, in the initial examinations identified in Exhibit "2", Mas never spent even 15 minutes of face-to-face time with the Insureds or their families when conducting the examinations, much less 45 minutes, to the extent that the examinations actually were conducted at all.

482.    Rather, in the purported initial examinations identified in Exhibit "3", the examinations rarely entailed more than 10 minutes of face-to-face time between Mas, the Insureds, or the Insureds' families, to the extent that they were provided at all.

483.    In keeping with the fact that the initial examinations in the claims identified in Exhibit "2" did not involve more than 10 minutes of face-to-face time between Mas, the Insureds, or the Insureds' families – to the extent that they were provided at all – Mas used pre-printed template forms in purporting to conduct the examinations at E-Z Medical, just as he did at E-Z Medical.

484.    All that was required to complete the pre-printed template forms was a brief patient interview and a perfunctory physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, and basic range of motion and muscle strength testing.

485.    These interviews and examinations did not require Mas to spend more than 10 minutes of face-to-face time with the Insureds during the putative initial examinations.

486.    Indeed, Mas could not legitimately have personally spent at least 45 minutes of face-to-face time with the Insureds or their families during the initial examinations at Davila Medical, or even directly supervised anyone else who was purporting to perform the examinations, considering the massive amount of healthcare services he simultaneously was purporting to personally perform or directly supervise at numerous healthcare clinics and medical practices throughout the Miami area.

487.    For example:

(i)    On May 9, 2017, Davila Medical, Davila, and Mas billed GEICO under CPT code 99204 for an initial examination that Mas falsely purported to perform on an Insured named ED, and falsely represented that Mas spent at least 45 minutes of face-to-face time with the Insured or the Insured's family during the examination. On that same day, Mas also purported to personally provide or directly supervise more than <u>35 hours</u> of physical therapy services to 30 individual Insureds, from

153

seven different facilities, namely Atlantic Medical, Baracusa Health, Davila Medical, E-Z Medical, Starlite Medical, Therapeutic Rehab, and Westchester Medical, all of which were billed to GEICO.

(ii)     On June 7, 2017, Davila Medical, Davila, and Mas billed GEICO under CPT code 99204 for two initial examinations that Mas falsely purported to perform on Insureds named VV and BF, and falsely represented that Mas spent at least 45 minutes of face-to-face time with the Insureds or their families during each examination. On that same day, Mas also purported to personally provide or directly supervise more than 28 hours of physical therapy services to 22 individual Insureds, from five different facilities, namely Atlantic Medical, Davila Medical, E-Z Medical, Starlite, and Westchester Medical, all of which were billed to GEICO.

(iii)    On October 3, 2017, Davila Medical, Davila, and Mas billed GEICO under CPT code 99204 for three initial examinations that Mas falsely purported to perform on Insureds named LC, KQ, and RC, and falsely represented that Mas spent at least 45 minutes of face-to-face time with the Insureds or their families during each examination. On that same day, Mas also purported to personally provide or directly supervise more than 21 hours of physical therapy services to 14 individual Insureds, from six different facilities, namely Davila Medical, E-Z Medical, Health Solutions, Starlite Medical, Therapeutic Rehab, and Westchester Medical, all of which were billed to GEICO.

(iv)    On December 8, 2017, Davila Medical, Davila, and Mas billed GEICO under CPT code 99204 for two initial examinations that Mas falsely purported to perform on Insureds named AT and RC, and falsely represented that Mas spent at least 45 minutes of face-to-face time with the Insureds or their families during each examination. On that same day, Mas also purported to personally provide or directly supervise more than 35 hours of physical therapy services to 26 individual Insureds, from seven different facilities, namely Davila Medical, E-Z Medical, Health Solutions, Star Medical, Starlite Medical, Therapeutic Rehab, and Westchester Medical, all of which were billed to GEICO.

(v)     On December 19, 2017, Davila Medical, Davila, and Mas billed GEICO under CPT code 99204 for two initial examinations that Mas falsely purported to perform on Insureds named RC and EA, and falsely represented that Mas spent at least 45 minutes of face-to-face time with the Insureds or their families during each examination. On that same day, Mas also purported to personally provide or directly supervise more than 39 hours of physical therapy services to 25 individual Insureds, from six different facilities, namely Davila Medical, E-Z Medical, Star Medical, Starlite Medical, Therapeutic Rehab, and Westchester Medical, all of which were billed to GEICO.

488.    In the claims for initial examinations that are identified in Exhibit "2", Davila Medical, Davila, and Mas routinely falsely represented that Mas had spent at least 45 minutes of face-to-face time with the Insureds or their families during the examinations, despite the fact that – on those same dates – Mas also purported to personally perform a massive amount of physical therapy and other services to large numbers of Insureds at multiple locations throughout the Miami area.

489.    Davila Medical, Davila, and Mas routinely misrepresented the amount of time that was spent in conducting the initial examinations because lengthier examinations that are billable under CPT code 99204 are reimbursable at higher rates than examinations that take less time to perform.

**c.     Misrepresentations Regarding "Comprehensive" Physical Examinations**

490.    Moreover, in every claim identified in Exhibit "2" for initial examinations under CPT code 99204, Davila Medical, Davila, and Mas falsely represented the extent of the underlying physical examinations.

491.    Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial patient examination represents that the physician who performed the examination conducted a "comprehensive" physical examination

492.    As set forth in Exhibit "2", Davila Medical, Davila, and Mas virtually always billed for their putative initial examinations using CPT code 99204, and thereby represented that the physician who purported to conduct the examinations – typically Mas – conducted comprehensive physical examinations of the Insureds who purportedly received the examinations.

493.     Pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the examining physician either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

494.     Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

495.     The CPT Assistant recognizes the following organ systems:

(i)      constitutional symptoms (e.g., fever, weight loss);

(ii)     eyes;

(iii)    ears, nose, mouth, throat;

(iv)     cardiovascular;

(v)      respiratory;

(vi)     gastrointestinal;

(vii)    genitourinary;

(viii)   musculoskeletal;

(ix)     integumentary (skin and/or breast);

(x)      neurological;

(xi)     psychiatric;

(xii)    endocrine;

(xiii)   hematologic/lymphatic; and

(xiv)    allergic/immunologic.

496.     Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)      at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)     the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)      examination of gait and station;

(vi)     examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and

(ix)     mental status, including orientation to time, place and person, as well as mood and affect.

497.     In the claims for initial examinations identified in Exhibit "2", when Davila Medical, Davila, and Mas billed for the initial examinations under CPT code 99204, they falsely represented that Mas or someone working under his direct supervision performed "comprehensive" patient examinations on the Insureds he purported to treat during the initial examinations.

498.    In fact, with respect to the claims for initial examinations under CPT code 99204 that are identified in Exhibit "2", neither Mas nor anyone under his direct supervision ever conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

499.    For instance, in each of the claims under CPT code 99204 identified in Exhibit "2", neither Mas nor anyone under his direct supervision ever conducted any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

500.    Furthermore, although Mas often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems during the initial examinations in the claims for initial examinations identified in Exhibit "2", the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)      the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(ii)     examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iii)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(iv)     inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(v)      coordination, deep tendon reflexes, and sensation; and/or

(vi)     mental status, including orientation to time, place and person, as well as mood and affect.

501.    For example:

(i)      On or about September 15, 2016, Davila Medical, Davila, and Mas billed GEICO under CPT code 99204 for an initial examination of an Insured named JR, and

158

thereby represented that they had provided a "comprehensive" physical examination to JR. However, neither Mas nor any other healthcare provider working under his direct supervision documented findings with respect to at least eight of JR's organ systems, nor did they document a "complete" examination of JR's musculoskeletal system or any of JR's other organ systems.

(ii)     On or about September 15, 2016, Davila Medical, Davila, and Mas billed GEICO under CPT code 99204 for an initial examination of an Insured named BP, and thereby represented that they had provided a "comprehensive" physical examination to BP. However, neither Mas nor any other healthcare provider working under his direct supervision documented findings with respect to at least eight of BP's organ systems, nor did they document a "complete" examination of BP's musculoskeletal system or any of BP's other organ systems.

(iii)    On or about January 18, 2017, Davila Medical, Davila, and Mas billed GEICO under CPT code 99204 for an initial examination of an Insured named MM, and thereby represented that they had provided a "comprehensive" physical examination to MM. However, neither Mas nor any other healthcare provider working under his direct supervision documented findings with respect to at least eight of MM's organ systems, nor did they document a "complete" examination of MM musculoskeletal system or any of MM's other organ systems.

(iv)     On or about September 20, 2017, Davila Medical, Davila, and Mas billed GEICO under CPT code 99204 for an initial examination of an Insured named DM, and thereby represented that they had provided a "comprehensive" physical examination to DM. However, neither Mas nor any other healthcare provider working under his direct supervision documented findings with respect to at least eight of DM's organ systems, nor did they document a "complete" examination of DM musculoskeletal system or any of DM's other organ systems.

(v)      On or about June 6, 2017, Davila Medical, Davila, and Mas billed GEICO under CPT code 99204 for an initial examination of an Insured named AA, and thereby represented that they had provided a "comprehensive" physical examination to AA. However, neither Mas nor any other healthcare provider working under his direct supervision documented findings with respect to at least eight of AA's organ systems, nor did they document a "complete" examination of AA's musculoskeletal system or any of AA's other organ systems.

(vi)     On or about November 28, 2017, Davila Medical, Davila, and Mas billed GEICO under CPT code 99204 for an initial examination of an Insured named GR, and thereby represented that they had provided a "comprehensive" physical examination to GR. However, neither Mas nor any other healthcare provider working under his direct supervision documented findings with respect to at least eight of GR's organ systems, nor did they document a "complete" examination of GR's musculoskeletal system or any of GR's other organ systems.

(vii)    On or about January 4, 2018, Davila Medical, Davila, and Mas billed GEICO under CPT code 99204 for an initial examination of an Insured named RC, and thereby represented that they had provided a "comprehensive" physical examination to RC. However, neither Mas nor any other healthcare provider working under his direct supervision documented findings with respect to at least eight of RC's organ systems, nor did they document a "complete" examination of RC's musculoskeletal system or any of RC's other organ systems.

(viii)    On or about January 4, 2018, Davila Medical, Davila, and Mas billed GEICO under CPT code 99204 for an initial examination of an Insured named AT, and thereby represented that they had provided a "comprehensive" physical examination to AT. However, neither Mas nor any other healthcare provider working under his direct supervision documented findings with respect to at least eight of AT's organ systems, nor did they document a "complete" examination of AT's musculoskeletal system or any of AT's other organ systems.

502.    In all of the claims for initial examinations under CPT code 99204 that are identified in Exhibit "2", Davila Medical, Davila, and Mas falsely represented that they had provided "comprehensive" physical examinations. In fact, they had not provided comprehensive physical examinations because neither Mas nor anyone working under his direct supervision had documented findings with respect to at least eight of the Insureds' organ systems, nor had they documented "complete" examinations of the Insureds' musculoskeletal systems or any of the Insureds' other organ systems.

503.    In the claims for initial examinations under CPT code 99204 that are identified in Exhibit "2", Davila Medical, Davila, and Mas falsely represented that they had provided "comprehensive" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at higher rates than examinations that do not require the examining physician to provide "comprehensive" physical examinations.

**d.      Misrepresentations Regarding the Extent of Medical Decision-Making**

504.    Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician who performed the examination engaged in "moderate complexity" medical decision-making.

505.    As set forth above, pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

506.    As set forth above, and in Exhibit "2", Davila Medical, Davila, and Mas billed for all of their putative initial patient examinations using CPT code 99204, and thereby represented that Mas engaged in some genuine, moderate-complexity medical decision-making during the initial examinations.

507.    In actuality, however, the purported initial examinations did not involve any legitimate medical decision-making at all.

508.    First, in Davila Medical, Davila, and Mas's claims for initial examinations identified in Exhibit "2", the initial examinations did not involve the retrieval, review, or analysis of any significant medical records, diagnostic tests, or other information.

509.    The majority of Insureds in the claims identified in Exhibit "2" presented to Davila Medical for "treatment" without any medical records at all.

510.     Furthermore, prior to the initial examinations, Davila Medical, Davila, and Mas neither requested any medical records from any other providers, nor conducted any diagnostic tests beyond the basic range of motion and muscle strength testing that is attendant to any physical examination.

511.     Second, in Davila Medical, Davila, and Mas's claims for initial examinations identified in Exhibit "2",  there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

512.     Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Davila Medical Defendants, to the extent that the Davila Medical Defendants provided any such diagnostic procedures or treatment options in the first instance.

513.     In virtually every one of the claims identified in Exhibit "2", any diagnostic procedures and "treatments" that the Davila Medical Defendants actually provided were limited to a series of medically unnecessary follow-up examinations and physical therapy treatments, none of which was health-or life-threatening if properly administered.

514.     Third, in Davila Medical, Davila, and Mas's claims for initial examinations identified in Exhibit "2", Mas did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

515.     Rather, to the extent that the initial examinations were conducted in the first instance, Davila Medical and Mas – at the direction of Davila – provided a nearly identical, pre-determined "diagnosis" for every Insured, and prescribed a virtually identical course of treatment for every Insured.

162

516.     Specifically, in the claims identified in Exhibit "2", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

517.     Even so, Davila Medical, Davila, and Mas prepared initial examination reports in which they provided phony, boilerplate sprain/strain "diagnoses" to virtually every Insured.

518.     Then, based upon these phony "diagnoses", Davila Medical, Davila, and Mas directed virtually every Insured to return to Davila Medical five times each week for medically unnecessary physical therapy during the first three weeks of "treatment".

519.     As set forth above, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

520.     An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

521.     As set forth above, in the claims identified in Exhibit "2", virtually all of the Insureds whom the Davila Medical Defendants purported to treat were involved in relatively minor accidents, to the extent that they were involved in any actual accidents at all.

522.     It is extremely improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "2" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

523.     It likewise is improbable – to the point of impossibility – that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "2" would present for an initial examination with substantially identical symptoms, and

receive substantially identical diagnoses, requiring a substantially identical course of treatment, on the exact same date after their underlying automobile accident.

524.     Even so, in keeping with the fact that these putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, Davila Medical and Mas – at the direction of Davila –issued substantially identical, phony "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

525.     For example:

(i)       On August 31, 2016, two Insureds – JR and BP – were purportedly involved in the same automobile accident. Thereafter – incredibly – JR and BP presented at Davila Medical for initial examinations on the <u>exact same date</u>, September 2, 2016. JR and BP were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JR and BP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Davila Medical and Mas – at the direction of Davila – provided JR and BP with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them.

(ii)      On June 6, 2017, three Insureds – VV, BF, and LR – were involved in the same automobile accident. Thereafter – incredibly – VV and BF presented at Davila Medical for initial examinations on the <u>exact same date</u>, June 7, 2017, and LR presented at Davila Medical for an initial examination on June 8, 2017. VV, BF, and LR were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that VV, BF, and LR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Davila Medical and Mas – at the direction of Davila – provided VV, BF, and LR with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them.

(iii)     On November 27, 2017, three Insureds – GR, TO, and JJ – were involved in the same automobile accident. Thereafter – incredibly – GR, TO, and JJ presented at Davila Medical for initial examinations on the <u>exact same date</u>, November 28,

2017. GR, TO, and JJ were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that GR, TO, and JJ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Davila Medical and Mas – at the direction of Davila – provided GR, TO, and JJ with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them.

(iv)     On December 7, 2017, two Insureds – AT and RC – were involved in the same automobile accident. Thereafter – incredibly – AT and RC presented at Davila Medical for initial examinations on the <u>exact same date</u>, December 8, 2017. AT and RC were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AT and RC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Davila Medical and Mas – at the direction of Davila – provided AT and RC with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them.

(v)      On December 17, 2017, two Insureds – RC and EA – were involved in the same automobile accident. Thereafter – incredibly – RC and EA presented at Davila Medical for initial examinations on the <u>exact same date</u>, December 19, 2017. RC and EA were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that RC and EA suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Davila Medical and Mas – at the direction of Davila – provided RC and EA with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them.

526.     Davila Medical, Davila, and Mas routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Davila Medical Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations and physical therapy services.

527.    In keeping with the fact that Davila Medical, Davila, and Mas routinely inserted false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, for virtually every one of the Insureds in the claims identified in Exhibit "2", Davila Medical and Mas – at the direction of Davila – diagnosed the Insureds with virtually identical neck and back injuries, and appended to virtually every initial examination report a "Notice of Medical Emergency," stating that that the patient had "sustained symptoms of sufficient severity . . . such that the absence of immediate medical attention could reasonably be expected to result in in any of the following serious impairment to bodily functions or serious dysfunction of a bodily organ or part."

528.    It is extremely improbable that virtually every one of the Insureds in the claims identified in Exhibit "2" would have strains in their cervical, thoracic, and lumbar spines, and have symptoms so acute that their injuries could be considered a medical emergency.

529.    It is even more improbable – to the point of impossibility – that this would occur over and over again, in the context of minor automobile accidents that could not possibly have caused such severe levels of pain and/or injury.

530.    Davila Medical, Davila, and Mas inserted this false information in their initial examination reports despite the fact that the minor underlying accidents did not and could not possibly have caused such consistent, high levels of pain in the Insureds, much less to more than one Insured involved in a single accident.

531.    For example:

(i)    On August 31, 2016, an Insured named JR was involved in a minor automobile accident. In keeping with the fact that JR was not seriously injured in the accident, JR did not visit any hospital following the accident. To the extent that JR experienced any health problems at all as the result of his accident, they were of low severity. Even so, following a purported initial examination of JR on

September 2, 2017, Davila Medical and Mas – at Davila's direction – falsely reported that JR's injuries constituted an "emergency medical condition."

(ii)     On August 31, 2016, an Insured named BP was involved in a minor automobile accident. In keeping with the fact that BP was not seriously injured in the accident, BP did not visit any hospital following the accident. To the extent that BP experienced any health problems at all as the result of his accident, they were of low severity. Even so, following a purported initial examination of BP on September 2, 2017, Davila Medical and Mas – at Davila's direction – falsely reported that BP's injuries constituted an "emergency medical condition."

(iii)    On December 7, 2017, an Insured named AT was involved in a minor automobile accident. In keeping with the fact that AT was not seriously injured in the accident, AT did not visit any hospital following the accident. To the extent that AT experienced any health problems at all as the result of his accident, they were of low severity. Even so, following a purported initial examination of AT on December 8, 2017, Davila Medical and Mas – at Davila's direction – falsely reported that AT had injuries including "severe lumbar sprain secondary to MVA with potential for serious impairment," and that her injuries constituted an "emergency medical condition."

(iv)    On December 7, 2017, an Insured named RC was involved in a minor automobile accident. In keeping with the fact that RC was not seriously injured in the accident, RC did not visit any hospital following the accident. To the extent that RC experienced any health problems at all as the result of his accident, they were of low severity. Even so, following a purported initial examination of RC on December 8, 2017, Davila Medical and Mas – at Davila's direction – falsely reported that RC had injuries including "severe cervical whiplash secondary to MVA with potential for serious impairment," and that his injuries constituted an "emergency medical condition."

532.     In every claim for initial examinations identified in Exhibit "2", Davila Medical, Davila, and Mas falsely reported that the Insureds suffered from severe pain in their neck, back, and extremities, and that such injuries constituted a "medical emergency condition".

533.     Davila Medical, Davila, and Mas routinely inserted this false information in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Davila Medical Defendants purported to provide to the

Insureds, including medically unnecessary follow-up examinations and physical therapy services.

534.    To the extent that the Insureds in the claims identified in Exhibit "2" ever had any genuine medical problems at all as the result of their minor automobile accidents, the problems virtually always were limited to ordinary sprains or strains of the back, neck, or extremities.

535.    The diagnosis and treatment of these ordinary sprains and strains did not require any "moderate complexity" medical decision-making on the part of Mas or anyone else.

536.    To the contrary, and as set forth above, Mas did not engage in any legitimate medical decision-making at all in connection with the initial examinations in the claims identified in Exhibit "2", because the purported "results" of the examinations were pre-determined, phony, and designed to provide a false justification for the laundry-list of other Fraudulent Services that the Davila Medical Defendants purported to provide.

537.    In the claims for initial examinations identified in Exhibit "2", Davila Medical, Davila, and Mas routinely falsely represented that the initial examinations involved medical decision-making of moderate complexity in order to provide a false basis to bill for the initial examinations under CPT code 99204, because CPT code 99204 is reimbursable at a higher rate than examinations that do not require moderate complexity medical decision-making.

538.    In the claims for initial examinations identified in Exhibit "2", Davila Medical, Davila, and Mas routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

> (ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and
>
> (iii)    Davila Medical never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it unlawfully was operated without a legitimate medical director.

539.    In this context, Mas – who at all relevant times purported to serve as the "medical director" at Davila Medical – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

540.    Had Mas actually fulfilled his statutory role as medical director at Davila Medical, he would have noted – among other things – that the Davila Medical Defendants routinely fraudulently represented in Davila Medical's billing that the putative initial examinations were legitimately and lawfully performed.

541.    Mas failed to do so, because he never actually served as a legitimate medical director at Davila Medical in the first instance.

**(ii)**    **The Fraudulent Charges for Follow-Up Examinations at Davila Medical**

542.    In addition to their fraudulent initial examinations, Davila Medical, Davila, and Mas virtually always purported to subject each of the Insureds in the claims identified in Exhibit "2" to multiple, fraudulent follow-up examination(s) during the course of their fraudulent treatment and billing protocol.

543.    Mas purported to personally perform or directly supervise virtually all of the follow-up examinations in the claims identified in Exhibit "2".

544.     As set forth in Exhibit "2", Davila Medical, Davila, and Mas then billed the follow-up examinations to GEICO under CPT code 99214, virtually always resulting in charges of $250.00 for reach follow-up examination they purported to provide.

545.     In the claims for follow-up examinations identified in Exhibit "2", the charges for the follow-up examinations were fraudulent in that they misrepresented Davila Medical's eligibility to collect PIP Benefits in the first instance.

546.     In fact, and as set forth above, Davila Medical never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing requirements set forth in the Clinic Act.

547.     As set forth below, Davila Medical, Davila, and Mas's charges for the follow-up examinations identified in Exhibit "2" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

**a.      Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

548.     As set forth above, pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination typically requires that the patient present with problems of moderate to high severity.

549.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99214 to bill for a follow-up patient examination.

550.     For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99214 to bill for a follow-up patient examination:

(i)      Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)     Office evaluation of 28-year-old patient with regional enteritis, diarrhea and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)    Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)    Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)     Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)    Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)   Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/Internal Medicine/Family Medicine)

(viii)  Office visit with 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

551.    Accordingly, and as set forth above, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

552.    By contrast, and as set forth above, to the limited extent that the Insureds in the claims identified in Exhibit "2" experienced any injuries at all in their minor automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains, which were not severe at all.

553.    In keeping with the fact that the Insureds in the claims identified in Exhibit "2" almost never experienced any injuries more serious than garden-variety soft tissue injuries such

as sprains and strains, in most of the claims identified in Exhibit "2" the Insureds did not seek treatment at any hospital as the result of their accidents.

554.    Furthermore, in the substantial majority of cases, contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, and that no one was seriously injured in the underlying accidents, or injured at all.

555.    As set forth above, ordinary strains and sprains virtually always resolve after a short course of conservative treatment such as rest, ice, compression, and elevation, or no treatment at all.

556.    By the time the Insureds in the claims identified in Exhibit "2" presented at Davila Medical for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or their presenting problems were minimal.

557.    Even so, in the claims for follow-up examinations identified in Exhibit "3", Davila Medical, Davila, and Mas routinely billed for their putative follow-up examinations under CPT code 99214, and thereby falsely represented that the Insureds continued to suffer from presenting problems of moderate to high severity.

558.    For example:

(i)     On August 31, 2016, an Insured named JR was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that JR was not seriously injured in the accident, JR did not visit any hospital following the accident. To the extent that JR experienced any health problems at all as the result of his accident, they were of low severity at the outset, and had resolved within a few weeks. Even so, following a purported follow-up examination of JR on September 21, 2016, Davila Medical, Davila, and Mas billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that JR presented with problems of moderate to high severity.

(ii)     On August 31, 2016, an Insured named BP was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that BP was not seriously injured in the accident, BP did not visit any hospital following the accident. To the extent that BP experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had resolved within a few weeks. Even so, following a purported follow-up examination of BP on September 21, 2016, Davila Medical, Davila, and Mas billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that BP presented with problems of moderate to high severity.

(iii)    On January 30, 2017, an Insured named JQ was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that JQ was not seriously injured in the accident, JQ did not visit any hospital following the accident, and did not seek any treatment of any kind for a week after the accident. To the extent that JQ experienced any health problems at all as the result of his accident, they were of low severity at the outset, and had resolved within a few weeks. Even so, following a purported follow-up examination of JQ on February 21, 2017, Davila Medical, Davila, and Mas billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that JQ presented with problems of moderate to high severity.

(iv)     On November 27, 2017, an Insured named JZ was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that JZ was not seriously injured in the accident, JZ did not visit any hospital following the accident. To the extent that JZ experienced any health problems at all as the result of his accident, they were of low severity at the outset, and had resolved within a few weeks. Even so, following a purported follow-up examination of JZ on December 25, 2017, Davila Medical, Davila, and Mas billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that JZ presented with problems of moderate to high severity.

(v)      On December 7, 2017, an Insured named RC was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that RC was not seriously injured in the accident, RC did not visit any hospital following the accident. To the extent that RC experienced any health problems at all as the result of his accident, they were of low severity at the outset, and had resolved within a few weeks. Even so, following a purported follow-up examination of RC on January 9, 2018, Davila Medical, Davila, and Mas billed GEICO for the follow-up examination using CPT code 99214 and

173

thereby falsely represented that RC presented with problems of moderate to high severity.

(vi)   On December 7, 2017, an Insured named AT was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that AT was not seriously injured in the accident, AT did not visit any hospital following the accident. To the extent that AT experienced any health problems at all as the result of his accident, they were of low severity at the outset, and had resolved within a few weeks. Even so, following a purported follow-up examination of AT on January 9, 2018, Davila Medical, Davila, and Mas billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that AT presented with problems of moderate to high severity.

559.   In all of the claims for follow-up examinations identified in Exhibit "2", Davila Medical, Davila, and Mas falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

560.   In the claims for follow-up examinations identified in Exhibit "2", Davila Medical, Davila, and Mas routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for their charges for the examinations under CPT code 99214, because follow-up examinations billable under CPT code 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

561.   In the claims for follow-up examinations identified in Exhibit "2", Davila Medical, Davila, and Mas also routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for the other Fraudulent Services that the Davila Medical Defendants purported to provide to the Insureds, including additional, medically unnecessary follow-up examinations and physical therapy.

174

**b.      Misrepresentations Regarding the Results of the Follow-Up Examinations**

562.    What is more, pursuant to the CPT Assistant, when Davila Medical, Davila, and Mas billed for their putative follow-up examinations under CPT code 99214, they represented that Mas or someone working under his direct supervision performed at least two of the following three components: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

563.    In actuality, however, in the claims for follow-up examinations identified in Exhibit "2", Mas did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

564.    Rather, following their purported follow-up examinations, Davila Medical and Mas – at the direction of Davila – simply: (i) reiterated the false, boilerplate "diagnoses" they previously had provided to the Insureds; and either  (ii) referred the Insureds back to Davila Medical for even more medically unnecessary physical therapy services, despite the fact that the Insureds purportedly already had received extensive physical therapy services from Davila Medical that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

565.    In keeping with the fact that the purported "results" of the follow-up examinations were pre-determined, and had no legitimate connection to the Insureds' true medical circumstances or presentation, Davila Medical and Mas – at the direction of Davila – recommended a substantially identical course of medically unnecessary "treatment" to virtually every one of the Insureds identified in Exhibit "2", irrespective of the Insureds' actual presenting problems, to the extent the Insureds experienced any legitimate injuries at all.

566.    Specifically, Davila Medical and Mas – at the direction of Davila – directed virtually every Insured to receive two to four months of purported "physical therapy" treatments, typically consisting of daily physical therapy for the first two weeks of treatment, followed by physical therapy four times per week for the subsequent four weeks.

567.    In addition, Davila Medical and Mas – at the direction of Davila – directed virtually every Insured to receive substantially identical types of physical therapy services, including: (i) cold/hot packs; (ii) therapeutic exercises and activities; (iii) paraffin baths; (iv) infrared treatment; (v) ultrasound; (vi) neuromuscular reeducation; and (vii) electric stimulation. See Exhibit "2".

568.    As set forth above, in a legitimate clinical setting, each individual patient's physical therapy schedule, and the specific physical therapy modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

569.    In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy is constantly adjusted for each individual patient based on each patient's treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy.

570.    By contrast, at Davila Medical, the nature and extent of the physical therapy that each Insured purportedly received was pre-determined, and had no legitimate connection to the Insureds' individual circumstances, presentation, or progress through the Defendants' fraudulent treatment and billing protocol.

571.    The phony "follow-up examinations" that Davila Medical, Davila, and Mas purported to provide the Insureds in the claims identified in Exhibit "2" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the

putative "results" of the examinations were pre-determined to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into Davila Medical's offices.

572.    In the claims for follow-up examinations identified in Exhibit "2", Davila Medical, Davila, and Mas routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   Davila Medical never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it unlawfully was operated without a legitimate medical director.

573.    In this context, Mas – who at all relevant times purported to serve as the "medical director" at Davila Medical – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

574.    Had Mas actually fulfilled his statutory role as medical director at Davila Medical, he would have noted – among other things – that the Davila Medical Defendants routinely fraudulently represented in Davila Medical's billing that the putative follow-up examinations were legitimately and lawfully performed and billed.

575.    Mas failed to do so, because he never actually served as a legitimate medical director at Davila Medical in the first instance.

**(iii)     The Fraudulent Charges for Physical Therapy at Davila Medical**

576.     In addition to the fraudulent initial examinations and follow-up examinations, the Davila Medical Defendants virtually always purported to subject each of the Insureds in the claims identified in Exhibit "2" to between two and four months of medically unnecessary physical therapy.

577.     As set forth above, though Mas falsely purported to personally perform or directly supervise virtually all of the physical therapy services in the claims identified in Exhibit "2", the physical therapy services actually were performed without supervision by D. Diaz, Vital, Pajon, or other massage therapists associated with Davila Medical to the extent that they were even provided at all.

578.     As set forth in Exhibit "2", the Davila Medical Defendants then billed the purported physical therapy services to GEICO under:

(i)      CPT code 97010 for putative hot/cold pack treatments, resulting in a charge of $12.00-$24.00 for each round of hot/cold pack treatments they purported to provide;

(ii)     CPT code 97026, for putative infrared therapy, resulting in a charge of $20.00 for each round of infrared therapy they purported to provide;

(iii)    CPT code 97035, for putative ultrasound, resulting in a charge of $27.00 for each round of ultrasound they purported to provide;

(iv)     CPT code 97110, for putative therapeutic exercises, resulting in a charge of $60.00-$135.00 for each round of therapeutic exercises they purported to provide;

(v)      CPT code 97112, for putative neuromuscular reeducation, resulting in a charge of $60.00 for each round of neuromuscular reeducation they purported to provide;

(vi)     CPT code 97530, for putative therapeutic activity therapy, resulting in a charge of $68.00-$136.00 for each round of therapeutic activity therapy they purported to provide; and

(vii)    CPT code 97535, for putative "self-care training", resulting in a charge of $68.00-$15.00 for each round of "self-care training" therapy they purported to provide.

579.    In the claims for physical therapy services identified in Exhibit "2", the charges for the physical therapy services were fraudulent in that they misrepresented Davila Medical's eligibility to collect PIP Benefits in the first instance.

580.    In fact, and as set forth above, Davila Medical never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act.

581.    What is more, and as set forth above, in the claims for physical therapy services identified in Exhibit "2", the Davila Medical Defendants falsely represented that the physical therapy services lawfully had been performed or directly supervised by Mas, when in fact they were unlawfully performed without supervision by D. Diaz, Vital, Pajon, or other massage therapists associated with Davila Medical, who are not and never have been licensed as physical therapists.

582.    As set forth above, in order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

583.    Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

584.    In each of the claims for physical therapy services identified in Exhibit "2", the Davila Medical Defendants falsely represented that the services were lawfully provided and eligible for PIP reimbursement.

585.    In fact, in the claims for physical therapy services identified in Exhibit "2", the services were not lawfully provided, inasmuch as: (i) the putative physical therapy services were

179

performed – to the extent that they were performed at all – by Diaz, Vital, Pajon, or other unsupervised massage therapists associated with Davila Medical, who were individuals who were not licensed to practice physical therapy; and (ii) the Davila Medical Defendants deliberately misrepresented the identities of the individuals who purported to perform the physical therapy services in their billing for the physical therapy services, in a calculated attempt to induce GEICO to pay the unreimbursable charges.

**3.      The Baracusa Health Defendants' Fraudulent Treatment and Billing Protocol**

**(i)      The Fraudulent Charges for Initial Examinations at Baracusa Health**

586.     As an initial step in the Baracusa Health Defendants' fraudulent treatment and billing protocol, Baracusa Health, Corrales, and Mas purported to provide each of the Insureds in the claims identified in Exhibit "3" with a putative initial examination.

587.     Mas purported to personally perform virtually all of the initial examinations at Baracusa Health in the claims identified in Exhibit "3".

588.     As set forth in Exhibit "3", Baracusa Health, Corrales, and Mas then billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99203, resulting in charges of $300.00 for each initial examination that they purported to provide.

589.     In the claims for initial examinations identified in Exhibit "3", the charges for the initial examinations were fraudulent in that they misrepresented Baracusa Health's eligibility to collect PIP Benefits in the first instance.

590.     In fact, and as set forth above, Baracusa Health never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act.

591.    As set forth below, the charges for the initial examinations identified in Exhibit "3" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

**a.    Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

592.    As set forth above, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the AMA in connection with the use of current procedural terminology, or CPT, codes. See Fla. Stat. § 627.736.

593.    The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

594.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination represents that the Insured presented with problems of moderate severity.

595.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately severe, and thereby justify the use of CPT code 99203 to bill for an initial patient examination.

596.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99203 to bill for an initial patient examination:

(vi)    Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(vii)    Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(viii)    Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(ix)    Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(x)     Initial office visit with couple for counseling concerning voluntary vasectomy for sterility Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

597.    Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

598.    By contrast, to the extent that the Insureds in the claims identified in Exhibit "3" had any presenting problems at all as the result of their minor automobile accidents, the problems were virtually always low severity soft tissue injuries such as sprains and strains.

599.    For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "3" either had no presenting problems at all as the result of their minor automobile accidents, or else problems of low severity, in most of the claims identified in Exhibit "3" the Insureds did not seek treatment at any hospital as the result of their accidents.

600.    To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain or strain diagnosis.

601.    Furthermore, to the extent that police reports existed with respect to the claims identified in Exhibit "3", the majority of the contemporaneous police reports indicated that no one was injured in the accidents, and that the underlying accidents involved low-speed, low-impact collisions, where the Insureds' vehicles were functional following the accidents.

602.    Even so, in the claims for initial examinations identified in Exhibit "3", Baracusa Health, Corrales, and Mas routinely billed for their putative initial examinations using CPT code

99203, and thereby falsely represented that the Insureds presented with problems of moderate severity.

603.     What is more, Baracusa Health, Corrales, and Mas billed for two putative initial examinations under CPT code 99203 for all but one patient.

604.     For example:

(i)      On July 1, 2016, an Insured named LU was involved in a minor automobile accident. The contemporaneous police report indicated that no one was injured in the accident. In keeping with the fact that LU was not seriously injured in the accident, LU did not visit any hospital following the accident, and did not seek any treatment of any kind for a week after the accident. To the extent that LU experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of LU by Mas on July 7, 2016, Baracusa Health, Corrales, and Mas billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that LU presented with moderately severe health problems as the result of the accident. Additionally, Baracusa Health, Corrales, and Mas billed GEICO for a second initial examination on October 11, 2016, once again using CPT code 99203, and thereby falsely represented that LU presented with moderately severe health problems during an initial examination on October 11, 2016.

(ii)     On December 26, 2016, an Insured named TM was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that TM was not seriously injured in the accident, TM did not visit any hospital following the accident, and did not seek any treatment until approximately two weeks after the accident. To the extent that TM experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of TM by Mas on January 9, 2017, Baracusa Health, Corrales, and Mas billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that TM presented with moderately severe health problems as the result of the accident. Additionally, Baracusa Health, Corrales, and Mas billed GEICO for a second initial examination on February 28, 2017, once again using CPT code 99203, and thereby falsely represented that TM presented moderately severe health problems during an initial examination on February 28, 2017.

(iii)    On February 12, 2017, an Insured named MD was involved in a minor automobile accident. The contemporaneous police report indicated that no one was injured in the accident. In keeping with the fact that MD was not seriously injured in the accident, MD did not visit any hospital following the accident, and did not seek any treatment of any kind until nearly two weeks after the accident. To the extent

183

that MD experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of MD by Mas on February 24, 2017, Baracusa Health, Corrales, and Mas billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that MD presented with moderately severe health problems as the result of the accident. Additionally, Baracusa Health, Corrales, and Mas billed GEICO for a second initial examination on March 27, 2017, once again using CPT code 99203, and thereby falsely represented that MD presented moderately severe health problems during an initial examination on March 27, 2017.

605.    In all of the claims for initial examinations identified in Exhibit "3", Baracusa Health, Corrales, and Mas falsely represented that the Insureds presented with problems of moderate severity, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

606.    In the claims for initial examinations identified in Exhibit "3", Baracusa Health, Corrales, and Mas routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations involving presenting problems of low severity, or no severity.

607.    In the claims for initial examinations identified in Exhibit "3", Baracusa Health, Corrales, and Mas also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the laundry list of other Fraudulent Services that the Baracusa Health Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations and physical therapy services.

**b.    Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

608.    What is more, in every claim identified in Exhibit "3" for initial examinations under CPT code 99203, Baracusa Health, Corrales, and Mas misrepresented and exaggerated the

amount of face-to-face time that the examining physician – purportedly Mas – spent with the Insureds or the Insureds' families during the putative initial examination.

609.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination typically represents that the physician who conducted the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

610.    As set forth in Exhibit "3", Baracusa Health, Corrales, and Mas always billed for their putative initial examinations using CPT code 99203, and thereby represented that the physician who purported to conduct the examinations – namely Mas – spent at least 30 minutes of face-to-face time with the Insureds or their families during the examinations.

611.    In fact, in the initial examinations identified in Exhibit "3", Mas never spent even 15 minutes of face-to-face time with the Insureds or their families when conducting the examinations, much less 30 minutes, to the extent that the examinations actually were conducted at all.

612.    Rather, in the purported initial examinations identified in Exhibit "3", the examinations rarely entailed more than 10 minutes of face-to-face time between Mas, the Insureds, or the Insureds' families, to the extent that they were provided at all.

613.    In keeping with the fact that the initial examinations in the claims identified in Exhibit "3" did not involve more than 10 minutes of face-to-face time between Mas, the Insureds, or the Insureds' families – to the extent that they were provided at all – Mas used pre-printed template forms in purporting to conduct the examinations at Baracusa Health.

614.    All that was required to complete the pre-printed template forms was a brief patient interview and a perfunctory physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, and basic range of motion and muscle strength testing.

615.    These interviews and examinations did not require Mas to spend more than 10 minutes of face-to-face time with the Insureds during the putative initial examinations.

616.    Indeed, Mas could not legitimately have personally spent at least 30 minutes of face-to-face time with the Insureds or their families during the initial examinations at Baracusa Health, considering the massive amount of healthcare services he simultaneously was purporting to personally perform or directly supervise at numerous healthcare clinics and medical practices throughout the Miami area.

617.    For example:

(i)     On October 11, 2016, Baracusa Health, Corrales, and Mas billed GEICO under CPT code 99203 for a second initial examination of an individual insured named LU, and falsely represented that Mas spent at least 30 minutes of face-to-face time with the Insured or their family during the examination. On that same date, Mas also purported to personally provide or directly supervise at least 13.25 hours of physical therapy services to 26 individual Insureds, from seven different facilities, namely Baracusa Health, E-Z Medical, Davila Medical, Health Wellness Evolution Co., Atlantic Medical, We Care Medical, and Golden Health. Additionally, Mas also purported to personally provide or directly supervise an additional 15 minute examination to an Insured at Therapeutic Rehab, and a 15 minute examination to an Insured at Atlantic Medical.

(ii)    On November 15, 2016, Baracusa Health, Corrales, and Mas billed GEICO under CPT code 99203 for a second initial examination of an Insured named DM, and falsely represented that Mas spent at least 30 minutes of face-to-face time with the Insured or their family during the examination. On that same date, Mas also purported to personally provide or directly supervise more than 11.5 hours of physical therapy services to 9 individual Insureds, from seven different facilities, namely Baracusa Health, E-Z Medical, Davila Medical, Health Wellness Evolution Co., Atlantic Medical, We Care Medical, and Golden Health. Additionally, Mas also purported to personally provide or directly supervise a 15 minute examination to an Insured at Atlantic Medical.

(iii)   On January 9, 2017, Baracusa Health, Corrales, and Mas billed GEICO under CPT code 99203 for an initial examination of an individual insured named TM, and falsely represented that Mas spent at least 30 minutes of face-to-face time with the Insured or their family during the examination. On that same date, Mas also purported to personally provide or directly supervise at least 8 hours of physical therapy services to 6 individual Insureds, from four different facilities, namely Baracusa Health, E-Z Medical, Davila Medical, Health Wellness

186

Evolution Co., and Golden Health. Additionally, Mas also purported to personally provide or directly supervise two 30 minute examinations to two Insureds at Golden Health, and two 15 minute examinations to two Insureds at Golden Health.

(iv)    On February 24, 2017, Baracusa Health, Corrales, and Mas billed GEICO under CPT code 99203 for an initial examination of an individual insured named MD, and falsely represented that Mas spent at least 30 minutes of face-to-face time with the Insured or their family during the examination. On that same date, Mas also purported to personally provide or directly supervise at least 9.5 hours of physical therapy services to 8 individual Insureds, from <u>five different facilities</u>, namely Baracusa Health, E-Z Medical, Davila Medical, Therapeutic Rehab, and Golden Health. Additionally, Mas also purported to personally provide or directly supervise a 45 minute examination of an Insured at Atlantic Medical.

(v)     On February 28, 2017, Baracusa Health, Corrales, and Mas billed GEICO under CPT code 99203 for a <u>second</u> initial examination of an individual insured named TM, and falsely represented that Mas spent at least 30 minutes of face-to-face time with the Insured or their family during the examination. On that same date, Mas also purported to personally provide or directly supervise more than 20.75 hours of physical therapy services to 18 individual Insureds, from <u>seven different facilities</u>, Baracusa Health, E-Z Medical, Davila Medical, Therapeutic Rehab, We Care Medical, Atlantic Medical, and Golden Health.

(vi)    On April 24, 2017, Baracusa Health, Corrales, and Mas billed GEICO under CPT code 99203 for a <u>second</u> initial examination of an individual insured named MD, and falsely represented that Mas spent at least 30 minutes of face-to-face time with the Insured or their family during the examination. On that same date, Mas also purported to personally provide or directly supervise more than 41.25 hours of physical therapy services to 32 individual Insureds, from <u>nine different facilities</u>, namely Baracusa Health, E-Z Medical, Davila Medical, Therapeutic Rehab, Atlantic Medical, Golden Health, Starlite Medical, and Westchester Medical. Additionally, Mas also purported to personally provide or directly supervise a 25 minute outpatient visit for an Insured at Golden Health, a 25 minute outpatient visit for an Insured at Westchester Medical, and a 15 minute outpatient visit for an Insured at Atlantic Medical.

618.    In the claims for initial examinations that are identified in Exhibit "3", Baracusa Health, Corrales, and Mas routinely falsely represented that Mas had spent at least 30 minutes of face-to-face time with the Insureds or their families during the examinations.

619. This, despite the fact that – on those same dates – Mas also purported to personally perform a massive amount of physical therapy and other services to large numbers of Insureds at multiple locations throughout the Miami area.

620. Baracusa Health, Corrales, and Mas routinely misrepresented the amount of time that was spent in conducting the initial examinations because lengthier examinations that are billable under CPT code 99203 are reimbursable at higher rates than examinations that take less time to perform.

**c.    Misrepresentations Regarding "Detailed" Physical Examinations**

621. Moreover, in every claim identified in Exhibit "3" for initial examinations under CPT code 99203, Baracusa Health, Corrales, and Mas falsely represented the extent of the underlying physical examinations.

622. Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician who performed the examination conducted a "detailed" physical examination.

623. As set forth in Exhibit "3", Baracusa Health, Corrales, and Mas virtually always billed for their putative initial examinations using CPT code 99203, and thereby represented that the physician who purported to conduct the examinations – namely Mas – conducted detailed physical examinations of the Insureds who purportedly received the examinations.

624. Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the physician performing the examination conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

625.    To the extent that the Insureds in the claims identified in Exhibit "3" had any actual complaints at all as the result of their minor automobile accidents, the complaints were limited to minor musculoskeletal complaints, specifically sprains and strains.

626.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted an extended examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to the following:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)   examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)     brief assessment of mental status;

(vi)    examination of gait and station;

(vii)   inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)  coordination;

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)     examination of sensation

627.    In the claims for initial examinations identified in Exhibit "3", when Baracusa Health, Corrales, and Mas billed for the initial examinations under CPT code 99203, they falsely

189

represented that Mas performed "detailed" patient examinations on the Insureds he purported to treat during the initial examinations.

628.    In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibit "3", Mas never conducted an extended examination of the Insureds' musculoskeletal systems:

629.    For instance, in each of the claims under CPT code 99203 identified in Exhibit "3", Mas did not conduct an extended examination of the Insureds' musculoskeletal systems, inasmuch as he did not document findings with respect to the following:

(i)      palpation of lymph nodes in neck, axillae, groin and/or other location;

(ii)     brief assessment of mental status;

(iii)    examination of gait and station;

(iv)     inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(v)      coordination;

(vi)     examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(vii)    examination of sensation.

630.    For example:

(i)      On July 7, 2016, Baracusa Health, Corrales, and Mas billed GEICO under CPT code 99203 for an initial examination of an individual insured named LU, and thereby represented that they had provided a "detailed" physical examination. However, Mas did not document an extended examination of the musculoskeletal system of LU, despite the fact that – to the extent LU had any complaints at all as the result of the automobile accident – they were limited to minor musculoskeletal complaints.

(ii)     On September 23, 2016, Baracusa Health, Corrales, and Mas billed GEICO under CPT code 99203 for an initial examination of an individual insured named DM,

and thereby represented that they had provided a "detailed" physical examination. However, Mas did not document an extended examination of the musculoskeletal system of DM, despite the fact that – to the extent DM had any complaints at all as the result of the automobile accident – they were limited to minor musculoskeletal complaints.

(iii)   On September 23, 2016, Baracusa Health, Corrales, and Mas billed GEICO under CPT code 99203 for a **second** initial examination of an individual insured named DM, and thereby represented that they had provided a "detailed" physical examination. However, Mas did not document an extended examination of the musculoskeletal system of DM, despite the fact that – to the extent DM had any complaints at all as the result of the automobile accident – they were limited to minor musculoskeletal complaints.

(iv)   On October 11, 2016, Baracusa Health, Corrales, and Mas billed GEICO under CPT code 99203 for a **second** initial examination of an individual insured named LU, and thereby represented that they had provided a "detailed" physical examination. However, Mas did not document an extended examination of the musculoskeletal system of LU, despite the fact that – to the extent LU had any complaints at all as the result of the automobile accident – they were limited to minor musculoskeletal complaints.

(v)   On January 9, 2017, Baracusa Health, Corrales, and Mas billed GEICO under CPT code 99203 for an initial examination of an individual insured named TM, and thereby represented that they had provided a "detailed" physical examination. However, Mas did not document an extended examination of the musculoskeletal system of TM, despite the fact that – to the extent TM had any complaints at all as the result of the automobile accident – they were limited to minor musculoskeletal complaints.

(vi)   On February 24, 2017, Baracusa Health, Corrales, and Mas billed GEICO under CPT code 99203 for an initial examination of an individual insured named MD, and thereby represented that they had provided a "detailed" physical examination. However, Mas did not document an extended examination of the musculoskeletal system of MD, despite the fact that – to the extent MD had any complaints at all as the result of the automobile accident – they were limited to minor musculoskeletal complaints.

(vii)   On February 28, 2017, Baracusa Health, Corrales, and Mas billed GEICO under CPT code 99203 for a **second** initial examination of an individual insured named TM, and thereby represented that they had provided a "detailed" physical examination. However, Mas did not document an extended examination of the musculoskeletal system of TM, despite the fact that – to the extent TM had any complaints at all as the result of the automobile accident – they were limited to minor musculoskeletal complaints.

(viii)   On April 24, 2017, Baracusa Health, Corrales, and Mas billed GEICO under CPT code 99203 for a **second** initial examination of an individual insured named MD, and thereby represented that they had provided a "detailed" physical examination. However, Mas did not document an extended examination of the musculoskeletal system of MD, despite the fact that – to the extent MD had any complaints at all as the result of the automobile accident – they were limited to minor musculoskeletal complaints.

631.     In all of the claims for initial examinations under CPT code 99203 that are identified in Exhibit "3", Baracusa Health, Corrales, and Mas falsely represented that they had provided "detailed" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that do not require the examining physician to provide "detailed" physical examinations.

**d.     Misrepresentations Regarding the Extent of Medical Decision-Making**

632.     Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician who performed the examination engaged in "low complexity" medical decision-making.

633.     As set forth above, pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

634.     As set forth above, and in Exhibit "3", Baracusa Health, Corrales, and Mas billed for all of their putative initial patient examinations using CPT code 99203, and thereby

represented that Mas engaged in some genuine, low-complexity medical decision-making during the initial examinations.

635.    In actuality, however, the purported initial examinations did not involve any legitimate medical decision-making at all.

636.    First, in Baracusa Health, Corrales and Mas's claims for initial examinations identified in Exhibit "3", the initial examinations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information.

637.    When the Insureds in the claims identified in Exhibit "3" presented to Baracusa Health for "treatment", they did not arrive with any medical records.

638.    Furthermore, prior to the initial examinations, Baracusa Health neither requested any medical records from any other providers, nor conducted any diagnostic tests beyond the basic range of motion and muscle strength testing that is attendant to any physical examination.

639.    Second, in Baracusa Health, Corrales, and Mas's claims for initial examinations identified in Exhibit "3",  there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

640.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Baracusa Health Defendants, to the extent that the Baracusa Health Defendants provided any such diagnostic procedures or treatment options in the first instance.

641.    In virtually every one of the claims identified in Exhibit "3", any diagnostic procedures and "treatments" that the Baracusa Health Defendants actually provided were limited

to a series of medically unnecessary follow-up examinations and physical therapy treatments, none of which was health-or life-threatening if properly administered.

642.   Third, in Baracusa Health, Davila and Mas's claims for initial examinations identified in Exhibit "3", Mas did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

643.   Rather, to the extent that the initial examinations were conducted in the first instance, Baracusa Health and Mas – at the direction of Corrales – provided a nearly identical, pre-determined "diagnosis" for every Insured, and prescribed a virtually identical course of treatment for every Insured.

644.   Specifically, in the claims identified in Exhibit "3", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

645.   Even so, Baracusa Health, Corrales, and Mas prepared initial examination reports in which they provided phony, boilerplate sprain/strain "diagnoses" to virtually every Insured.

646.   Then, based upon these phony "diagnoses", Baracusa Health, Corrales, and Mas directed every Insured to return to Baracusa Health five times each week for medically unnecessary physical therapy during the first two weeks of "treatment".

647.   Baracusa Health, Corrales, and Mas routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Baracusa Health Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations and physical therapy services.

648.    In keeping with the fact that Baracusa Health, Corrales, and Mas routinely inserted false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, for virtually every one of the Insureds in the claims identified in Exhibit "3", Baracusa Health and Mas – at the direction of Corrales – diagnosed the Insureds with virtually identical neck and back injuries, and appended to virtually every initial examination report a "Notice of Medical Emergency," stating that that the patient had "sustained symptoms of sufficient severity . . . such that the absence of immediate medical attention could reasonably be expected to result in in any of the following: A) serious jeopardy to patient health B) serious impairment to bodily functions C) serious dysfunction of a bodily organ or part."

649.    It is extremely improbable that virtually every one of the Insureds in the claims identified in Exhibit "3" would have strains in their cervical, thoracic, and lumbar spines, and have symptoms so acute that their injuries could be considered a medical emergency.

650.    It is even more improbable – to the point of impossibility – that this would occur over and over again, in the context of minor automobile accidents that could not possibly have caused such severe levels of pain and/or injury.

651.    Baracusa Health, Corrales, and Mas inserted this false information in their initial examination reports despite the fact that the minor underlying accidents did not and could not possibly have caused such severe symptoms in the Insureds.

652.    For example:

(i)     On July 1, 2016, an Insured named LU was involved in a minor automobile accident. The contemporaneous police report indicated that no one was injured in the accident. In keeping with the fact that LU was not seriously injured in the accident, LU did not visit any hospital following the accident, and did not seek any treatment of any kind for a week after the accident. To the extent that LU experienced any health problems at all as the result of the accident, they were of

195

low severity. Even so, following a purported initial examination of LU by Mas on July 7, 2016, Baracusa Health and Mas – at Corrales's direction – falsely reported that LU had multiple injuries including "severe cervical whiplash secondary to MVA with potential for serious impairment," and that her injuries constituted an "emergency medical condition".

(ii)     On December 26, 2016, an Insured named TM was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that TM was not seriously injured in the accident, TM did not visit any hospital following the accident, and did not seek any treatment until approximately two weeks after the accident. To the extent that TM experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of TM by Mas on January 9, 2017, Baracusa Health and Mas – at Corrales's direction – falsely reported that TM had multiple injuries including "severe cervical whiplash secondary to MVA with potential for serious impairment," and that her injuries constituted an "emergency medical condition".

(iii)    On February 12, 2017, an Insured named MD was involved in a minor automobile accident. The contemporaneous police report indicated that no one was injured in the accident. In keeping with the fact that MD was not seriously injured in the accident, MD did not visit any hospital following the accident, and did not seek any treatment of any kind until nearly two weeks after the accident. To the extent that MD experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of MD by Mas on February 24, 2017, Baracusa Health and Mas – at Corrales's direction – falsely reported that MD had multiple injuries including "severe lumbar sprain secondary to MVA with potential for serious impairment," and that her injuries constituted an "emergency medical condition."

653.     In every claim for initial examination conducted by Mas and identified in Exhibit "3", Baracusa Health, Corrales, and Mas falsely reported that the Insureds suffered from a severe injury, and that each Insured had injuries which constituted a "medical emergency condition".

654.     Baracusa Health, Corrales, and Mas routinely inserted this false information in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Baracusa Health Defendants purported to

provide to the Insureds, including medically unnecessary follow-up examinations and physical therapy services.

655.     To the extent that the Insureds in the claims identified in Exhibit "3" ever had any genuine medical problems at all as the result of their minor automobile accidents, the problems virtually always were limited to ordinary sprains or strains of the back, neck, or extremities.

656.     The diagnosis and treatment of these ordinary sprains and strains did not require any "low complexity" medical decision-making on the part of Mas or anyone else.

657.     To the contrary, and as set forth above, Mas did not engage in any legitimate medical decision-making at all in connection with the initial examinations in the claims identified in Exhibit "3", because the purported "results" of the examinations were pre-determined, phony, and designed to provide a false justification for the laundry-list of other Fraudulent Services that the Baracusa Health Defendants purported to provide.

658.     In the claims for initial examinations identified in Exhibit "3", Baracusa Health, Corrales, and Mas routinely falsely represented that the initial examinations involved medical decision-making of low complexity in order to provide a false basis to bill for the initial examinations under CPT code 99203, because CPT code 99203 is reimbursable at a higher rate than examinations that do not require any medical decision-making.

659.     In the claims for initial examinations identified in Exhibit "3", Baracusa Health, Corrales, and Mas routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)    Baracusa Health never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it unlawfully was operated without a legitimate medical director.

660.    In this context, Mas – who at all relevant times purported to serve as the "medical director" at Baracusa Health – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." <u>See</u> Fla. Stat. § 400.9935(1).

661.    Had Mas actually fulfilled his statutory role as medical director at Baracusa Health, he would have noted – among other things – that the Baracusa Health Defendants routinely fraudulently represented in Baracusa Health's billing that the putative initial examinations were legitimately and lawfully performed.

662.    Mas failed to do so, because he never actually served as a legitimate medical director at Baracusa Health in the first instance.

**(ii)    The Fraudulent Charges for Follow-Up Examinations at Baracusa Health**

663.    In addition to their fraudulent initial examinations, Baracusa Health, Corrales, and Mas virtually always purported to subject each of the Insureds in the claims identified in Exhibit "3" to multiple, fraudulent follow-up examination(s) during the course of their fraudulent treatment and billing protocol.

664.    Mas purported to personally perform virtually all of the follow-up examinations in the claims identified in Exhibit "3".

665.     As set forth in Exhibit "3", Baracusa Health, Corrales, and Mas often billed GEICO for the follow-up examinations under CPT codes 99213 or 99214, resulting in charges of either $156.75 or $230.45 for each follow-up examination they purported to provide.

666.     In the claims for follow-up examinations identified in Exhibit "3", the charges for the follow-up examinations were fraudulent in that they misrepresented Baracusa Health's eligibility to collect PIP Benefits in the first instance.

667.     In fact, and as set forth above, Baracusa Health never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing requirements set forth in the Clinic Act.

668.     As set forth below, Baracusa Health, Corrales, and Mas's charges for the follow-up examinations identified in Exhibit "3" also were fraudulent in that they misrepresented the nature and extent of the follow-up examinations.

a.      **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

669.     As set forth above, pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination typically requires that the patient present with problems of moderate to high severity.

670.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99214 to bill for a follow-up patient examination.

671.     For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99214 to bill for a follow-up patient examination:

(i)      Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)    Office evaluation of 28-year-old patient with regional enteritis, diarrhea and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)   Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)    Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)     Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)    Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)   Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/Internal Medicine/Family Medicine)

(viii)  Office visit with 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

672.    Accordingly, and as set forth above, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

673.    Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

674.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as problems of low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination.

675.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might qualify as problems of low to moderate severity, and therefore support the use of CPT code 99213 to bill for a follow-up patient examination:

(i)     Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)    Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)   Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)    Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)     Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)    Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)   Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

676.    Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some ongoing, real threat to the patient's health.

677.    By contrast, and as set forth above, to the limited extent that the Insureds in the claims identified in Exhibit "3" experienced any injuries at all in their minor automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains, which were not severe at all.

678.    In keeping with the fact that the Insureds in the claims identified in Exhibit "3" almost never experienced any injuries more serious than garden-variety soft tissue injuries such

as sprains and strains, in the vast majority of the claims identified in Exhibit "3" the Insureds did not seek treatment at any hospital as the result of their accidents.

679.     Furthermore, in many cases, the contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, and that no one was seriously injured in the underlying accidents, or injured at all.

680.     As set forth above, ordinary strains and sprains virtually always resolve after a short course of conservative treatment such as rest, ice, compression, and elevation, or no treatment at all.

681.     When the Insureds in the claims identified in Exhibit "3" presented at Baracusa Health for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or their presenting problems were minimal.

682.     Even so, in the claims for follow-up examinations identified in Exhibit "3", Baracusa Health, Corrales, and Mas routinely billed at least one of each Insured's putative follow-up examinations under CPT code 99213, and thereby falsely represented that the Insureds continued to suffer from presenting problems of low to moderate severity.

683.     What is more, Baracusa Health, Corrales, and Mas routinely billed at least one of each Insured's putative follow-up examinations under CPT code 99203, which is only to be used for a new patient examination of moderate severity.

684.     Moreover, in some instances, Baracusa Health, Corrales, and Mas billed GEICO for their putative follow-up examinations under CPT code 99214, and thereby falsely represented that the Insureds continued to suffer from presenting problems of moderate to high severity.

685.     In cases where Baracusa Health, Corrales, and Mas billed GEICO for Insured's putative follow-up examinations under CPT codes 99214, they did so after previously billing for a follow-up examination under CPT code 99213, and thereby falsely represented the Insureds injuries increased in severity after they had received treatment.

686.     For example:

(i)      On July 1, 2016, an Insured named LU was involved in a minor automobile accident. The contemporaneous police report indicated that no one was injured in the accident. In keeping with the fact that LU was not seriously injured in the accident, LU did not visit any hospital following the accident, and did not seek any treatment of any kind for a week after the accident. To the extent that LU experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had resolved within a few weeks. Even so, following a purported follow-up examination of LU on July 28, 2016, Baracusa Health, Corrales, and Mas billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that LU presented with problems of low to moderate severity.

(ii)     On December 26, 2016, an Insured named TM was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that TM was not seriously injured in the accident, TM did not visit any hospital following the accident, and did not seek any treatment until approximately two weeks after the accident. To the extent that TM experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had resolved within a few weeks.  Even so, following a purported follow-up examination of TM by Mas on January 31, 2017, Baracusa Health, Corrales, and Mas billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that TM presented with problems of low to moderate severity. Thereafter, on February 28, 2017, Baracusa Health, Corrales, and Mas billed GEICO for a purported new patient evaluation of TM under CPT Code 99203, and thereby falsely represented that TM was a new patient and presented with problems of low to moderate severity. What is more, on March 27, 2017, Baracusa Health, Corrales, and Mas billed GEICO for a follow-up examination of TM using CPT code 99214, and thereby falsely represented that TM presented with problems of moderate to high severity.

(iii)    On January 30, 2017, an Insured named JQ was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that JQ was not seriously injured in the accident, JQ did not visit any hospital following the accident, and did not seek any treatment of any

203

kind for a week after the accident. To the extent that JQ experienced any health problems at all as the result of his accident, they were of low severity at the outset, and had resolved within a few weeks. Even so, following a purported follow-up examination of JQ on February 21, 2017, Baracusa Health, Corrales, and Mas billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that JQ presented with problems of moderate to high severity.

(iv)     On February 12, 2017, an Insured named MD was involved in a minor automobile accident. The contemporaneous police report indicated that no one was injured in the accident. In keeping with the fact that MD was not seriously injured in the accident, MD did not visit any hospital following the accident, and did not seek any treatment of any kind until nearly two weeks after the accident. To the extent that MD experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had resolved within a few weeks.  Even so, following a purported follow-up examination of MD by Mas on March 27, 2017, Baracusa Health, Corrales, and Mas billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that DM presented with problems of low to moderate severity. Thereafter, on April 24, 2017, Baracusa Health, Corrales, and Mas billed GEICO for a purported new patient evaluation of MD under CPT Code 99203, and thereby falsely represented that MD was a new patient and presented with problems of low to moderate severity.

687.    In all of the claims for follow-up examinations identified in Exhibit "3", Baracusa Health, Corrales, and Mas falsely represented that the Insureds presented with problems of low to moderate severity or moderate to high severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

688.    In the claims for follow-up examinations identified in Exhibit "3", Baracusa Health, Corrales, and Mas routinely falsely represented that the Insureds presented with problems of low to moderate severity or moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99213 and 99214, because follow-up examinations billable under CPT codes 99213 and 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

689.    In the claims for follow-up examinations identified in Exhibit "3", Baracusa Health, Corrales, and Mas also routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to create a false basis for the other Fraudulent Services that the Baracusa Health Defendants purported to provide to the Insureds, including additional, medically unnecessary follow-up examinations and physical therapy.

**b.     Misrepresentations Regarding the Results of the Follow-Up Examinations**

690.    What is more, pursuant to the CPT Assistant, when Baracusa Health, Corrales, and Mas billed for their putative follow-up examinations under CPT code 99214, they represented that Mas performed at least two of the following three components: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

691.    Similarly, pursuant to the CPT Assistant, when Baracusa Health, Corrales, and Mas billed for their putative follow-up examinations under CPT code 99213, they represented that Mas performed at least two of the following three components: (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused physical examination"; and (iii) engaged in medical decision-making of "low complexity".

692.    In actuality, however, in the claims for follow-up examinations identified in Exhibit "3", Mas did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

693.    Rather, following their purported follow-up examinations, Baracusa Health and Mas – at the direction of Corrales – simply: (i) reiterated the false, boilerplate "diagnoses" they previously had provided to the Insureds; and either  (ii) referred the Insureds back to Baracusa

Health for even more medically unnecessary physical therapy services, despite the fact that the Insureds purportedly already had received extensive physical therapy services from Baracusa Health that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

694.     In keeping with the fact that the purported "results" of the follow-up examinations were pre-determined, and had no legitimate connection to the Insureds' true medical circumstances or presentation, Baracusa Health and Mas – at the direction of Corrales – recommended a substantially identical course of medically unnecessary "treatment" to virtually every one of the Insureds identified in Exhibit "3", irrespective of the Insureds' actual presenting problems, to the extent the Insureds experienced any legitimate injuries at all.

695.     Specifically, Baracusa Health and Mas – at the direction of Corrales – directed virtually every Insured to receive two to four months of purported "physical therapy" treatments, typically consisting of physical therapy five times a week for the first two weeks of treatment, followed by physical therapy four times per week for the subsequent four weeks, followed by physical therapy three times a week for the remaining four weeks.

696.     In addition, Baracusa Health and Mas – at the direction of Corrales – directed virtually every Insured to receive substantially identical _types_ of physical therapy services, including: (i) cold/hot packs; (ii)therapeutic exercises; (iii) paraffin baths; (iv) infrared treatment; (v) ultrasound; (vi) neuromuscular reeducation; (vii) contrast baths; (viii) traction mechanical therapy; (ix) manual therapy; (x) "self-care training"; and xi) electric stimulation. See Exhibit "3".

697.    As set forth above, in a legitimate clinical setting, each individual patient's physical therapy schedule, and the specific physical therapy modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

698.    In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy is constantly adjusted for each individual patient based on each patient's treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy.

699.    By contrast, at Baracusa Health, the nature and extent of the physical therapy that each Insured purportedly received was pre-determined, and had no legitimate connection to the Insureds' individual circumstances, presentation, or progress through the Defendants' fraudulent treatment and billing protocol.

700.    The phony "follow-up examinations" that Baracusa Health, Corrales, and Mas purported to provide the Insureds in the claims identified in Exhibit "3" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were pre-determined to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into Baracusa Health's offices.

701.    In the claims for follow-up examinations identified in Exhibit "3", Baracusa Health, Corrales, and Mas routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)     the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)    Baracusa Health never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it unlawfully was operated without a legitimate medical director.

702.    In this context, Mas – who at all relevant times purported to serve as the "medical director" at Baracusa Health – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

703.    Had Mas actually fulfilled his statutory role as medical director at Baracusa Health, he would have noted – among other things – that the Baracusa Health Defendants routinely fraudulently represented in Baracusa Health's billing that the putative follow-up examinations were legitimately and lawfully performed and billed.

704.    Mas failed to do so, because he never actually served as a legitimate medical director at Baracusa Health in the first instance.

**(iii)    The Fraudulent Charges for Physical Therapy at Baracusa Health**

705.    In addition to the fraudulent initial examinations and follow-up examinations, the Baracusa Health Defendants virtually always purported to subject each of the Insureds in the claims identified in Exhibit "3" to between two and four months of medically unnecessary physical therapy.

706.    As set forth above, though Mas falsely purported to personally perform or directly supervise virtually all of the physical therapy services in the claims identified in Exhibit "3", the physical therapy services actually were performed without supervision by Romero or other

massage therapists associated with Baracusa Health, to the extent that they were even provided at all.

707.    As set forth in Exhibit "3", the Baracusa Health Defendants then billed the purported physical therapy services to GEICO under:

(i)     CPT code 97010 for putative hot/cold pack treatments, resulting in a charge of $15.00 for each round of hot/cold pack treatments they purported to provide;

(ii)    CPT code 97012, for putative traction mechanical therapy, resulting in a charge of $33.75 for each round of traction mechanical therapy they purported to provide;

(iii)   CPT code 97018, for putative paraffin bath therapy, resulting in a charge of $47.60 for each round of paraffin bath therapy they purported to provide;

(iv)    CPT code 97026, for putative infrared therapy, resulting in a charge of $13.50 for each round of infrared therapy they purported to provide;

(v)     CPT code 97032 for putative electric stimulation treatments, resulting in a charge of $40.50 for each round of electric stimulation treatments they purported to provide;

(vi)    CPT code 97034 for putative contrast baths, resulting in a charge of $38.25 for each round of contrast bath treatments they purported to provide;

(vii)   CPT code 97035, for putative ultrasound, resulting in a charge of $26.50 for each round of ultrasound they purported to provide;

(viii)  CPT code 97110, for putative therapeutic exercises, resulting in a charge of $68.40 for each round of therapeutic exercises they purported to provide;

(ix)    CPT code 97112, for putative neuromuscular reeducation, resulting in a charge of $71.50-143.00 for each round of neuromuscular reeducation they purported to provide;

(x)     CPT code 97140, for manual therapy, resulting in a charge of $62.20 for each round of manual therapy they purported to provide; and

(xi)    CPT code 97535, for putative "self-care training", resulting in a charge of $74.30 for each round of therapeutic activity therapy they purported to provide.

708.    In the claims for physical therapy services identified in Exhibit "3", the charges for the physical therapy services were fraudulent in that they misrepresented Baracusa Health's eligibility to collect PIP Benefits in the first instance.

709.    In fact, and as set forth above, Baracusa Health never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act.

710.    What is more, and as set forth above, in the claims for physical therapy services identified in Exhibit "3", the Baracusa Health Defendants falsely represented that the physical therapy services lawfully had been performed or directly supervised by Mas, when in fact they were unlawfully performed without supervision by Romero or other massage therapists associated with Baracusa Health, who are not and never have been licensed as physical therapists.

711.    As set forth above, in order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

712.    Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

713.    In each of the claims for physical therapy services identified in Exhibit "3", the Baracusa Health Defendants falsely represented that the services were lawfully provided and eligible for PIP reimbursement.

714.    In fact, in the claims for physical therapy services identified in Exhibit "3", the services were not lawfully provided, inasmuch as: (i) the putative physical therapy services were

performed – to the extent that they were performed at all – by Romero or other unsupervised massage therapists associated with Baracusa Health, who were individuals who were not licensed to practice physical therapy; and (ii) the Baracusa Health Defendants deliberately misrepresented the identities of the individuals who purported to perform the physical therapy services in their billing for the physical therapy services, in a calculated attempt to induce GEICO to pay the unreimbursable charges.

**4.      The Westchester Medical Defendants' Fraudulent Treatment and Billing Protocol**

**(i)      The Fraudulent Charges for Initial Examinations at Westchester Medical**

715.    As an initial step in the Westchester Medical Defendants' fraudulent treatment and billing protocol, Westchester Medical, Morales, and Mas purported to provide each of the Insureds in the claims identified in Exhibit "4" with a putative initial examination.

716.    Mas purported to personally perform virtually all of the initial examinations at Westchester Medical in the claims identified in Exhibit "4".

717.    As set forth in Exhibit "4", Westchester Medical, Morales, and Mas then billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99203 or CPT code 99204, resulting in charges of $240.00 for each initial examination that they purported to provide under CPT code 99203 and charges of $360.00 for each initial examination that they purported to provide under CPT code 99204.

718.    In the claims for initial examinations identified in Exhibit "4", the charges for the initial examinations were fraudulent in that they misrepresented Westchester Medical's eligibility to collect PIP Benefits in the first instance.

719.    In fact, and as set forth above, Westchester Medical never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act.

720. As set forth below, the charges for the initial examinations identified in Exhibit "4" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

**a.      Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

721. As set forth above, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the AMA in connection with the use of current procedural terminology, or CPT, codes. See Fla. Stat. § 627.736.

722. The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

723. Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial patient examination represents that the Insured presented with problems of moderate to high severity.

724. The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99204 to bill for an initial patient examination.

725. Specifically, the CPT Assistant provides the following clinical examples of presenting problems that support the use of CPT code 99204 to bill for an initial patient examination:

(i)      Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)     Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)    Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

212

 (iv) Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

 (v) Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

 (vi) Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

 (vii) Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

726. Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

727. Similarly, pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination represents that the Insured presented with problems of moderate severity.

728. The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately severe, and thereby justify the use of CPT code 99203 to bill for an initial patient examination.

729. For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99203 to bill for an initial patient examination:

 (xi) Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

 (xii) Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(xiii)   Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(xiv)   Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(xv)   Initial office visit with couple for counseling concerning voluntary vasectomy for sterility Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

730.   Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

731.   By contrast, to the extent that the Insureds in the claims identified in Exhibit "4" had any presenting problems at all as the result of their minor automobile accidents, the problems were virtually always low severity soft tissue injuries such as sprains and strains.

732.   For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "4" either had no presenting problems at all as the result of their minor automobile accidents, or else problems of low severity, in most of the claims identified in Exhibit "4" the Insureds did not seek treatment at any hospital as the result of their accidents.

733.   To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain or strain diagnosis.

734.   Furthermore, to the extent that police reports existed with respect to the claims identified in Exhibit "4", the contemporaneous police reports virtually always indicated that no one was injured in the accidents, and that the majority of the underlying accidents involved low-

speed, low-impact collisions, where the Insureds' vehicles were functional following the accidents.

735.    Even so, in the claims for initial examinations identified in Exhibit "4", Westchester Medical, Morales, and Mas routinely billed for their putative initial examinations using CPT codes 99203 and 99204, and thereby falsely represented that the Insureds presented with problems of either moderate severity or moderate to high severity.

736.    For example:

(i)     On March 10, 2017, an Insured named MF was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that MF was not seriously injured in the accident, MF did not visit any hospital following the accident, and did not seek any treatment of any kind for a week after the accident. To the extent that MF experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of MF by Mas on March 17, 2017, Westchester Medical, Morales, and Mas billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that MF presented with moderately severe health problems as the result of the accident.

(ii)    On March 28, 2017, an Insured named VA was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that VA was not seriously injured in the accident, VA did not visit any hospital following the accident. To the extent that VA experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of VA by Mas on March 28, 2017, Westchester Medical, Morales, and Mas billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that VA presented with health problems of moderate to high severity as the result of the accident.

(iii)   On March 28, 2017, an Insured named RH was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that RH was not seriously injured in the accident, RH did not visit any hospital following the accident. To the extent that RH experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of RH by Mas on March 28, 2017, Westchester Medical, Morales, and Mas billed GEICO for the initial

examination using CPT code 99204, and thereby falsely represented that Victor RH presented with health problems of moderate to high severity as the result of the accident.

(iv)    On May 8, 2017, an Insured named LD was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that LD was not seriously injured in the accident, LD did not visit any hospital following the accident, and did not seek any treatment of any kind for approximately ten days after the accident. To the extent that LD experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of LD by Mas on May 18, 2017, Westchester Medical, Morales, and Mas billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that LD presented with health problems of moderate to high severity as the result of the accident.

(v)    On November 27, 2017, an Insured named YM was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that YM was not seriously injured in the accident, YM did not visit any hospital following the accident. To the extent that YM experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of YM by Mas on May 18, 2017, Westchester Medical, Morales, and Mas billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that YM presented with health problems of moderate to high severity as the result of his accident.

(vi)    On November 29, 2017, an Insured named MP was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that MP was not seriously injured in the accident, MP did not visit any hospital following the accident, and did not seek any treatment of any kind for a week after the accident. To the extent that MP experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of MP by Mas on December 6, 2017, Westchester Medical, Morales, and Mas billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that MP presented with health problems of moderate to high severity as the result of the accident.

(vii)    On December 11, 2017, an Insured named JJ was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that JJ was not seriously injured in the accident, JJ did not

216

visit any hospital following the accident. To the extent that JJ experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of JJ by Mas on December 12, 2017, Westchester Medical, Morales, and Mas billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that JJ presented with health problems of moderate to high severity as the result of the accident.

(viii)   On December 11, 2017, an Insured named IZ was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that IZ was not seriously injured in the accident, IZ did not visit any hospital following the accident. To the extent that IZ experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of IZ by Mas on December 12, 2017, Westchester Medical, Morales, and Mas billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that IZ presented with health problems of moderate to high severity as the result of his accident.

737.   In all of the claims for initial examinations identified in Exhibit "4", Westchester Medical, Morales, and Mas falsely represented that the Insureds presented with problems of moderate severity or moderate to high severity, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

738.   In the claims for initial examinations identified in Exhibit "4", Westchester Medical, Morales, and Mas routinely falsely represented that the Insureds presented with problems of moderate or moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99203 and 99204, because examinations billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations involving presenting problems of low severity, or no severity.

739.   In the claims for initial examinations identified in Exhibit "4", Westchester Medical, Morales, and Mas also routinely falsely represented that the Insureds presented with

problems of moderate severity or moderate to high severity in order to create a false basis for the laundry list of other Fraudulent Services that the Westchester Medical Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations and physical therapy services.

**b.    Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

740.    What is more, in every claim identified in Exhibit "4" for initial examinations under CPT code 99203 and 99204, Westchester Medical, Morales, and Mas misrepresented and exaggerated the amount of face-to-face time that the examining physician – purportedly Mas – spent with the Insureds or the Insureds' families during the putative initial examination.

741.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination typically represents that the physician who conducted the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

742.    Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination typically represents that the physician who conducted the examination spent at least 45 minutes of face-to-face time with the patient or the patient's family

743.    As set forth in Exhibit "4", Westchester Medical, Morales, and Mas mostly billed for putative initial examinations using CPT codes 99203 and 99204, and thereby that the physician who purported to conduct the examinations – namely Mas – spent at least 30 or 45 minutes of face-to-face time with the Insureds or their families during the examinations.

744.    In fact, in the initial examinations identified in Exhibit "4", Mas never spent even 15 minutes of face-to-face time with the Insureds or their families when conducting the examinations, much less 30 or 45 minutes, to the extent that the examinations actually were conducted at all.

745.     Rather, in the purported initial examinations identified in Exhibit "4", the examinations rarely entailed more than 10 minutes of face-to-face time between Mas, the Insureds, or the Insureds' families, to the extent that they were provided at all.

746.     In keeping with the fact that the initial examinations in the claims identified in Exhibit "4" did not involve more than 10 minutes of face-to-face time between Mas, the Insureds, or the Insureds' families – to the extent that they were provided at all – Mas used pre-printed template forms in purporting to conduct the examinations at Westchester Medical.

747.     All that was required to complete the pre-printed template forms was a brief patient interview and a perfunctory physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, and basic range of motion and muscle strength testing.

748.     These interviews and examinations did not require Mas to spend more than 10 minutes of face-to-face time with the Insureds during the putative initial examinations.

749.     Indeed, Mas could not legitimately have personally spent 30 or 45 minutes of face-to-face time with the Insureds or their families during the initial examinations at Westchester Medical, considering the massive amount of healthcare services he simultaneously was purporting to personally perform or directly supervise at numerous healthcare clinics and medical practices throughout the Miami area.

750.     For example:

(i)     On March 28, 2017, Westchester Medical, Morales, and Mas billed GEICO under CPT code 99204 for four initial examinations of four individual Insureds named IL, LD, RH, and VA, and falsely represented that Mas spent at least 45 minutes of face-to-face time with the Insureds or their families during each examination. On that same date, Mas also purported to personally provide or directly supervise at least 33.5 hours of physical therapy services to 26 individual Insureds, from six different facilities, namely Westchester Medical, E-Z Medical, Baracusa Health, Atlantic Medical, Therapeutic Rehab, and Golden Health.

   (ii)       On June 8, 2017, 2017, Westchester Medical, Morales, and Mas billed GEICO under CPT code 99204 for two initial examinations of individual Insureds named BR and NM, and falsely represented that Mas spent at least 45 minutes of face-to-face time with the Insureds or their families during each examination. On that same date, Mas also purported to personally provide or directly supervise more than 36.25 hours of physical therapy services to 26 individual Insureds, from five different facilities, namely Westchester Medical, E-Z Medical, Davila Medical, Starlite Medical, and Atlantic Medical.

   (iii)     On October 19, 2017, Westchester Medical, Morales, and Mas billed GEICO under CPT code 99204 for two initial examinations of individual Insureds named JR and BH, and falsely represented that Mas spent at least 45 minutes of face-to-face time with the Insureds or their families during each examination. On that same date, Mas also purported to personally provide or directly supervise at least 30.75 hours of physical therapy services to 22 individual Insureds, from seven different facilities, from seven different facilities, namely Westchester Medical, E-Z Medical, Davila Medical, Starlite Medical, Star Medical, Therapeutic Rehab, and Health Solutions.

   (iv)     On October 26, 2017, Westchester Medical, Morales, and Mas billed GEICO under CPT code 99204 for an initial examination of an individual Insured named LC, and falsely represented that Mas spent at least 45 minutes of face-to-face time with the Insured or her family during the examination. On that same date, Mas also purported to personally provide or directly supervise at least 27.5 hours of physical therapy services, from seven different facilities, namely Westchester Medical, E-Z Medical, Davila, Starlite Medical, Star Medical, Therapeutic Rehab, and Health Solutions.

   (v)      On November 30, 2017, Westchester Medical, Morales, and Mas billed GEICO under CPT code 99204 for an initial examination of an individual Insured named MP, and falsely represented that Mas spent at least 45 minutes of face-to-face time with the Insured or her family during the examination. On that same date, Mas also purported to personally provide or directly supervise more than 45.5 hours of physical therapy services to 32 individual Insureds, from seven different facilities, namely Westchester Medical, E-Z Medical, Davila Medical, Starlite Medical, Star Medical, Therapeutic Rehab, and Health Solutions.

   (vi)     On December 12, 2017, Westchester Medical, Morales, and Mas billed GEICO under CPT code 99204 for two initial examinations of individual Insureds named IZ and JJ, and falsely represented that Mas spent at least 45 minutes of face-to-face time with the Insureds or their families during each examination. On that same date, Mas also purported to personally provide or directly supervise more than 47.75 hours of physical therapy services to 36 individual Insureds, from seven different facilities, namely Westchester Medical, E-Z Medical, Davila Medical, Starlite Medical, Star Medical, Therapeutic Rehab, and Health Solution.

(vii)    On December 14, 2017, Westchester Medical, Morales, and Mas billed GEICO under CPT code 99204 for an initial examination of an individual insured named NG, and falsely represented that Mas spent at least 45 minutes of face-to-face time with the Insured or his family during the examination. On that same date, Mas also purported to personally provide or directly supervise more than 32.5 hours of physical therapy services to 23 individual Insureds, from seven different facilities, namely Westchester Medical, E-Z Medical, Davila, Starlite Medical, Star Medical, Therapeutic Rehab, and Health Solutions.

751.    In the claims for initial examinations that are identified in Exhibit "4", Westchester Medical, Morales, and Mas routinely falsely represented that Mas had spent either 30 minutes of face-to-face time or 45 minutes of face-to-face time with the Insureds or their families during the examinations, despite the fact that – on those same dates – Mas also purported to personally perform a massive amount of physical therapy and other services to large numbers of Insureds at multiple locations throughout the Miami area.

752.    Westchester Medical, Morales, and Mas routinely misrepresented the amount of time that was spent in conducting the initial examinations because lengthier examinations that are billable under CPT code 99203 and 99204 are reimbursable at higher rates than examinations that take less time to perform.

**c.**    **Misrepresentations Regarding "Detailed" or "Comprehensive" Physical Examinations**

753.    Moreover, in every claim for initial examinations under CPT code 99203 and 99204, Westchester Medical, Morales, and Mas falsely represented the extent of the underlying physical examinations.

754.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician who performed the examination conducted a "detailed" physical examination.

755.    Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician who performed the examination conducted a "comprehensive" physical examination.

756.    As set forth in Exhibit "4", Westchester Medical, Morales, and Mas virtually always billed for their putative initial examinations using CPT code 99203 or 99204, and thereby represented that the physician who purported to conduct the examinations – namely Mas – conducted detailed or comprehensive physical examinations of the Insureds who purportedly received the examinations.

757.    Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the physician performing the examination conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

758.    To the extent that the Insureds in the claims identified in Exhibit "4" had any actual complaints at all as the result of their minor automobile accidents, the complaints were limited to minor musculoskeletal complaints, specifically sprains and strains.

759.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted an extended examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to the following:

(xi)    measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(xii)   general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(xiii)  examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(xiv)   palpation of lymph nodes in neck, axillae, groin and/or other location;

222

(xv)     brief assessment of mental status;

(xvi)    examination of gait and station;

(xvii)   inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(xviii)  coordination;

(xix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(xx)     examination of sensation.

760.    In the claims for initial examinations identified in Exhibit "4", when Westchester Medical, Morales, and Mas billed for the initial examinations under CPT code 99203, they falsely represented that Mas performed "detailed" patient examinations on the Insureds he purported to treat during the initial examinations.

761.    In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibit "4", Mas never conducted an extended examination of the Insureds' musculoskeletal systems.

762.    For instance, in each of the claims under CPT code 99203 identified in Exhibit "4", Mas did not conduct an extended examination of the Insureds' musculoskeletal systems, inasmuch as he did not document findings with respect to the following:

(i)      palpation of lymph nodes in neck, axillae, groin and/or other location;

(ii)     brief assessment of mental status;

(iii)    examination of gait and station;

(iv)     inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(v)     coordination;

(vi)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(vii)   examination of sensation.

763.    For example:

(i)     On March 9, 2017, Westchester Medical, Morales, and Mas billed GEICO under CPT code 99203 for an initial examination that Mas purported to perform on an Insured named MH, and thereby represented that they had provided a "detailed" physical examination to MH. However, Mas did not document an extended examination of MH's musculoskeletal system, despite the fact that – to the extent MH had any complaints at all as the result of his automobile accident – they were limited to minor musculoskeletal complaints.

(ii)    On March 9, 2017, Westchester Medical, Morales, and Mas billed GEICO under CPT code 99203 for an initial examination that Mas purported to perform on an Insured named JP, and thereby represented that they had provided a "detailed" physical examination to JP. However, Mas did not document an extended examination of JP's musculoskeletal system, despite the fact that – to the extent JP had any complaints at all as the result of his automobile accident – they were limited to minor musculoskeletal complaints.

(iii)   On March 17, 2017, Westchester Medical, Morales, and Mas billed GEICO under CPT code 99203 for an initial examination that Mas purported to perform on an Insured named MF, and thereby represented that they had provided a "detailed" physical examination to MF. However, Mas did not document an extended examination of MF's musculoskeletal system, despite the fact that – to the extent MF had any complaints at all as the result of his automobile accident – they were limited to minor musculoskeletal complaints.

764.    Pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the examining physician either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

765.     Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

766.     The CPT Assistant recognizes the following organ systems:

(i)      constitutional symptoms (e.g., fever, weight loss);

(ii)     eyes;

(iii)    ears, nose, mouth, throat;

(iv)     cardiovascular;

(v)      respiratory;

(vi)     gastrointestinal;

(vii)    genitourinary;

(viii)   musculoskeletal;

(ix)     integumentary (skin and/or breast);

(x)      neurological;

(xi)     psychiatric;

(xii)    endocrine;

(xiii)   hematologic/lymphatic; and

(xiv)    allergic/immunologic

767.     Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)      at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – <u>e.g.</u>, development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (<u>e.g.</u>, swelling, varicosities) and palpation (<u>e.g.</u>, pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)    examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (<u>e.g.</u>, scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)    coordination, deep tendon reflexes, and sensation; and

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

768.    In the claims for initial examinations identified in Exhibit "4", when Westchester Medical, Morales, and Mas billed for the initial examinations under CPT code 99204, they falsely represented that Mas performed "comprehensive" patient examinations on the Insureds he purported to treat during the initial examinations.

769.    In fact, with respect to the claims for initial examinations under CPT code 99204 that are identified in Exhibit "4", Mas never conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

770.    For instance, in each of the claims under CPT code 99204 identified in Exhibit "4", Mas did not conduct any general examination of multiple patient organ systems, inasmuch as he did not document findings with respect to at least eight organ systems.

226

771. Furthermore, although Mas often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems in the claims for initial examinations identified in Exhibit "4", the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)     the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(ii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iii)   palpation of lymph nodes in neck, axillae, groin, and/or other location;

(iv)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(v)     coordination, deep tendon reflexes, and sensation; and/or

(vi)    mental status, including orientation to time, place and person, as well as mood and affect.

772. For example:

(i)     On March 28, 2017, Westchester Medical, Morales, and Mas billed GEICO under CPT code 99204 for an initial examination of an Insured named IL, and thereby represented that they had provided a "comprehensive" physical examination to IL. However, Mas did not document findings with respect to at least eight of IL's organ systems, nor did he document a "complete" examination of IL's musculoskeletal system or any of IL's other organ systems.

(ii)    On March 28, 2017, Westchester Medical, Morales, and Mas billed GEICO under CPT code 99204 for an initial examination of an Insured named LD, and thereby represented that they had provided a "comprehensive" physical examination to LD. However, Mas did not document findings with respect to at least eight of LD's organ systems, nor did he document a "complete" examination of LD's musculoskeletal system or any of LD's other organ systems.

(iii)   On March 28, 2017, Westchester Medical, Morales, and Mas billed GEICO under CPT code 99204 for an initial examination of an Insured named VA, and thereby represented that they had provided a "comprehensive" physical examination to VA. However, Mas did not document findings with respect to at least eight of

227

VA's organ systems, nor did he document a "complete" examination of VA's musculoskeletal system or any of VA's other organ systems.

(iv)    On June 5, 2017, Westchester Medical, and Mas billed GEICO under CPT code 99204 for an initial examination that Mas purported to perform on an Insured named EC, and thereby represented that they had provided a "detailed" physical examination to EC. However, Mas did not document an extended examination of EC's musculoskeletal system, despite the fact that – to the extent EC had any complaints at all as the result of his automobile accident – they were limited to minor musculoskeletal complaints.

(v)     On October 26, 2017, Westchester Medical, Morales, and Mas billed GEICO under CPT code 99204 for an initial examination of an Insured named LC, and thereby represented that they had provided a "comprehensive" physical examination to LC. However, Mas did not document findings with respect to at least eight of LC's organ systems, nor did he document a "complete" examination of LC's musculoskeletal system or any of LC's other organ systems.

(vi)    On November 30, 2017, Westchester Medical, Morales, and Mas billed GEICO under CPT code 99204 for an initial examination of an Insured named MP, and thereby represented that they had provided a "comprehensive" physical examination to MP. However, Mas did not document findings with respect to at least eight of MP's organ systems, nor did he document a "complete" examination of MP's musculoskeletal system or any of MP's other organ systems.

773.    In all of the claims for initial examinations under CPT code 99203 that are identified in Exhibit "4", Westchester Medical, Morales, and Mas falsely represented that they had provided "detailed" physical examinations. In fact, they had not provided detailed physical examinations because Mas had not documented an extended examination of the affected body areas and other symptomatic or related organ systems.

774.    In all of the claims for initial examinations under CPT code 99204 that are identified in Exhibit "4", Westchester Medical, Morales, and Mas falsely represented that they had provided "comprehensive" physical examinations. In fact, they had not provided comprehensive physical examinations because Mas had not documented findings with respect to at least eight of the Insureds' organ systems, nor had he documented "complete" examinations of the Insureds' musculoskeletal systems or any of the Insureds' other organ systems.

228

775.     In all of the claims for initial examinations under CPT codes 99203 and 99204 that are identified in Exhibit "4", Westchester Medical, Morales, and Mas falsely represented that they had provided either "detailed" or "comprehensive" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99203 and 99204, because examinations billable under CPT code 99203 and 99204 are reimbursable at higher rates than examinations that do not require the examining physician to provide "detailed" or "comprehensive" physical examinations.

**d.     Misrepresentations Regarding the Extent of Medical Decision-Making**

776.     Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician who performed the examination engaged in "low complexity" medical decision-making.

777.     Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician who performed the examination engaged in "moderate complexity" medical decision-making.

778.     As set forth above, pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

779.     As set forth above, and in Exhibit "4", Westchester Medical, Morales, and Mas billed for all of their putative initial patient examinations using CPT code 99203 or 99204, and

thereby represented that Mas engaged in some genuine, low-complexity medical decision-making or moderate-complexity decision-making during the initial examinations.

780.    In actuality, however, the purported initial examinations did not involve any legitimate medical decision-making at all.

781.    First, in Westchester Medical, Morales, and Mas's claims for initial examinations identified in Exhibit "4", the initial examinations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information.

782.    When the Insureds in the claims identified in Exhibit "4" presented to Westchester Medical for "treatment", they did not arrive with any medical records.

783.    Furthermore, prior to the initial examinations, Westchester Medical, Morales, and Mas neither requested any medical records from any other providers, nor conducted any diagnostic tests beyond the basic range of motion and muscle strength testing that is attendant to any physical examination.

784.    Second, in Westchester Medical, Morales, and Mas's claims for initial examinations identified in Exhibit "4",  there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

785.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Westchester Medical Defendants, to the extent that the Westchester Medical Defendants provided any such diagnostic procedures or treatment options in the first instance.

786.    In virtually every one of the claims identified in Exhibit "4", any diagnostic procedures and "treatments" that the Westchester Medical Defendants actually provided were

230

limited to a series of medically unnecessary follow-up examinations and physical therapy treatments, none of which was health- or life-threatening if properly administered.

787.   Third, in Westchester Medical, Morales and Mas's claims for initial examinations identified in Exhibit "4", Mas did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

788.   Rather, to the extent that the initial examinations were conducted in the first instance, Westchester Medical and Mas – at the direction of Morales – provided a nearly identical, pre-determined "diagnosis" for every Insured, and prescribed a virtually identical course of treatment for every Insured.

789.   Specifically, in the claims identified in Exhibit "4", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

790.   Even so, Westchester Medical, Morales, and Mas prepared initial examination reports in which they provided phony, boilerplate sprain/strain "diagnoses" to virtually every Insured.

791.   Then, based upon these phony "diagnoses", Westchester Medical, Morales, and Mas directed virtually every Insured to return to Westchester Medical five times each week for medically unnecessary physical therapy during the first two to three weeks of "treatment".

792.   As set forth above, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

793.   An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

794.    As set forth above, in the claims identified in Exhibit "4", virtually all of the Insureds whom the Westchester Defendants purported to treat were involved in relatively minor accidents, to the extent that they were involved in any actual accidents at all.

795.    It is extremely improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "4" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

796.    It is even more improbable – to the point of impossibility – that this would occur over and over again.

797.    It likewise is improbable – to the point of impossibility – that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "4" would present for an initial examination with substantially identical symptoms, and receive substantially identical diagnoses, requiring a substantially identical course of treatment, on the exact same date after their underlying automobile accident.

798.    Even so, in keeping with the fact that these putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, Westchester Medical and Morales – at the direction of Mas – frequently issued substantially identical, phony "diagnoses", on the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

799.    For example:

(i)    On March 8, 2017, two Insureds – MH and JP – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Westchester Medical for initial examinations by Mas on the exact same date, March 9, 2017. MH and JP were different ages, in different physical conditions,

located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MH and JP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Westchester Medical and Morales – at the direction of Mas – provided MH and JP with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them.

(ii)    On March 25, 2017, two Insureds – IL and LD – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Westchester Medical for initial examinations by Mas on the exact same date, March 28, 2017. IL and LD were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that IL and LD suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Westchester Medical and Morales – at the direction of Mas – provided IL and LD with substantially identical sprain/strain "diagnoses", and treated both patients with a substantially identical course of medically unnecessary physical therapy treatment.

(iii)   On March 25, 2017, two Insureds – RH and VA – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Westchester Medical for initial examinations by Mas on the exact same date, March 28, 2017. RH and VA were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that RH and VA suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Westchester Medical and Morales – at the direction of Mas – provided RH and VA with substantially identical sprain/strain "diagnoses", and treated both patients with a substantially identical course of medically unnecessary physical therapy treatment.

(iv)    On April 5, 2017, two Insureds – YD and MF – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Westchester Medical for initial examinations by Mas on the exact same date, April 12, 2017. YD and MF were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that YD and MF suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Westchester Medical and Morales – at the direction of Mas – provided YD and MF with substantially identical sprain/strain "diagnoses", and treated both patients with a substantially identical course of medically unnecessary physical therapy treatment.

(v)     On June 1, 2017, two Insureds – NM and BR – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at

Westchester Medical for initial examinations by Mas on the exact same date, June 8, 2017. NM and BR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that NM and BR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Westchester Medical and Morales – at the direction of Mas – provided NM and BR with substantially identical sprain/strain "diagnoses", and treated both patients with a substantially identical course of medically unnecessary physical therapy treatment.

(vi)     On October 18, 2017, two Insureds – JR and BH – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Westchester Medical for initial examinations by Mas on the exact same date, October 19, 2017. JR and BH were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JR and BH suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations Westchester Medical and Morales – at the direction of Mas – provided JR and BH with substantially identical sprain/strain "diagnoses", and recommended the substantially identical course of medically unnecessary physical therapy treatment for both patients.

800.     Westchester Medical, Morales, and Mas routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Westchester Medical Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations and physical therapy services.

801.     In keeping with the fact that Westchester Medical, Morales, and Mas routinely inserted false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, for virtually every one of the Insureds in the claims identified in Exhibit "4", Westchester Medical and Mas – at the direction of Morales – diagnosed almost all of the Insureds with sprains in their cervical, thoracic, and lumbar spines.

802.    Additionally, Westchester Medical, Morales, and Mas appended to virtually every initial examination report a "Notice of Medical Emergency," stating that that the patient had "sustained symptoms of sufficient severity . . . such that the absence of immediate medical attention could reasonably be expected to result in in any of the following: A) serious jeopardy to patient health B) serious impairment to bodily functions C) serious dysfunction of a bodily organ or part."

803.    It is extremely improbable that virtually every one of the Insureds in the claims identified in Exhibit "4" would have sprains in their cervical, thoracic, and lumbar spines, and have symptoms so acute that their injuries could be considered a medical emergency.

804.    It is even more improbable – to the point of impossibility – that this would occur over and over again, in the context of minor automobile accidents that could not possibly have caused such severe levels of pain and/or injury.

805.    Westchester Medical, Morales, and Mas inserted this false information in their initial examination reports despite the fact that the minor underlying accidents did not and could not possibly have caused such consistent, high levels of pain in the Insureds, much less to more than one Insured involved in a single accident.

806.    For example:

(i)     On March 25, 2017, two Insureds – RH and VA - were involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that the vehicle suffered only functional damage in the accident, the air bag was not deployed, and that no one was injured in the accident. In keeping with the fact that RH and VA were not seriously injured in the minor accident, neither RH nor VA visited any hospital following the accident. To the extent that RH and VA experienced any health problems at all as the result of their minor accident, they were of low severity. Even so, following purported initial examinations of RH and VA by Mas on March 28, 2018, Westchester Medical and Mas – at the direction of Morales – falsely reported that RH and VA suffered from vascular headaches, had sprains in their cervical spines, and sprains in one or more of their shoulders, elbows, knees

235

sprains, and ankles. Mas further falsely reported that both patients were experiencing medical emergencies.

(ii)  On March 25, 2017, two Insureds – IL and LD - were involved in a minor automobile accident. The contemporaneous police report indicated that the vehicle suffered only functional damage in the accident, the air bag was not deployed, and that no one was injured in the accident. In keeping with the fact that IL and LD were not seriously injured in the minor accident, neither IL nor LD visited any hospital following the accident. To the extent that IL and LD suffered any health problems at all as the result of their minor accident, they were of low severity. Even so, following purported initial examinations of IL and LD by Mas on March 28, 2018, Westchester Medical and Mas – at the direction of Morales – falsely reported that IL and LD suffered from vascular headaches, had sprains in their cervical and lumbar spines, and sprains in one or more of their shoulders, elbows, knees sprains, and ankles. Mas further falsely reported that both patients were experiencing medical emergencies.

(iii)  On June 1, 2017, two Insureds – BR and NM - were involved in a minor automobile accident. The contemporaneous police report state that no one was injured in the accident, the airbag was not deployed, and that the vehicles only suffered functional damage. In keeping with the fact that BR and NM were not seriously injured in the minor accident, neither BR nor NM visited any hospital following the accident. To the extent BR and NM suffered any health problems at all as the result of their minor accident, they were of low severity. Even so, following purported initial examinations of BR and NM by Mas on June 8, 2017, Westchester Medical and Mas – at the direction of Morales – falsely reported that BR and NM suffered from thoracic cervical, thoracic, and lumbar sprains, as well as sprains in their knee(s) and elbow(s). Mas further falsely reported that both patients were experiencing medical emergencies.

(iv)  On October 18, 2017, two Insureds – JR and BH - were involved in a minor automobile accident. The contemporaneous police report state that no one was injured in the accident. In keeping with the fact that JR and BH were not seriously injured in the minor accident, neither JR nor BH visited any hospital following the accident. To the extent JR and BH suffered any health problems at all as the result of their minor accident, they were of low severity. Even so, following purported initial examinations of JR and BH by Mas on October 19, 2017, Westchester Medical and Mas – at the direction of Morales – falsely reported that JR and BH suffered from thoracic pain, severe shoulder tendinitis, elbow epicondylitis, wrist sprain(s), and severe post traumatic headaches. Mas further falsely reported that both patients were experiencing medical emergencies.

(v)  On December 11, 2017, two Insureds – IZ and JJ - were involved in a minor automobile accident. The contemporaneous police report states that the accident was a low-speed, low-impact collision, that the vehicle suffered only minor damage, no one was injured in the accident, and the airbag was not deployed. In

keeping with the fact that IZ and JJ were not seriously injured in the minor accident, neither IZ nor JJ visited any hospital following the accident. To the extent IZ and JJ suffered any health problems at all as the result of their minor accident, they were of low severity. Even so, following purported initial examinations of IZ and JJ by Mas on December 12, 2017, Westchester Medical and Mas – at the direction of Morales – falsely reported that IZ and JJ suffered from severe pain due to the accident. Additionally, Mas diagnosed both patients with cervical, thoracic, and lumbar sprains. Mas further falsely reported that both patients were experiencing medical emergencies.

807.    In virtually every claim for initial examinations identified in Exhibit "4", Westchester Medical, Morales, and Mas falsely reported that the Insureds suffered from at least one severe injury, and that each Insured had injuries which constituted a "medical emergency condition".

808.    Westchester Medical, Morales, and Mas routinely inserted this false information in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Westchester Medical Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations and physical therapy services.

809.    To the extent that the Insureds in the claims identified in Exhibit "4" ever had any genuine medical problems at all as the result of their minor automobile accidents, the problems virtually always were limited to ordinary sprains or strains of the back, neck, or extremities.

810.    The diagnosis and treatment of these ordinary sprains and strains did not require any "low complexity" or "moderate complexity" medical decision-making on the part of Mas or anyone else.

811.    To the contrary, and as set forth above, Mas did not engage in any legitimate medical decision-making at all in connection with the initial examinations in the claims

identified in Exhibit "4", because the purported "results" of the examinations were pre-determined, phony, and designed to provide a false justification for the laundry-list of other Fraudulent Services that the Westchester Medical Defendants purported to provide.

812.   In the claims for initial examinations identified in Exhibit "4", Westchester Medical, Morales, and Mas routinely falsely represented that the initial examinations involved medical decision-making of low complexity in order to provide a false basis to bill for the initial examinations under CPT code 99203 and 99204, because CPT codes 99203 and 99204 are reimbursable at a higher rate than examinations that do not require any medical decision-making.

813.   In the claims for initial examinations identified in Exhibit "4", Westchester Medical, Morales, and Mas routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

  (iv)   the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

  (v)   the charges for the putative examinations misrepresented the nature and extent of the examinations; and

  (vi)   Westchester Medical never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it unlawfully was operated without a legitimate medical director.

814.   In this context, Mas – who at all relevant times purported to serve as the "medical director" at Westchester Medical – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

815.    Had Mas actually fulfilled his statutory role as medical director at Westchester Medical, he would have noted – among other things – that the Westchester Medical Defendants routinely fraudulently represented in Westchester Medical's billing that the putative initial examinations were legitimately and lawfully performed.

816.    Mas failed to do so, because he never actually served as a legitimate medical director at Westchester Medical in the first instance.

**(ii)    The Fraudulent Charges for Follow-Up Examinations at Westchester Medical**

817.    In addition to their fraudulent initial examinations, Westchester Medical, Morales, and Mas virtually always purported to subject each of the Insureds in the claims identified in Exhibit "4" to multiple, fraudulent follow-up examination(s) during the course of their fraudulent treatment and billing protocol.

818.    Mas purported to personally perform virtually all of the follow-up examinations in the claims identified in Exhibit "4".

819.    As set forth in Exhibit "4", Westchester Medical, Morales, and Mas billed GEICO for at least one follow-up visit for virtually every insured under CPT code 99214, resulting in charges of $230.45 or $250.00 for reach follow-up examination they purported to provide under CPT code 99214.

820.    In the claims for follow-up examinations identified in Exhibit "4", the charges for the follow-up examinations were fraudulent in that they misrepresented Westchester Medical's eligibility to collect PIP Benefits in the first instance.

821.    In fact, and as set forth above, Westchester Medical never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing requirements set forth in the Clinic Act.

822.     As set forth below, Westchester Medical, Morales, and Mas's charges for the follow-up examinations identified in Exhibit "4" also were fraudulent in that they misrepresented the nature and extent of the follow-up examinations.

**a.      Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

823.     As set forth above, pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination typically requires that the patient present with problems of moderate to high severity.

824.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99214 to bill for a follow-up patient examination.

825.     For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99214 to bill for a follow-up patient examination:

(i)      Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)     Office evaluation of 28-year-old patient with regional enteritis, diarrhea and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)    Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)     Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)      Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)     Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)   Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/Internal Medicine/Family Medicine)

(viii)   Office visit with 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

826.   Accordingly, and as set forth above, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

827.   By contrast, and as set forth above, to the limited extent that the Insureds in the claims identified in Exhibit "4" suffered any injuries at all in their minor automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains, which were not severe at all.

828.   In keeping with the fact that the Insureds in the claims identified in Exhibit "4" almost never suffered any injuries more serious than garden-variety soft tissue injuries such as sprains and strains, in the claims identified in Exhibit "4" the Insureds did not seek treatment at any hospital as the result of their accidents.

829.   Furthermore, in the substantial majority of cases, contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, and that no one was seriously injured in the underlying accidents, or injured at all.

830.   As set forth above, ordinary strains and sprains virtually always resolve after a short course of conservative treatment such as rest, ice, compression, and elevation, or no treatment at all.

831.     When the Insureds in the claims identified in Exhibit "4" presented at Westchester Medical for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or their presenting problems were minimal.

832.     Even so, in the claims for follow-up examinations identified in Exhibit "4", Westchester Medical, Morales, and Mas routinely billed at least one of each Insured's putative follow-up examinations under CPT code 99214, and thereby falsely represented that the Insureds continued to suffer from presenting problems of at least moderate to high severity.

833.     For example:

(i)      On March 10, 2017, an Insured named MF was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that MF was not seriously injured in the accident, MF did not visit any hospital following the accident, and did not seek any treatment of any kind for a week after the accident. To the extent that MF experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following a purported follow-up examination of MF on April 19, 2017, Westchester Medical, Morales, and Mas billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that MF presented with problems of moderate to high severity.

(ii)     On March 25, 2017, two Insureds – RH and VA – were involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that the vehicle suffered only functional damage in the accident, the air bag was not deployed, and that no one was injured in the accident. In keeping with the fact that RH and VA were not seriously injured in the minor accident, neither RH nor VA visited any hospital following the accident. To the extent that RH and VA experienced any health problems at all as the result of their minor accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following purported follow-up examinations of RH on April 24, 2017, and VA on April 25, 2017, Westchester Medical, Morales, and Mas billed GEICO for the follow-up examinations using CPT code 99214 and thereby falsely represented that RH and VA presented with problems of moderate to high severity.

(iii)    On March 25, 2017, two Insureds – IL and LD – were involved in a minor automobile accident. The contemporaneous police report indicated that the vehicle suffered only minor damage in the accident, the air bag was not deployed, and that no one was injured in the accident. In keeping with the fact that IL and LD were not seriously injured in the minor accident, neither IL nor LD visited any hospital following the accident. To the extent that IL and LD experienced any health problems at all as the result of their minor accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following purported follow-up examinations of IL on April 25, 2017, and LD on May 5, 2017 and June 15, 2017, Westchester Medical, Morales, and Mas billed GEICO for the follow-up examinations using CPT code 99214 and thereby falsely represented that IL and LD presented with problems of moderate to high severity.

(iv)    On May 8, 2017, an Insured named LD was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that LD was not seriously injured in the accident, LD did not visit any hospital following the accident, and did not seek any treatment of any kind for approximately ten days after the accident. To the extent that LD experienced any health problems at all as the result of his accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following purported follow-up examinations of LD on June 13, 2017 and July 13, 2017, Westchester Medical, Morales, and Mas billed GEICO for the follow-up examinations using CPT code 99214 and thereby falsely represented that LD presented with problems of moderate to high severity.

(v)    On June 1, 2017, two Insureds – BR and NM – were involved in an automobile accident. The contemporaneous police report indicated that no one was injured in the accident, the airbag was not deployed, and that the vehicles only suffered functional damage. In keeping with the fact that BR and NM were not seriously injured in the minor accident, neither BR nor NM visited any hospital following the accident. To the extent BR and NM experienced any health problems at all as the result of their minor accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following purported follow-up examinations of BR and NM on July 6, 2017, Westchester Medical, Morales, and Mas billed GEICO for the follow-up examinations using CPT code 99214 and thereby falsely represented that BR and NM presented with problems of moderate to high severity.

(vi)    On October 18, 2017, two Insureds – JR and BH – were involved in an automobile accident. The contemporaneous police report state that no one was injured in the accident. In keeping with the fact that JR and BH were not seriously injured in the minor accident, neither JR nor BH visited any hospital following the accident. To the extent JR and BH experienced any health problems at all as the result of their minor accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following purported follow-

243

up examinations of JR on November 9, 2018 and December 11, 2017, and BH on November 9, 2018 and December 11, 2018, Westchester Medical, Morales, and Mas billed GEICO for the follow-up examinations using CPT code 99214 and thereby falsely represented that JR and BH presented with problems of moderate to high severity.

(vii)   On November 27, 2017, an Insured named YM was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that YM was not seriously injured in the accident, YM did not visit any hospital following the accident. To the extent that YM experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following purported follow-up examinations of YM on December 18, 2017 and January 29, 2018, Westchester Medical, Morales, and Mas billed GEICO for the follow-up examinations using CPT code 99214 and thereby falsely represented that YM presented with problems of moderate to high severity.

(viii)   On November 29, 2017, an Insured named MP was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that MP was not seriously injured in the accident, MP did not visit any hospital following the accident, and did not seek any treatment of any kind for a week after the accident. To the extent that MP experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following purported follow-up examinations of MP on December 21, 2017 and February 1, 2018, Westchester Medical, Morales, and Mas billed GEICO for the follow-up examinations using CPT code 99214 and thereby falsely represented that MP presented with problems of moderate to high severity.

(ix)   On December 11, 2017, two Insureds – IZ and JJ – were involved in a minor automobile accident. The contemporaneous police report states that the accident was a low-speed, low-impact collision, the vehicle suffered only minor damage, no one was injured in the accident, and the airbag was not deployed. In keeping with the fact that IZ and JJ were not seriously injured in the minor accident, neither IZ nor JJ visited any hospital following the accident. To the extent IZ and JJ experienced any health problems at all as the result of their minor accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following purported follow-up examinations of IZ on January 8, 2018 and February 5, 2018, and JJ on January 22, 2018 and February 22, 2018, Westchester Medical, Morales, and Mas billed GEICO for the follow-up examinations using CPT code 99214 and thereby falsely represented that IZ and JJ presented with problems of moderate to high severity.

834.    In all of the claims for follow-up examinations identified in Exhibit "4",
Westchester Medical, Morales, and Mas falsely represented that the Insureds presented with
problems of moderate to high severity, when in fact the Insureds either did not have any genuine
presenting problems at all as the result of their minor automobile accidents at the time of the
follow-up examinations, or else their presenting problems were minimal.

835.    In the claims for follow-up examinations identified in Exhibit "4", Westchester
Medical, Morales, and Mas routinely falsely represented that the Insureds presented with
problems of moderate to high severity in order to create a false basis for their charges for the
examinations under CPT code 99214, because follow-up examinations billable under CPT code
99214 are reimbursable at higher rates than examinations involving presenting problems of
minimal severity, or no severity.

836.    In the claims for follow-up examinations identified in Exhibit "4", Westchester
Medical, Morales, and Mas also routinely falsely represented that the Insureds presented with
problems of moderate to high severity in order to create a false basis for the other Fraudulent
Services that the Westchester Medical Defendants purported to provide to the Insureds, including
additional, medically unnecessary follow-up examinations and physical therapy.

**b.      Misrepresentations Regarding the Results of the Follow-Up Examinations**

837.    What is more, pursuant to the CPT Assistant, when Westchester Medical,
Morales, and Mas billed for their putative follow-up examinations under CPT code 99214, they
represented that Mas performed at least two of the following three components: (i) took a
"detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in
medical decision-making of "moderate complexity".

838.    In actuality, however, in the claims for follow-up examinations identified in Exhibit "4", Mas did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

839.    Rather, following their purported follow-up examinations, Westchester Medical and Mas – at the direction of Morales – simply: (i) reiterated the false, boilerplate "diagnoses" they previously had provided to the Insureds; and either  (ii) referred the Insureds back to Westchester Medical for even more medically unnecessary physical therapy services, despite the fact that the Insureds purportedly already had received extensive physical therapy services from Westchester Medical that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

840.    In keeping with the fact that the purported "results" of the follow-up examinations were pre-determined, and had no legitimate connection to the Insureds' true medical circumstances or presentation, Westchester Medical and Mas – at the direction of Morales – recommended a substantially identical course of medically unnecessary "treatment" to virtually every one of the Insureds identified in Exhibit "4", irrespective of the Insureds' actual presenting problems, to the extent the Insureds experienced any legitimate injuries at all.

841.    Specifically, Westchester Medical and Mas – at the direction of Morales – directed virtually every Insured to receive two to three months of purported "physical therapy" treatments, typically consisting of physical therapy five times a week for the first three or four weeks of treatment, followed by physical therapy four times per week for the subsequent four week, followed by physical therapy three times a week for the remaining four weeks.

842.    In addition, Westchester Medical and Mas – at the direction of Morales – directed virtually every Insured to receive substantially identical <u>types</u> of physical therapy services, including: (i) cold/hot packs; (ii)therapeutic exercises; (iii) paraffin baths; (iv) infrared treatment; (v) ultrasound; (vi) neuromuscular reeducation; (vii) electric stimulation; (viii) traction mechanical therapy; (ix) manual therapy; and (x) "self-care training". <u>See</u> Exhibit "4".

843.    As set forth above, in a legitimate clinical setting, each individual patient's physical therapy schedule, and the specific physical therapy modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

844.    In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy is constantly adjusted for each individual patient based on each patient's treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy.

845.    By contrast, at Westchester Medical, the nature and extent of the physical therapy that each Insured purportedly received was pre-determined, and had no legitimate connection to the Insureds' individual circumstances, presentation, or progress through the Defendants' fraudulent treatment and billing protocol.

846.    The phony "follow-up examinations" that Westchester Medical, Morales, and Mas purported to provide the Insureds in the claims identified in Exhibit "4" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were pre-determined to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into Westchester Medical's offices.

847.     In the claims for follow-up examinations identified in Exhibit "4", Westchester Medical, Morales, and Mas routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   Westchester Medical never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it unlawfully was operated without a legitimate medical director.

848.     In this context, Mas – who at all relevant times purported to serve as the "medical director" at Westchester Medical – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

849.     Had Mas actually fulfilled his statutory role as medical director at Westchester Medical, he would have noted – among other things – that the Westchester Medical Defendants routinely fraudulently represented in Westchester Medical's billing that the putative follow-up examinations were legitimately and lawfully performed and billed.

850.     Mas failed to do so, because he never actually served as a legitimate medical director at Westchester Medical in the first instance.

**(iii)   The Fraudulent Charges for Physical Therapy at Westchester Medical**

851.     In addition to the fraudulent initial examinations and follow-up examinations, the Westchester Medical Defendants virtually always purported to subject each of the Insureds in the

claims identified in Exhibit "4" to between two and four months of medically unnecessary physical therapy.

852.    As set forth above, though Mas falsely purported to personally perform or directly supervise virtually all of the physical therapy services in the claims identified in Exhibit "4", the physical therapy services actually were performed without supervision by Morales or other massage therapists associated with Westchester Medical, to the extent that they were even provided at all.

853.    As set forth in Exhibit "4", the Westchester Medical Defendants then billed the purported physical therapy services to GEICO under:

(i)     CPT code 97010 for putative hot/cold pack treatments, resulting in a charge of $15.00 for each round of hot/cold pack treatments they purported to provide;

(ii)    CPT code 97012, for putative traction mechanical therapy, resulting in a charge of $33.75 for each round of traction mechanical therapy they purported to provide;

(iii)   CPT code 97018, for putative paraffin bath therapy, resulting in a charge of $47.60 for each round of paraffin bath therapy they purported to provide;

(iv)    CPT code 97026, for putative infrared therapy, resulting in a charge of $13.50 for each round of infrared therapy they purported to provide;

(v)     CPT code 97032 for putative electric stimulation treatments, resulting in a charge between $40.50 and $81.00 for each round of electric stimulation treatments they purported to provide;

(vi)    CPT code 97035, for putative ultrasound, resulting in a charge of $26.50 for each round of ultrasound they purported to provide;

(vii)   CPT code 97110, for putative therapeutic exercises, resulting in a charge of $68.40 for each round of therapeutic exercises they purported to provide;

(viii)  CPT code 97140, for manual therapy, resulting in a charge of $62.20 for each round of manual therapy they purported to provide; and

(ix)    CPT code 97535, for putative "self-care training", resulting in a charges between $74.30 and $80.00 each round of therapeutic activity therapy they purported to provide.

854.    In the claims for physical therapy services identified in Exhibit "4", the charges for the physical therapy services were fraudulent in that they misrepresented Westchester Medical's eligibility to collect PIP Benefits in the first instance.

855.    In fact, and as set forth above, Westchester Medical never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act.

856.    What is more, and as set forth above, in the claims for physical therapy services identified in Exhibit "4", the Westchester Medical Defendants falsely represented that the physical therapy services lawfully had been performed or directly supervised by Mas, when in fact they were unlawfully performed without supervision by Morales or other massage therapists associated with Westchester Medical, who are not and never have been licensed as physical therapists.

857.    As set forth above, in order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

858.    Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

859.    In each of the claims for physical therapy services identified in Exhibit "4", the Westchester Medical Defendants falsely represented that the services were lawfully provided and eligible for PIP reimbursement.

860.    In fact, in the claims for physical therapy services identified in Exhibit "4", the services were not lawfully provided, inasmuch as: (i) the putative physical therapy services were

performed – to the extent that they were performed at all – by Morales or other unsupervised massage therapists associated with Westchester Medical, who were individuals who were not licensed to practice physical therapy; and (ii) the Westchester Medical Defendants deliberately misrepresented the identities of the individuals who purported to perform the physical therapy services in their billing for the physical therapy services, in a calculated attempt to induce GEICO to pay the unreimbursable charges.

## III.    The Fraudulent Claims the Defendants Submitted or Caused to be Submitted to GEICO

861.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of HCFA-1500 forms and treatment reports through the Clinic Defendants to GEICO, containing thousands of individual charges, seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

862.    The claims that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following, material respects:

863.    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Clinic Defendants were in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance. In fact, the Clinic Defendants never were in compliance with the Clinic Act, and never were eligible to collect PIP Benefits, because they were operated without legitimate medical directors who legitimately fulfilled the statutory requirements applicable to clinic medical directors.

864.    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement. In fact, the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement, because: (a) they were

medically unnecessary and provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (b) in the case of the physical therapy services, because they were provided by unsupervised massage therapists, physical therapist assistants, and/or physicians' assistants in contravention of Florida law; and (c) in the case of the examinations at E-Z Medical, because they were provided by an unsupervised physician assistant.

865.    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

866.    The HCFA-1500 forms and treatment reports submitted by and on behalf of the Defendants frequently misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

IV.    **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

867.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO.

868.   To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants have systemically concealed their fraud and have gone to great lengths to accomplish this concealment.

869.   For instance, the Defendants knowingly misrepresented and concealed facts related to the Clinic Defendants in an effort to prevent discovery that the Clinic Defendants lacked legitimate medical directors, and therefore were ineligible to collect PIP Benefits in the first instance.

870.   What is more, the Defendants knowingly misrepresented and concealed facts related to the Fraudulent Services in an effort to prevent discovery that the Fraudulent Services were being provided – to the extent that they were provided at all – by unsupervised massage therapists, physical therapist assistants, and physicians assistants in contravention of Florida law.

871.   Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent pre-determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to them.

872.   Moreover, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently never were performed in the first instance.

873.   The Defendants have hired law firms to pursue collection of the fraudulent charges for the Fraudulent Services from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.

874.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $1,275,000.00.

875.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
**Against E-Z Medical, Davila Medical, Baracusa Health, and Westchester Medical**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

876.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-875 above.

877.    There is an actual case in controversy between GEICO and the Clinic Defendants regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

878.    The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because they unlawfully were operated in violation of the Clinic Act's medical director and operating requirements.

879.    The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided.

880.    The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined

fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

881.    The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

882.    The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

883.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that E-Z Medical, Davila Medical, Baracusa Health, and Westchester Medical have no right to receive payment for any pending bills submitted to GEICO.

**SECOND CAUSE OF ACTION**
**Against Diaz-Pairol and Mas**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

884.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-72, 119-190, 322-456, and 861-875, above.

885.    E-Z Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

886.    Diaz-Pairol and Mas knowingly have conducted and/or participated, directly or indirectly, in the conduct of E-Z Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent

charges on a continuous basis for over four years seeking payments that E-Z Medical was not eligible to receive under the No-Fault Law because: (i) E-Z Medical unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the E-Z Medical Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

887.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

888.    E-Z Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Diaz-Pairol and Mas operated E-Z Medical, inasmuch as E-Z Medical was not engaged in a legitimate healthcare practice, and acts of mail fraud therefore were essential in order for E-Z Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the E-Z Medical Defendants continue to attempt collection on the fraudulent billing submitted through E-Z Medical to the present day.

889. E-Z Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by E-Z Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

890. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $401,000.00 pursuant to the fraudulent bills submitted through the E-Z Medical enterprise.

891. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION
### Against Diaz-Pairol, Mas, R. Hernandez, Fernandez, and Y. Rodriguez
### (Violation of RICO, 18 U.S.C. § 1962(d))

892. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-72, 119-190, 322-456, and 861-875, above.

893. E-Z Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

894. Diaz-Pairol, Mas, R. Hernandez, Fernandez, and Y. Rodriguez are or were employed by or associated with the E-Z Medical enterprise.

895. Diaz-Pairol, Mas, R. Hernandez, Fernandez, and Y. Rodriguez knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of E-Z Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous

basis for over four years seeking payments that E-Z Medical was not eligible to receive under the No-Fault Law because: (i) E-Z Medical unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the E-Z Medical Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

896.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

897.    Diaz-Pairol, Mas, R. Hernandez, Fernandez, and Y. Rodriguez knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

898.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $401,000.00 pursuant to the fraudulent bills submitted through the E-Z Medical enterprise.

899.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
**Against the E-Z Medical Defendants**
**(Under Fla. Stat. 501.201 <u>et</u>. <u>seq</u>.)**

900.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-72, 119-190, 322-456, and 861-875, above.

901.    The E-Z Medical Defendants are actively engaged in trade and commerce in the State of Florida.

902.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

903.    The E-Z Medical Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

904.    The bills and supporting documents submitted or caused to be submitted by the E-Z Medical Defendants to GEICO were fraudulent in that they misrepresented: (i) E-Z Medical's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

905.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the E-Z Medical Defendants has been materially injurious to GEICO and its Insureds.

906.    The conduct of the E-Z Medical Defendants was the actual and proximate cause of the damages sustained by GEICO.

907.    The E-Z Medical Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $401,000.00

908.    By reason of the E-Z Medical Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## FIFTH CAUSE OF ACTION
### Against Diaz-Pairol, Mas, R. Hernandez, Fernandez, and Y. Rodriguez
### (Under Fla. Stat. 772.103 et. seq.)

909.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-72, 119-190, 322-456, and 861-875, above.

910.    In furtherance of the fraudulent scheme, Diaz-Pairol, Mas, R. Hernandez, Fernandez, and Y. Rodriguez submitted or caused to be submitted thousands of fraudulent charges through the E-Z Medical enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

911.    When the billing was submitted, Diaz-Pairol, Mas, R. Hernandez, Fernandez, and Y. Rodriguez knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) E-Z Medical unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided, and therefore were not eligible for PIP reimbursement in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the E-Z Medical Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance;

and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

912.    These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

913.    This pattern of criminal activity resulted in Diaz-Pairol, Mas, R. Hernandez, Fernandez, and Y. Rodriguez receiving more than $401,000.00 in PIP Benefits to which they were not entitled.

914.    Diaz-Pairol, Mas, R. Hernandez, Fernandez, and Y. Rodriguez's pattern of criminal activity has caused GEICO to sustain damages of at least $401,000.00.

915.    By reason of Diaz-Pairol, Mas, R. Hernandez, Fernandez, and Y. Rodriguez's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

## SIXTH CAUSE OF ACTION
### Against the E-Z Medical Defendants
### (Common Law Fraud)

916.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-72, 119-190, 322-456, and 861-875, above.

917.    The E-Z Medical Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through E-Z Medical for the Fraudulent Services.

918.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that E-Z Medical was in

compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact E-Z Medical never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

919.    The E-Z Medical Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through E-Z Medical that were not reimbursable.

920.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $401,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the E-Z Medical Defendants through E-Z Medical.

921.    The E-Z Medical Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

922.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SEVENTH CAUSE OF ACTION
### Against the E-Z Medical Defendants
### (Unjust Enrichment)

923.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-72, 119-190, 322-456, and 861-875, above.

924.    As set forth above, the E-Z Medical Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

925.    When GEICO paid the bills and charges submitted or caused to be submitted by the E-Z Medical Defendants through E-Z Medical, it reasonably believed that it was legally obligated to make such payments based on the E-Z Medical Defendants' improper, unlawful, and/or unjust acts.

926.    The E-Z Medical Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the E-Z Medical Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

927.    The E-Z Medical Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

928.    By reason of the above, the E-Z Medical Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $401,000.00

## EIGHTH CAUSE OF ACTION
### Against Davila and Mas
### (Violation of RICO, 18 U.S.C. § 1962(c))

929.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-53, 73-87, 119, 191-231, 322-328, 457-585, and 861-875, above.

930.    Davila Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

931.    Davila and Mas knowingly have conducted and/or participated, directly or indirectly, in the conduct of Davila Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Davila Medical was not eligible to receive under the No-Fault Law because: (i) Davila Medical unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Davila Medical Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

932.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

933.    Davila Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Davila and Mas operated Davila Medical, inasmuch as Davila

Medical was not engaged in a legitimate healthcare practice, and acts of mail fraud therefore were essential in order for Davila Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Davila Medical Defendants continue to attempt collection on the fraudulent billing submitted through Davila Medical to the present day.

934.    Davila Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Davila Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

935.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $600,000.00 pursuant to the fraudulent bills submitted through the Davila Medical enterprise.

936.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
**Against Davila, Mas, D. Diaz, Vital, and Pajon**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

937.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-53, 73-87, 119, 191-231, 322-328, 457-585, and 861-875, above.

938.    Davila Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

939.    Davila, Mas, D. Diaz, Vital, and Pajon are employed by or associated with the Davila Medical enterprise.

940.    Davila, Mas, D. Diaz, Vital, and Pajon knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Davila Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Davila Medical was not eligible to receive under the No-Fault Law because: (i) Davila Medical unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Davila Medical Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

941.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

942.     Davila, Mas, D. Diaz, Vital, Pajon knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

943.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $600,000.00 pursuant to the fraudulent bills submitted through the Davila Medical enterprise.

944.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**TENTH CAUSE OF ACTION**
**Against the Davila Medical Defendants**
**(Under Fla. Stat. 501.201 et. seq.)**

945.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-53, 73-87, 119, 191-231, 322-328, 457-585, and 861-875, above.

946.     The Davila Medical Defendants are actively engaged in trade and commerce in the State of Florida.

947.     GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

948.     The Davila Medical Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

949.     The bills and supporting documents submitted or caused to be submitted by the Davila Medical Defendants to GEICO were fraudulent in that they misrepresented: (i) Davila Medical's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services

were lawfully provided; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

950.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the Davila Medical Defendants has been materially injurious to GEICO and its Insureds.

951.    The conduct of the Davila Medical Defendants was the actual and proximate cause of the damages sustained by GEICO.

952.    The Davila Medical Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $600,000.00.

953.    By reason of the Davila Medical Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## ELEVENTH CAUSE OF ACTION
### Against Davila, Mas, D. Diaz, Vital, and Pajon
### (Under Fla. Stat. 772.103 et. seq.)

954.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-53, 73-87, 119, 191-231, 322-328, 457-585, and 861-875, above.

955.    In furtherance of the fraudulent scheme, Davila, Mas, D. Diaz, Vital, and Pajon submitted or caused to be submitted thousands of fraudulent charges through the Davila Medical enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

956.    When the billing was submitted, Davila, D. Diaz, Vital, and Pajon knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Davila Medical unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not

eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided, and therefore were not eligible for PIP reimbursement in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Davila Medical Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

957.    These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

958.    This pattern of criminal activity resulted in Davila, Mas, D. Diaz, Vital, and Pajon receiving more than $600,000.00 in PIP Benefits to which they were not entitled.

959.    Davila, Mas, D. Diaz, Vital, and Pajon's pattern of criminal activity has caused GEICO to sustain damages of at least $600,000.00.

960.    By reason of Davila, Mas, D. Diaz, Vital, and Pajon's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

## TWELFTH CAUSE OF ACTION
### Against the Davila Medical Defendants
### (Common Law Fraud)

961.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-53, 73-87, 119, 191-231, 322-328, 457-585, and 861-875, above.

962.    The Davila Medical Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Davila Medical for the Fraudulent Services.

963.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Davila Medical was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Davila Medical never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

964.    The Davila Medical Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Davila Medical that were not reimbursable.

965.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $600,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Davila Medical Defendants through Davila Medical.

966. The Davila Medical Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

967. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**THIRTEENTH CAUSE OF ACTION**
**Against the Davila Medical Defendants**
**(Unjust Enrichment)**

968. GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-53, 73-87, 119, 191-231, 322-328, 457-585, and 861-875, above.

969. As set forth above, the Davila Medical Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

970. When GEICO paid the bills and charges submitted or caused to be submitted by the Davila Medical Defendants through Davila Medical, it reasonably believed that it was legally obligated to make such payments based on the Davila Medical Defendants' improper, unlawful, and/or unjust acts.

971. The Davila Medical Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Davila Medical Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

972. The Davila Medical Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

973. By reason of the above, the Davila Medical Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $600,000.00.

## FOURTEENTH CAUSE OF ACTION
### Against Corrales and Mas
### (Violation of RICO, 18 U.S.C. § 1962(c))

974.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-53, 88-103, 119, 232-276, 322-328, 586-714, and 861-875, above.

975.    Baracusa Health is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

976.    Corrales and Mas knowingly have conducted and/or participated, directly or indirectly, in the conduct of Baracusa Health's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over one and a half years seeking payments that Baracusa Health was not eligible to receive under the No-Fault Law because: (i) Baracusa Health unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Baracusa Health Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

977. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

978. Baracusa Health's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Corrales and Mas operated Baracusa Health, inasmuch as Baracusa Health was not engaged in a legitimate healthcare practice, and acts of mail fraud therefore were essential in order for Baracusa Health to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Baracusa Health Defendants continue to attempt collection on the fraudulent billing submitted through Baracusa Health to the present day.

979. Baracusa Health is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Baracusa Health in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

980. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $45,000.00 pursuant to the fraudulent bills submitted through the Baracusa Health enterprise.

981. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION
### Against Corrales, Mas, and Romero
### (Violation of RICO, 18 U.S.C. § 1962(d))

982.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-53, 88-103, 119, 232-276, 322-328, 586-714, and 861-875, above.

983.    Baracusa Health is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

984.    Corrales, Mas, and Romero are employed by or associated with the Baracusa Health enterprise.

985.    Corrales, Mas, and Romero knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Baracusa Health's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over one and a half years seeking payments that Baracusa Health was not eligible to receive under the No-Fault Law because: (i) Baracusa Health unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Baracusa Health Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

986.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

987.    Corrales, Mas, and Romero knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

988.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $45,000.00 pursuant to the fraudulent bills submitted through the Baracusa Health enterprise.

989.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## SIXTEENTH CAUSE OF ACTION
### Against the Baracusa Health Defendants
### (Under Fla. Stat. 501.201 et. seq.)

990.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-53, 88-103, 119, 232-276, 322-328, 586-714, and 861-875, above.

991.    The Baracusa Health Defendants are actively engaged in trade and commerce in the State of Florida.

992.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

993.    The Baracusa Health Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

994.    The bills and supporting documents submitted or caused to be submitted by the Baracusa Health Defendants to GEICO were fraudulent in that they misrepresented: (i) Baracusa Health's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

995.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the Baracusa Health Defendants has been materially injurious to GEICO and its Insureds.

996.    The conduct of the Baracusa Health Defendants was the actual and proximate cause of the damages sustained by GEICO.

997.    The Baracusa Health Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $45,000.00.

998.    By reason of the Baracusa Health Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## SEVENTEENTH CAUSE OF ACTION
### Against Corrales, Mas, and Romero
### (Under Fla. Stat. 772.103 et. seq.)

999.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-53, 88-103, 119, 232-276, 322-328, 586-714, and 861-875, above.

1000.   In furtherance of the fraudulent scheme, Corrales, Mas, and Romero submitted or caused to be submitted hundreds of fraudulent charges through the Baracusa Health enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

1001.   When the billing was submitted, Corrales, Mas, and Romero knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Baracusa Health unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided, and therefore were not eligible for PIP reimbursement in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Baracusa Health Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1002.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1003.   This pattern of criminal activity resulted in Corrales, Mas, and Romero receiving more than $45,000.00 in PIP Benefits to which they were not entitled.

1004.   Corrales, Mas, and Romero's pattern of criminal activity has caused GEICO to sustain damages of at least $45,000.00.

1005.   By reason of Corrales, Mas, and Romero's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

## EIGHTEENTH CAUSE OF ACTION
### Against the Baracusa Health Defendants
### (Common Law Fraud)

1006.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-53, 88-103, 119, 232-276, 322-328, 586-714, and 861-875, above.

1007.   The Baracusa Health Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, hundreds of fraudulent charges through Baracusa Health for the Fraudulent Services.

1008.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Baracusa Health was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Baracusa Health never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

1009.   The Baracusa Health Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Baracusa Health that were not reimbursable.

1010.  GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $45,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Baracusa Health Defendants through Baracusa Health.

1011.  The Baracusa Health Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

1012.  Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**NINETEENTH CAUSE OF ACTION**
**Against the Baracusa Health Defendants**
**(Unjust Enrichment)**

1013.  GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-53, 88-103, 119, 232-276, 322-328, 586-714, and 861-875, above.

1014.  As set forth above, the Baracusa Health Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

1015.  When GEICO paid the bills and charges submitted or caused to be submitted by the Baracusa Health Defendants through Baracusa Health, it reasonably believed that it was legally obligated to make such payments based on the Baracusa Health Defendants' improper, unlawful, and/or unjust acts.

1016.   The Baracusa Health Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Baracusa Health Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

1017.   The Baracusa Health Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

1018.   By reason of the above, the Baracusa Health Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $45,000.00.

1019.   Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### TWENTIETH CAUSE OF ACTION
**Against Morales and Mas**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

1020.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-53, 104-119, 277-328, and 718-875, above.

1021.   Westchester Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

1022.   Morales and Mas knowingly have conducted and/or participated, directly or indirectly, in the conduct of Westchester Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Westchester Medical was not eligible to receive under the No-Fault Law because: (i) Westchester Medical unlawfully was operated in violation of the Clinic Act's medical director and licensing

280

requirements; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Westchester Medical Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1023.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

1024.    Westchester Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Morales and Mas operated Westchester Medical, inasmuch as Westchester Medical was not engaged in a legitimate healthcare practice, and acts of mail fraud therefore were essential in order for Westchester Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Westchester Medical Defendants continue to attempt collection on the fraudulent billing submitted through Westchester Medical to the present day.

1025.    Westchester Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Westchester Medical in pursuit of

inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

1026.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $230,000.00 pursuant to the fraudulent bills submitted through the Westchester Medical enterprise.

1027.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**TWENTY-FIRST CAUSE OF ACTION**
**Against Morales and Mas**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

1028.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-53, 104-119, 277-328, and 718-875, above.

1029.   Westchester Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

1030.   Morales and Mas are employed by or associated with the Westchester Medical enterprise.

1031.   Morales and Mas knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Westchester Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Westchester Medical was not eligible to receive under the No-Fault Law because: (i) Westchester Medical unlawfully was operated in violation of the Clinic Act's medical director

and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Westchester Medical Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1032.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

1033.   Morales and Mas knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

1034.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $230,000.00 pursuant to the fraudulent bills submitted through the Westchester Medical enterprise.

1035.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-SECOND CAUSE OF ACTION
### Against the Westchester Medical Defendants
### (Under Fla. Stat. 501.201 et. seq.)

1036.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-53, 104-119, 277-328, and 718-875, above.

1037.   The Westchester Medical Defendants are actively engaged in trade and commerce in the State of Florida.

1038.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

1039.   The Westchester Medical Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

1040.   The bills and supporting documents submitted or caused to be submitted by the Westchester Medical Defendants to GEICO were fraudulent in that they misrepresented: (i) Westchester Medical's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

1041.   Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the Westchester Medical Defendants has been materially injurious to GEICO and its Insureds.

1042.   The conduct of the Westchester Medical Defendants was the actual and proximate cause of the damages sustained by GEICO.

1043.   The Westchester Medical Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $230,000.00.

1044.  By reason of the Westchester Medical Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## TWENTY-THIRD CAUSE OF ACTION
### Against Morales and Mas
### (Under Fla. Stat. 772.103 et. seq.)

1045.  GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-53, 104-119, 277-328, and 718-875, above.

1046.  In furtherance of the fraudulent scheme, Morales and Mas submitted or caused to be submitted thousands of fraudulent charges through the Westchester Medical enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

1047.  When the billing was submitted, Morales and Mas knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Westchester Medical unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided, and therefore were not eligible for PIP reimbursement in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Westchester Medical Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1048.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1049.   This pattern of criminal activity resulted in Morales and Mas receiving more than $230,000.00 in PIP Benefits to which they were not entitled.

1050.   Morales and Mas's pattern of criminal activity has caused GEICO to sustain damages of at least $230,000.00.

1051.   By reason of Morales and Mas's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

### TWENTY-FOURTH CAUSE OF ACTION
**Against the Westchester Medical Defendants**
**(Common Law Fraud)**

1052.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-53, 104-119, 277-328, and 718-875, above.

1053.   The Westchester Medical Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Westchester Medical for the Fraudulent Services.

1054.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Westchester Medical was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Westchester Medical never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP

reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

1055.  The Westchester Medical Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Westchester Medical that were not reimbursable.

1056.  GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $230,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Westchester Medical Defendants through Westchester Medical.

1057.  The Westchester Medical Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

1058.  Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

<u>**TWENTY-FIFTH CAUSE OF ACTION**</u>
**Against the Westchester Medical Defendants**
**(Unjust Enrichment)**

1059.  GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-53, 104-119, 277-328, and 718-875, above.

287

1060.  As set forth above, the Westchester Medical Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

1061.  When GEICO paid the bills and charges submitted or caused to be submitted by the Westchester Medical Defendants through Westchester Medical, it reasonably believed that it was legally obligated to make such payments based on the Westchester Medical Defendants' improper, unlawful, and/or unjust acts.

1062.  The Westchester Medical Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Westchester Medical Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

1063.  The Westchester Medical Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

1064.  By reason of the above, the Westchester Medical Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $230,000.00.

## **JURY DEMAND**

1065.  Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.      On the First Cause of Action against E-Z Medical, Davila Medical, Baracusa Health, and Westchester Medical, for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that E-Z Medical, Davila Medical, Baracusa Health, and Westchester Medical have no right to receive payment for any pending bills submitted to GEICO;

B.      On the Second Cause of Action against Diaz-Pairol and Mas, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $401,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Diaz-Pairol, Mas, R. Hernandez, Fernandez, and Y. Rodriguez, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $401,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against E-Z Medical, Diaz-Pairol, Mas, R. Hernandez, Fernandez, and Y. Rodriguez, compensatory damages in an amount to be determined at trial but in excess of $401,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

E.      On the Fifth Cause of Action against Diaz-Pairol, Mas, R. Hernandez, Fernandez, and Y. Rodriguez, compensatory damages in an amount to be determined at trial but in excess of $401,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

F.      On the Sixth Cause of Action against E-Z Medical, Diaz-Pairol, Mas, R. Hernandez, Fernandez, and Y. Rodriguez, compensatory damages in an amount to be determined at trial but in excess of $401,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against E-Z Medical, Diaz-Pairol, Mas, R. Hernandez, Fernandez, and Y. Rodriguez, more than $401,000.00  in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

H.      On the Eighth Cause of Action against Davila and Mas, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $600,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Ninth Cause of Action against Davila, Mas, D. Diaz, Vital, and Pajon, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $600,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

J.      On the Tenth Cause of Action against Davila Medical, Davila, Mas, D. Diaz, Vital, and Pajon, compensatory damages in an amount to be determined at trial but in excess of $600,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

K.      On the Eleventh Cause of Action against Davila, Mas, D. Diaz, Vital, and Pajon, compensatory damages in an amount to be determined at trial but in excess of $600,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

L.      On the Twelfth Cause of Action against Davila Medical, Davila, Mas, D. Diaz, Vital, and Pajon, compensatory damages in an amount to be determined at trial but in excess of $600,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against Davila Medical, Davila, Mas, D. Diaz, Vital, and Pajon, more than $600,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

290

N.      On the Fourteenth Cause of Action against Corrales and Mas, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $45,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

O.      On the Fifteenth Cause of Action against Corrales, Mas, and Romero, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $45,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

P.      On the Sixteenth Cause of Action against Baracusa Health, Corrales, Mas, and Romero, compensatory damages in an amount to be determined at trial but in excess of $45,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

Q.      On the Seventeenth Cause of Action against Corrales, Mas, and Romero, compensatory damages in an amount to be determined at trial but in excess of $45,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

R.      On the Eighteenth Cause of Action against Baracusa Health, Corrales, Mas, and Romero, compensatory damages in an amount to be determined at trial but in excess of $45,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

S.      On the Nineteenth Cause of Action against Baracusa Health, Corrales, Mas, and Romero,  more than $45,000.00  in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

T.      On the Twentieth Cause of Action against Morales and Mas, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $230,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

U.      On the Twenty-First Cause of Action against Morales and Mas, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $230,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

V.      On the Twenty-Second Cause of Action against Westchester Medical, Morales and Mas, compensatory damages in an amount to be determined at trial but in excess of $230,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

W.      On the Twenty-Third Cause of Action against Morales and Mas, compensatory damages in an amount to be determined at trial but in excess of $230,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

X.      On the Twenty-Fourth Cause of Action against Westchester Medical, Morales and Mas, compensatory damages in an amount to be determined at trial but in excess of $230,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Y.      On the Twenty-Fifth Cause of Action against Westchester Medical, Morales and Mas, more than $230,000.00  in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

Dated:        March 28, 2019

*/s/ John P. Marino*
John P. Marino (FBN 814539)
Lindsey R. Trowell (FBN 678783)
Kristen Wenger (FBN 92136)
SMITH, GAMBRELL & RUSSELL, LLP
50 North Laura Street, Suite 2600
Jacksonville, Florida 32202
Phone:  (904) 598-6100
Facsimile:  (904) 598-6204
ltrowell@sgrlaw.com
jmarino@sgrlaw.com
kwenger@sgrlaw.com

Christina Bezas (pro hac vice pending)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11550
Phone:  (516) 357-3000
Facsimile:  (516) 357-3333
christina.bezas@rivkin.com

*Attorneys for Plaintiffs*
